**E-FILED**
Thursday, 14 April, 2005  11:43:13 AM
Clerk, U.S. District Court, ILCD

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
URBANA DIVISION

| | | |
|---|---|---|
| RANDALL J. SANDONE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | No.  04-2232 |
| | ) | |
| ABN AMRO HOLDING N.V., Amsterdam, a | ) | The Honorable Judge Harold A. |
| Dutch corporation; ABN AMRO BANK | ) | Baker |
| N.V., Amsterdam, a Dutch corporation; and | ) | |
| ABN AMRO VENTURES B.V., Amsterdam, | ) | |
| a Dutch corporation, | | |
| | | |
| Defendants. | | |

### PLAINTIFF'S RESPONSE TO DEFENDANTS' MEMORANDUM IN SUPPORT OF THEIR MOTION TO DISMISS THE AMENDED COMPLAINT

Defendants (collectively referred to as "ABN AMRO"), have moved to dismiss on the following grounds:

1.  That this Court lacks personal jurisdiction over Defendants, because:

    a)  No "summary" of the Amended Complaint was provided to Defendants in Amsterdam; and

    b)  The Amended Complaint allegedly fails to comply with Illinois' Long Arm Statute because (i) the Amended Complaint commingles the activities of the Defendants, and (ii) Defendants have insufficient Illinois contacts.

2.  That Plaintiff lacks standing[1] to bring this claim, because the claim is derivative in nature and can only be brought by the bankruptcy trustee for Argus Systems Group, Inc. ("Argus").

---

[1] The Northern District of Illinois has recently observed that the Seventh Circuit regards as a "misnomer" the labeling of the question presented as one of "standing," as Defendants have done herein.  Rather, the inquiry to be made is whether the action is prosecuted in the name of the real party in interest. *Goodman v. Phoenix Container, Inc.*, 271 B.R. 821, 839 (fn. 5) (N.D. Ill. 2001).  Accordingly, this memorandum will approach that issue hereafter in compliance with the Seventh Circuit's approach.

3.      That the Amended Complaint does not state a claim upon which relief can be granted, because Plaintiff's *respondeat superior* theory is too broad.

Clearly, the threshold issue raised by Defendants is that of this Court's jurisdiction.  Were this Court to lack jurisdiction over these Defendants, the remaining arguments made by Defendants in their memorandum would be premature, and not ripe for this Court's consideration.  Accordingly, this response will address the threshold issue of jurisdiction first, then move on to the issues of standing and *respondeat superior*.

## ARGUMENT

**1.      This Court has personal jurisdiction over the Defendants.**

The first question is whether these Defendants are properly before this Court. Defendants challenge this Court's jurisdiction on two grounds:  (a) that there was no "summary" enclosed with the served documents, and (b) that Defendants' Illinois activities do not support jurisdiction, because the Amended Complaint's commingled Defendants' activities and Defendants are not currently active in Illinois.

A.      Service on Defendants has been effected.

Although Defendants' Illinois counsel have appeared in a companion action, *Sandone v. Walz*, No. 02-L-0272 (filed November 27, 2002, in the Circuit Court of the Sixth Judicial Circuit in Champaign County, Illinois), on behalf of Defendants' employee Keith Walz (whose conduct in the course and scope of his employment with ABN AMRO gave rise to the instant litigation), Defendants' counsel have refused to accept service on behalf of these three overseas corporate Defendants.  Accordingly, Plaintiff

has of necessity followed the cumbersome Hague Convention procedures in serving the

Defendants in Amsterdam.  *See* Fed R. Civ. P. 4(f)(1), 4(h)(2).

Attached hereto and marked as Exhibit 1 is an affidavit that sets forth the steps

that have been taken by Plaintiff, through his counsel, to effect service on Defendants in

Amsterdam.  Defendants do not dispute that they are in receipt of the Amended

Complaint and summonses, or that they have conferred with their counsel in relation

thereto in crafting a defensive strategy.  *See, e.g.,* Defendants' Exhibit A (purported

affidavit dated March 16, 2005, of one "Carly Lemans") attached to their memorandum,

which is a judicial admission by Defendants in paragraphs 7 and 8 thereof that they were

served with the Amended Complaint and summonses.  Further, the return of service

documents from the Public Prosecutor's office in Holland, which office effected service

on the Defendants in Amsterdam, were received by Plaintiff's counsel on March 11,

2005, and promptly filed in this Court.  *See* Exhibit 1 attached hereto.  Moreover,

Plaintiff went beyond the Hague requirements, as a courtesy to Defendants and at

Plaintiff's expense, by attending to a translation of the Amended Complaint from English

to Dutch and forwarding the translated version to Holland.  *See* attached Exhibit 1.

Despite their acknowledged receipt of the Amended Complaint and summonses,

Defendants argue (at p. 12 of their memorandum) that overseas service has failed because

"[t]he summonses delivered to the Defendants in Amsterdam did not include a summary

of the Amended Complaint."  Initially, Plaintiff draws to the Court's attention that a

"summary" was in fact sent to Holland with the package of materials for service on

Defendants.  *See* attached Exhibit 1.  In any event, Defendants offer no authority for this

alleged aspect of overseas service as a basis for jurisdictional challenge, and their half-

hearted technical argument should be rejected.  Clearly a "summary" would not shed any additional light on the contents of the Amended Complaint for these sophisticated corporate Defendants.  They and their counsel have the Amended Complaint and the Exhibits in full.  Even if there were any error or omission in this instance, it was harmless, as Defendants' feckless challenge implicitly admits.

Plaintiff notes that the Lemans affidavit (Defendants' Exhibit A) was not executed in the appropriate manner required of an affidavit under applicable U.S. law. Further, the affidavit does not identify the address or age of the purported affiant, or where the affidavit was allegedly executed, or before whom it was allegedly sworn.  It should be stricken on that basis alone.

But even if the Lemans affidavit (Defendants' Exhibit A) were properly-executed, it does not support Defendant's jurisdictional challenge.  Lemans complains that there was no "summary" among the documents that she "received."  But Lemans admits her "understanding" that "the Sandone envelopes were delivered [by the Public Prosecutor in Amsterdam] to Mr. A. van Vliet," who works in ABN AMRO's head office mailroom at the "Gustav Mahlerlaan."  It is not clear from the Lemans affidavit if "Gustav Mahlerlaan" is the location of Lemans' office, or how the documents were channeled from Mr. Van Vliet to Lemans.  She states only that the documents were "delivered to me through internal channels."  Such a porous chain of custody does not give rise to Lemans' conclusory assertions as to the contents or condition of the "Sandone envelopes" as received by her.  The proper affiant should have been Van Vliet, not Lemans, as Van Vliet was the ABN AMRO employee in Holland who received the served documents from the Public Prosecutor.

In this lacuna, the record as to service is established via the documentation referred to in Plaintiff's attached Exhibit 1, affidavit of Kristen Conley.   Defendants were properly served, and they acknowledge that they are in possession of the Amended Complaint and summonses.

B.    <u>Defendants' Illinois activities support this Court's jurisdiction</u>.

In support of their "Long Arm" arguments, Defendants once again rely on the Lemans affidavit (Defendants' Exhibit A).  But even if the Lemans affidavit met the minimal legal requirements, which it does not, it is conclusory in nature and should be disregarded for that reason as well.  For example, in paragraph 4 thereof Lemans offers her legal conclusion that ABN AMRO Holding "<u>does not </u>do business in the State of Illinois."  Likewise, in paragraph 4 of her affidavit, Lemans states that "ABN AMRO Ventures does not <u>currently</u> do any business in the State of Illinois" (emphasis added).  Defendants are silent as to the Illinois activities of the third Defendant, ABN AMROBank.

Clearly the proper jurisdictional focus is not on ABN AMRO's activities in March of 2005, but rather on Defendants' activities at the relevant times as per the Amended Complaint.  It does no good for any Defendant to say to a Court that he was active in Illinois at the time of (say) a car crash, but has since moved overseas.  Defendants' invocation of "currency" smacks of a judicial admission that Defendants were in fact doing business in Illinois at the relevant times, but now seek to play hide-and-seek in Holland.  Clarification as to Defendants' Illinois activities will come by way of deposition and other discovery in due course.

For present purposes, the Amended Complaint properly alleges (in paragraph 7) that the three ABN AMRO Defendants were "doing business in the State of Illinois, including but not limited to engaging in financial transactions including acquisitions and lending in the State of Illinois and elsewhere in the United States." Paragraph 8 alleges that the three ABN AMRO Defendants forced Argus into bankruptcy in Illinois. Paragraph 3 alleges that "a substantial part of the events or omissions giving rise to the claim" occurred in Illinois. Paragraph 18 alleges that Keith Walz was acting within the course and scope of his employment with Defendants when he committed the ten enumerated breaches – each of which took place in Illinois. *See* attached Exhibit 2, transcript of Walz's deposition of July 27, 2004.

The jurisdictional impact of Defendants' Illinois activities is to be determined by this Court in the light of the statutory language of 735 ILCS 5/2-209 and applicable Illinois case law (including, of course, the common law developed by federal courts sitting in diversity in Illinois). Such a determination cannot be made on the basis of Defendants' improperly-executed and self-serving affidavit.

Defendants further complain that the Amended Complaint "lumps together" or "aggregates" the activities of the three ABN AMRO Defendants. In this regard, Plaintiff has done nothing more than ABN AMRO's employee Keith Walz did in making numerous admissions at his deposition on July 27, 2004; Plaintiff has properly relied on Walz's sworn testimony in framing the terms of the Amended Complaint. *See* attached Exhibit 2, transcript of Walz's deposition. In Section 3 of this memorandum, *infra*, Plaintiff has excerpted twenty-eight portions of the Walz deposition wherein he designates his employer as "ABN AMRO," commingling the ABN AMRO family of

companies without distinction.  The conduct of Walz, as set forth in Exhibit 2 and

summarized below, is the basis for this litigation in that Walz admittedly performed his

tortious actions within the course and scope of his employment by ABN AMRO, and at

ABN AMRO's specific direction.  *See* attached Exhibit 2.

Moreover, Defendants' complaint that Plaintiff has not "established" the scope of

Defendants' activities is misplaced.  All that is under consideration at this stage of the

proceedings is the Amended Complaint.  Plaintiff does not have to "establish"

Defendants' activities at this stage – all he has to do is to properly allege them.  This he

has done, in paragraphs 3, 8 and 18, as discussed *supra*.

If depositions and other discovery were to establish that the allegations in the

Lemans affidavit (Defendants' Exhibit A) are correct, and that the activities of the three

corporate Defendants are to measured separately despite their admitted corporate

affiliation, Plaintiff will of course seek leave to amend his Complaint so as to incorporate

appropriate conspiracy allegations against the Defendants as thus interrelated.  This is

particularly so in that the Lemans affidavit, in paragraph 6 thereof, states that Walz is

"managing director of ABN AMRO Private Equity," which is "a business unit of ABN

AMRO Bank [and] not a business unit of ABN AMRO Ventures."  Defendants have

thereby conceded, wittingly or unwittingly, that ABN AMRO Bank was doing business

in Illinois at the relevant times.  The precise machinations of the full ABN AMRO family

of companies will be revealed by way of discovery and depositions.


**2.     This lawsuit is not derivative in nature, as asserted by Defendants.**

Defendants argue that this lawsuit is not an action by Plaintiff and others similarly

situated sounding in tort, notwithstanding the express terms of the Amended Complaint; rather, Defendants argue, this is a "derivative" suit that can brought, if at all, by Argus's bankruptcy trustee on behalf of the corporation and its shareholders. According to Defendants (at p. 4 of their memorandum), Argus – not plaintiff and putative class members - was "the real party in interest."

The error in Defendants' argument is that Plaintiff is not, via this lawsuit, seeking to engage in management activities vis-à-vis Argus, nor is Plaintiff proposing to act on behalf of Argus or its shareholders in any corporate sense. Plaintiff does not herein pursue the Argus corporation's interests. Plaintiff has filed this suit because he and others similarly situated have lost a lot of money, from their own pockets, as a consequence of Defendants' tortious conduct. Thus, Defendants' invocation of Federal Rule 23.1, and 805 ILCS 5/7.80(b), is misplaced – both those provisions assume that this lawsuit is actually in the name of Argus, or to enforce an Argus right. This is not the case.

Plaintiff seeks to recover his (and class members') financial losses caused by Defendants' conduct. The real parties in interest are precisely as the Amended Complaint defines them – the shareholders who lost money as a result of Defendants' tortious conduct. Specifically, the damage caused to Plaintiff and putative class members by Defendants' tortious conduct was the diminution of the value of their property. There can be no doubt that ABN AMRO, through Keith Walz, engaged in conduct with precisely that goal in mind – harm to Plaintiff and others similarly situated, for the purpose of enhancing ABN AMRO's perceived interests. *See* discussion in Section 3 hereof, *infra*, and in particular the excerpts from the Walz deposition (Exhibit 2).

Plaintiff's Amended Complaint is expressly stated in tort, alleging duty, breach of duty, causal relationship, and damages. It matters not, structurally for pleading purposes, whether the tort was committed by an ABN AMRO driver in a wayward delivery truck or by a duty-breaching board member expressly disrupting Argus management (*see* attached Exhibit 2 and discussion of Walz, below). ABN AMRO's chosen means of causing harm to Plaintiff and class members does not change Plaintiff's tort action into a derivative suit.

Defendants are correct that the question whether a suit is derivative by nature, or may be brought by a shareholder in his own right, is governed by the state of incorporation. *Kennedy v. Venrock Assocs.*, 348 F.3d 584, 589 (7th Cir. 2003). Argus is an Illinois corporation, so Illinois applies.

In determining whether former shareholders must file a claim in the form of a derivative suit rather than via a class action, the fundamental distinction is whether the wrong was committed against the corporation or against the shareholders. *King v. Kansas City Southern Indus., Inc.*, 56 F.R.D. 96, 98 (N.D. Ill. 1972). Thus, the determination of which is the appropriate action depends on "the nature of the alleged injury." *Solis-Holmes v. Thorn*, 2004 Bankr. LEXIS 1371 at *7 (C.D. Ill. 2004). Wrongs committed against the corporation itself are brought derivatively, but wrongs perpetrated upon shareholders directly, as here, may be brought in the form of a class action. *King*, 56 F.R.D. at 98.

A derivative suit consists of two causes of action: one against the directors of a corporation for failing to sue, and a second based upon a right belonging to the corporation. *Mann v. Kemper Financial Cos.*, 247 Ill. App. 3d 966, 974, 618 N.E.2d 317,

323 (1st Dist. 1993). Neither is applicable here. In a derivative suit, the shareholder

derives the power to sue from the unexercised authority of the corporation, and the direct

beneficiary of the derivative suit is the corporation that initially possessed the right to

bring the suit. Again, neither of these considerations is present here. The theory

underlying the use of derivative suits is that an action for harm to a corporation must be

brought in the corporate name. *Frank v. Hadesman and Frank, Inc.*, 83 F.3d 158, 159-60

(7th Cir. 1996). Plaintiff does not bring this action for harm to the corporation, nor has

Plaintiff ever been concerned with bringing an action in the corporate name to recover his

individual loss (and the losses of others similarly situated).

Illinois law holds that a director (such as ABN AMRO's employee Keith Walz)

occupies a position of trust, and as such, he or she owes a fiduciary duty to the

shareholders. *Vermeil v. Jefferson Trust & Savings Bank of Peoria*, 532 N.E.2d 288, 291

(Ill. App. Ct. 1988). Consequently,

> Directors of a corporation are trustees of its business and property
> for the collective body of stockholders in respect to such business.
> They are subject to the general rule, in regard to trusts and trustees,
> that they cannot, in their dealings with the business or property of
> the trust, use their relation to it for their own personal gain. It is
> their duty to administer the corporate affairs for the common
> benefit of all the stockholders, and exercise their best care, skill,
> and judgment in the management of the corporate business solely
> in the interest of the corporation. The stockholders are entitled to
> the utmost fidelity of the directors to the interest of the
> stockholders. It is a breach of duty for the directors to place
> themselves in a position where their personal interests would
> prevent them from acting for the best interests of those they
> represent. While a director is not disqualified from dealing with
> the corporation, he must act fairly and be free from all fraud or
> unfair conduct, his transactions will be subjected to the closest
> scrutiny, and, if not conducted with the utmost fairness, to the end
> that the corporation shall have received full value, they will be set
> aside.

*Id.* (quoting *Dixmoor Golf Club, Inc. v. Evans*, 156 N.E. 785, 787-88 (Ill. 1927) (emphasis added).

Moreover, attached to the Amended Complaint as Exhibit 1 thereto is a copy of the Voting Agreement made on December 3, 2001, between ABN AMRO, Argus and others, which was "thereafter approved by Argus's shareholders." Amended Complaint, paragraph 9. That Voting Agreement imposed a number of contractual obligations on ABN AMRO, including but not limited to (in paragraph 2.2) ABN AMRO's promise to Argus's shareholders that Plaintiff would remain as CEO for the purpose of achieving revenue targets in the fiscal year 2002 (and thereafter, if the established targets were met). Walz's conduct as an Argus board member (*see* attached Exhibit 2 and the discussion below) interfered with those contractual rights, the details of which interference are stated in paragraph 18 of the Amended Complaint. *See*, *e.g.*, sub-paragraphs 18A ("intentionally and unjustifiably interfered with and undermined management of Argus for the benefit of creditors including ABN AMRO"); 18D ("conspired with ABN AMRO and Mercurius to remove plaintiff as president and chief executive officer"); 18E ("for the benefit of ABN AMRO, failed to comply with the by-laws of Argus"); and 18F ("for the benefit of ABN AMRO, failed to comply with the contractual obligations of Argus"). Ironically, had the December 3, 2001, Voting Agreement not been approved by Argus shareholders, ABN AMRO would not have been able to secure the very seat on the Argus board that enabled Walz to "disrupt management." *See* discussion in Section 3, *infra*, and in particular the excerpts from the Walz deposition, Exhibit 2.

Where a claim, as in the instant case, revolves around the contractual rights of shareholders, the claim can be brought directly by the shareholders as the rights exist independently from the corporation. *Goodman v. Phoenix Container, Inc.*, 271 B.R. 821, 840 (N.D. Ill. 2001); *Spillyards v. Abboud*, 278 Ill. App. 3d 663, 671, 662 N.E.2d 1358, 1363 (1st Dist. 1996).

Finally, on April 13, 2005, the United States Bankruptcy Court for this Central District of Illinois (His Honor Judge Fines presiding), heard argument in Case No. 03-91852, *In re: Argus Systems Group, Inc.*, with respect to whether the Argus trustee should assign any theoretical authority he might have, in relation to the Amended Complaint *sub judice* against ABN AMRO, to Sandone and other shareholders. The matter was before the Bankruptcy Court on Sandone's Motion for an Order of Assignment, which was expressly filed on the basis that this matter *sub judice* is **not** derivative in nature, but that in an "abundance of caution" the Bankruptcy Court was asked to order the assignment. At the hearing, the trustee, Mr. Steve Miller, declared to the Bankruptcy Court that he believed he had disposed of all the Argus assets, and there was nothing of substance to assign in any event. This admission by the trustee underscores the distinction between Argus, on the one hand, and the instant Plaintiff and putative class members on the other hand. The Argus bankruptcy proceedings are on the verge of a final order. It was concerned with the Argus corporate entity and its liabilities and assets. The instant case, by contrast, is brought by individuals who have lost money personally because of ABN AMRO's tortious conduct. The Bankruptcy Court accepted Mr. Miller's oral submission and declined to order any assignment, given that there was nothing substantive in terms of Argus assets to assign. The Bankruptcy Court's ruling on

April 13, 2005, makes it plain that the instant suit is not derivative in nature.  Argus may be history – but the Plaintiff's and putative class members' civil grievances against ABN AMRO have yet to be resolved.  Those matters could not possibly have been addressed in the course of the Argus bankruptcy proceedings, because they do not involve Argus assets.

3.    **The Amended Complaint properly alleges *respondeat superior*.**

In the portion of their memorandum that addresses *respondeat superior* (pp. 9 11), Defendants have missed the big picture.  The scope of *respondeat superior* does not begin and end with the mere existence of an employment relationship, as Defendants would have it; and the Amended Complaint does not rest on a simple allegation that Keith Walz was an employee of ABN  AMRO.  Rather, the Amended Complaint asserts, in paragraph 18 thereof, that Walz committed no less than ten specific tortious acts "in the course and scope of his employment with ABN AMRO."

In their memorandum in support of their motion to dismiss, Defendants describe Walz (at p. 5) as "a rogue director" on the Argus board.  A more complete description of Walz's conduct on the Argus board was given at his July 27, 2004, deposition, which demonstrated that Walz may have been a "rogue" with respect to Argus, but his rogue activities were precisely what his employer ABN AMRO expected and required of him.  *See* attached Exhibit 2, transcript of Walz deposition of July 27, 2004.

The proper focus for *respondeat superior* is the scope and course of this so-called "rogue director's" employment, regardless of the nature of the activities he was performing within that employment.  The fact that Walz was a corporate board member,

rather than (say) a delivery boy, does not alter the *respondeat superior* analysis. The germane question is whether he was acting within his employment.

In their memorandum, Defendants relegate *In re Papercraft Corp.*, 165 B.R. 980 (Bankr. W.D. Pa), *vacated on other grounds*, 187 B.R. 486 (Bankr. W.D. Pa. 1995), *rev'd on other grounds*, 211 B.R. 813 (W.D. Pa. 1997), *aff'd sub nom. Citicorp Venture Capital, Ltd. V. Comm. of Creditors Holding Unsecured Claims*, 160 F.3d 982 (3rd Cir. 1998), to a footnote at page 10. Defendants argue that *Papercraft* is "easily distinguishable" because the defendant corporation in that case had directed and "expressly authorized its [board] nominee" to perform the objectionable actions in his role as a Papercraft board member. In fact, ABN AMRO did precisely what the defendants did in *Papercraft*, and *Papercraft* is on all fours with the instant case in this regard.

ABN AMRO's employee Walz has testified at deposition that his conduct as an Argus board member was at the behest of ABN AMRO. See Exhibit 2. Walz made clear at deposition that he was "wearing the hat" of ABN AMRO when he took actions that disrupted management at Argus.[2]

1.  His paycheck came "from ABN" (p. 6);

2.  He reported to "Gerben Kuyper," a "person in Amsterdam" who was ABN's "head of global private equity" (pp. 6-7);

3.  He served on at least eight other boards "as part of [his] work for ABN AMRO" (p. 8);

---

[2] Throughout his deposition, Walz made no distinction between ABN AMRO Holding N.V., ABN AMRO Bank N.V., and ABN AMRO Ventures B.V. – rather, Walz lumped all together in describing himself repeatedly as an employee of "ABN" or "ABN AMRO."

4.  He recognized that his duty as an Argus board member was to represent "the stakeholders in the company, creditors, shareholders [and] employees" (p. 9);

5.  He was asked to serve on the Argus board by Jan Dijkstra, an investment manager of ABN AMRO in Amsterdam, in December 2001 (p. 15);

6.  His contact at ABN AMRO as he served on the Argus board was Wouter van Veen, who was responsible for technology investments in the private equity group in Amsterdam (p. 21);

7.  He submitted quarterly reports about Argus to Mr. van Veen and to ABN AMRO's "investment committee (p. 24);

8.  In his capacity as an Argus board member, he was in communication with Frits Vromen, who was responsible for making investments for Mercurius, the other Dutch company that had invested in Argus (pp. 25-26);

9.  In arriving at his conclusion that Plaintiff needed to go as CEO of Argus, he talked with Fritz Vromen (at Mercurius) and others (pp. 28 et seq.);

10. He discussed with Kuyper, Van Veen, and the ABN AMRO investment committee whether to convert ABN AMRO's debt to equity, but the conversion was not made because "we [ABN AMRO] wanted to keep our credit position" with Argus (pp. 41-42);

11. In June, 2002, he "had our [i.e., ABN AMRO's] attorneys issue a letter to all the board members" of Argus expressing concern about Plaintiff's management (p. 46);

12. ABN AMRO indicated that they might invest in Argus if Plaintiff was removed (p. 56);

13. After Plaintiff left as Argus CEO, ABN AMRO and Mercurius did not invest in Argus because "we felt the company [Argus] was in such dire straits, it wasn't worth any further investment" (p. 58);

14. The Argus board never asked the Argus shareholders to ratify or confirm the board's removal of Plaintiff as Argus CEO (p. 60);

15. On October 4, 2002, he [Walz] indicated to another board member, Paul McNabb, that ABN AMRO would remove Plaintiff as CEO at the end of the year, and that ABN AMRO had written off its investment in Argus (p. 117);

16. In making his decisions, while sitting on the Argus board, as to whether or not to help Argus survive, he wore his "hat . . . for ABN AMRO" (p. 118);

17. ABN AMRO and Mercurius coordinated and conferred with one another "quite often" in regard to Argus (p. 128 et seq.);

18. He (Walz) recommended to Vromen that Argus should "take Chapter 11" (p. 134);

19. He did not report to the Argus board all of his communications with Vromen concerning Argus, because those were "confidential" and he [Walz] wore "two hats.  I represent ABN AMRO as a significant creditor/investor. And I also am a board member [of Argus]" (p. 142);

20. Walz's and Vromen's communications with Argus's staff, who were below Sandone in the chain of command, were "intended to disrupt management" at Argus (p. 151);

21. He suggested to Vromen that ABN AMRO's lawyers should start pursuing legal remedies against Argus, on behalf of ABN AMRO and Mercurius, in August of 2002 (p. 158-59);

22. As a member of the board of directors of Argus, he [Walz] recommended to Argus's creditors that they sue Argus (p. 159);

23. In exercising his perceived duty to Argus's creditors (ABN AMRO & Mercurius), Walz perceived that he had "no duty to [Argus] shareholders" (p. 161);

24. As an investment manager for ABN AMRO, Walz recommended to them that they do things to protect their position, including forcing Argus into bankruptcy (p. 162);

25. As an employee of one Dutch company, Walz recommended to the employee of another Dutch company (Vromen), "let's call the notes of the company that I am on the board of, which we know won't be in the position to pay it, so that the Dutch companies can then put Argus into bankruptcy" (pp. 163-64);

26. Walz's recommendations to ABN AMRO and Mercurius to call in the notes, start legal proceedings against Argus, and push Argus into bankruptcy were made in the course and scope of his employment with ABN AMRO, rather than as an Argus board member (p. 165);

27. Walz stated to the other Argus board members on November 6, 2002, that the only way ABN AMRO would possibly approve borrowing would be to gain or control Argus (pp. 175-76);

28. On December 10, 2002, Walz suggested that ABN AMRO and Mercurius should file a lawsuit against Argus and Plaintiff with the intent of freezing everything at Argus and prohibiting transactions so as to give more leverage to ABN AMRO and Mercurius (pp. 183-84);

These sworn statements by ABN AMRO's employee Walz, who sat on the Argus board at all relevant times, demonstrate the breadth of ABN AMRO's conduct that was executed by and through Walz – admittedly acting within the scope of his ABN AMRO employment. Applying the very *Papercraft* test that Defendants cite with approval but mistakenly attempt to distinguish, ABN AMRO is responsible under the doctrine of *respondeat superior* for the tortious conduct of Walz.

Having relegated *Papercraft* to a footnote, Defendants urge this Court to rely on non-binding decisions from other jurisdictions, hoping to evade responsibility for their conduct. Thus, they cite the Massachusetts District Court case of *CCBC.com, Inc. v. Thomson Financial, Inc.*, 270 F. Supp. 2d 146 (D. Mass. 2003); the New York District Court case of *U.S. Airways Group, Inc. v. British Airways PLC*, 989 F. Supp. 482 (S.D.N.Y. 1997); the Delaware lower-court case of *Emerson Radio Corp. v. Int'l Jensen Inc.*, 1996 WL 483086 (Del. Ch. August 20, 1996), *appeal denied*, 683 A.2d 58 (Del. 1996); another New York District Court case applying California law in *Medical Self Care, Inc. v. Nat'l Broad. Co., Inc.*, 2003 WL 1622181 (S.D.N.Y. Mar. 28, 2003). Not one of these non-binding cases is even applicable, because the common denominator is

the irrelevant principle that a corporation is not generally liable for the actions of a rogue designee on another corporate board. Even if that general principle were accepted as the law of every State in the Union, it would not apply here, where a tortfeasor corporation directs and authorizes its employee to commit the torts in question while sitting on another corporation's board. The test is the scope of the employee's employment.

Having created its straw argument drawn from non-binding courts in other jurisdictions, Defendants propose to stretch their novel proposition into Illinois, even while acknowledging (at p. 11) that "[n]o Illinois court has yet addressed this issue." Defendants take creative lawyering to a new level by their footnote citation of three Illinois cases that have absolutely nothing to do with the instant facts. In *Jaffe Commercial Fin. Co. v. Harris*, 456 N.E.2d 224 (Ill. App. Ct. 1st Dist. 1983), *Graham v. Mimms*, 444 N.E.2d 549 (Ill. App. Ct. 1st Dist. 1982), and *In re Joy Recovery Tech. Corp.*, 257 B.R. 253 (Bankr. N.D. Ill. 2001), the issue for which ABN AMRO cites these cases was <u>shareholder</u> liability. In the matter *sub judice*, the Amended Complaint asserts no claim whatsoever against the ABN AMRO Defendants based on their role (or Walz's) as a shareholder. The claim against ABN AMRO is premised on ABN AMRO's tortious conduct through Walz in his capacity, "wearing ABN's hat," as an Argus board member. Plaintiff's dictionary defines "red herring" as "something that draws attention from the matter or issue at hand" [from the use of red herring to distract hunting dogs from the scent]. Defendants' *respondeat superior* arguments are, if nothing else, a delightful embodiment of that stuffy definition, and that dog won't hunt.

Finally, ABN AMRO cannot escape liability on the basis that its employee's conduct was not actionable, as it is clear under Illinois law that Walz's conduct as alleged

in the Amended Complaint constituted a breach of fiduciary duty to shareholders such as Plaintiff and class members.  In *Vermeil* (discussed *supra*), the defendant (like ABN AMRO employee Keith Walz in the instant case) served as an officer, director, and shareholder of Heartland Investments, Inc., while also serving as a director of a bank. *Vermeil*, 532 N.E. at 289.  The defendant was also a member of the bank's loan committee, and was involved in obtaining two loans from the bank for the benefit of Heartland.  *Id.*  When Heartland subsequently defaulted, the bank brought suit against the defendant, claiming that he "breached his fiduciary duty to exercise ordinary care with respect to the bank."  *Id.* at 290.

In judging the conduct of the defendant in *Vermeil*, the court considered "whether there was a detriment to the corporation as a result of the transaction; and whether there was full disclosure – although neither disclosure nor shareholder assent can convert a dishonest transaction into a fair one."  *Id.* at 291 (citation omitted).  Additionally, where the corporation challenges the validity of the transaction or loan, "the burden is on the directors involved . . . to overcome the presumption against validity of the transaction by showing its fairness and propriety."  *Id.* (citation and internal quotation marks omitted).

Consequently, the court found that the defendant in *Vermeil* had breached his fiduciary duty.  *Id.* at 292.  While serving as a director at the bank, the defendant acted on behalf of Heartland and caused the bank to make multiple loans to Heartland by misrepresenting Heartland's ability to pay.  *Id.* at 291.  The defendant's breach of his fiduciary duties directly caused the bank to lose $250,000.  *Id.* at 292.

Therefore, where a director (in this case, ABN AMRO acting through the person of its employee Walz) acts on behalf of both his corporation and a lender, the director has

a heavy burden of showing the fairness of his conduct and the fact that he did not violate any of his fiduciary duties. *See also Christison v. Martin*, 531 F. Supp. 737, 740 (C.D. Ill. 1982) (holding a director liable for losses on loans where he did not disclose his interest in ISSI to IVAC while he served as a director to IVAC, which made several loans to ISSI before the director retired). In the instant case, this is a heavy burden that these Defendants must meet at trial.

<u>**CONCLUSION**</u>

For the foregoing reasons, Plaintiff respectfully requests that Defendants' motion to dismiss the Amended Complaint be denied, and that Defendants be directed to timely file their Answer(s) to the Amended Complaint.


Dated: April 14, 2005                     Respectfully submitted,

                                          RANDALL J. SANDONE, Plaintiff, by his
                                          attorneys, JOSEPH W. PHEBUS, GARY D.
                                          FORRESTER and DANIEL J. POPE of the law
                                          firm of PHEBUS & KOESTER

                                          s/ Joseph W. Phebus

                                          s/ Gary D. Forrester

                                          s/ Daniel J. Pope

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on April 14, 2005, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following: Richard L. Klaus, Edward M. Wagner.

                                          <u>s/Gary D. Forrester</u>
                                          PHEBUS & KOESTER
                                          136 West Main Street
                                          Urbana, Illinois 61801

(217)337-1400
(217)337-1607 (fax)
gforrester@phebuslaw.com

*f:\docs\joe\sandone\abn amro\reply mo dismiss--federal.doc*