**E-FILED**
Wednesday, 20 July, 2005  03:55:55 PM
Clerk, U.S. District Court, ILCD

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
URBANA DIVISION

| | | |
|---|---|---|
| RANDALL J. SANDONE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | No.  04-2232 |
| | ) | |
| ABN AMRO BANK N.V., Amsterdam, a | ) | The Honorable Judge Harold A. |
| Dutch corporation; and ABN AMRO | ) | Baker |
| VENTURES B.V., Amsterdam, a Dutch | ) | |
| corporation, | ) | |
| | | |
| Defendants. | | |

## PLAINTIFF'S RESPONSE TO DEFENDANTS' MEMORANDUM IN SUPPORT OF THEIR MOTION TO DISMISS THE SECOND AMENDED COMPLAINT

Defendants have moved to dismiss on the grounds, 1) that this Court lacks

personal jurisdiction over Defendants, because:  a) no "summary" of the Amended

Complaint was provided to Defendants in Amsterdam; and b) the Second Amended

Complaint allegedly fails to comply with Illinois' Long Arm Statute because  Defendant

ABN  AMRO Ventures B.V. ('Ventures") is not doing business in Illinois under 735

ILCS § 5/2-209(b)(4) ( no such argument is made on behalf of ABN AMRO Bank N.V.

("Bank").  2) That Plaintiff lacks standing[1] to bring this claim, because the claim is

derivative in nature and can only be brought by the bankruptcy trustee for Argus Systems

Group, Inc. ("Argus").  3) That the Second Amended Complaint does not state a claim

upon which relief can be granted because Plaintiff's *respondeat superior* theory would

"dangerously" expand the fiduciary duties of investors.

---

[1] The Northern District of Illinois has recently observed that the Seventh Circuit regards as a "misnomer" the labeling of the question presented as one of "standing," as Defendants have done herein.  Rather, the inquiry to be made is whether the action is prosecuted in the name of the real party in interest.  *Goodman v. Phoenix Container, Inc.*, 271 B.R. 821, 839 (fn. 5) (N.D. Ill. 2001).  Accordingly, this memorandum will approach that issue hereafter in compliance with the Seventh Circuit's approach.

1

Clearly, the threshold issue raised by Defendants is this Court's jurisdiction. Were this Court to lack jurisdiction over these Defendants, the remaining arguments made by Defendants in their Memorandum would be premature and not ripe for this Court's consideration.  Accordingly, even though Defendants argue lack of jurisdiction last, a telling admission in and of itself, this Response will address the threshold issue of jurisdiction first, then move on to the issues of the real party in interest and *respondeat superior*.

## ARGUMENT

**1.     This Court has personal jurisdiction over the Defendants.**

The first question is whether these Defendants are properly before this Court. Defendants challenge this Court's jurisdiction on two grounds:  (a) that there was no "summary" enclosed with the served documents, and (b) that Ventures does not do "business" in Illinois under the long-arm statute.

A.     <u>Service on Defendants has been effected</u>.

Although Defendants' Illinois counsel have appeared in a companion action, *Sandone v. Walz*, No. 02-L-0272, Defendants' counsel have refused to accept service on behalf of the two overseas corporate Defendants.  Accordingly, Plaintiff has followed the Hague Convention procedures in serving the Defendants in Amsterdam.  *See* Fed R. Civ. P. 4(f)(1), 4(h)(2).

Attached hereto and marked as Exhibit 1 is an affidavit that sets forth the steps that have been taken by Plaintiff, through his counsel, to effect service on Defendants in Amsterdam.  Defendants do not dispute that they were served with the Amended

Complaint and summonses.  Further, the return of service documents from the Public Prosecutor's office in Holland, which office effected service on the Defendants in Amsterdam, were received by Plaintiff's counsel on March 11, 2005, and promptly filed in this Court.

Despite their acknowledged receipt of the Amended Complaint and summonses, Defendants argue (at p. 13 of their Memorandum) that overseas service has failed because "[t]he summonses delivered to the Defendants in Amsterdam did not include a summary of the Amended Complaint."  Defendants offer no authority for this alleged aspect of overseas service as a basis for jurisdictional challenge, and their half-hearted technical argument should be rejected.  Clearly a "summary" was sent to Holland (see Plaintiff's Exhibit 1, Affidavit of Kristen Conley, par. 3 and summary attached as page 3 to Plaintiff's Exhibit D), and there is no competent affidavit that a "summary" was not served on Mr. Van Vliet. Further, a summary would not shed any additional light on the contents of the Second Amended Complaint for these sophisticated corporate Defendants. They and their counsel have the Amended Complaint and the Exhibits in full.  Even if there were any error or omission in this instance, it was harmless, as Defendants' challenge implicitly admits.

Further, the Defendants rely entirely on the "facts" contained in Lemans affidavit (Defendants' Exhibit A).  Lemans swears that there was no "summary" among the documents that "she received."  But Lemans admits her "understanding" is that "the Sandone envelopes were delivered [by the Public Prosecutor in Amsterdam] to Mr. A. Van Vliet," who works in ABN AMRO's head office mailroom at the "Gustav Mahlerlaan" and not to her directly.  It is not clear from the Lemans affidavit if "Gustav

Mahlerlaan" is the location of Lemans' office, the documents she received are identical to the documents served on Mr. Van Vliet, or how the documents were channeled from Mr. Van Vliet to Lemans. She swears only that the documents were "delivered to me through internal channels." Such a porous chain of custody does not give rise to Lemans' conclusory assertions that the contents or condition of the "Sandone envelopes" as received by Mr. Van Vliet did not contain the summary mailed to the Public Prosecutor. The proper affiant should have been Van Vliet, not Lemans, as Van Vliet was the ABN AMRO employee in Holland who received the served documents from the Public Prosecutor.

Further, the Lemans affidavit is deficient in a number of other different ways. She does not say what her level of education is or whether she is even a lawyer. She does not reveal how long she has been employed, what her responsibilities are, or even that the facts contained in the affidavit are based on her own personal knowledge, and it appears they are not. There is nothing in the affidavit to explain what "Vice President of Group Legal" may mean concerning her level of legal sophistication or responsibility for the corporate entities involved in this case.

What is clear and uncontested is that Defendants admit they were properly served by the Public Prosecutor with the Amended Complaint and summonses. Even if a summary was not served by the Public Prosecutor upon Mr. Van Vliet, it was harmless error at best. Thus, Defendants' Motion under Rule 12(b)(5) should be denied.

B.    Defendants' Illinois activities support this Court's jurisdiction.

As to jurisdiction, the two defendants must be considered separately. Any contention that the Bank is not subject to jurisdiction is so specious as to be in bad faith

as Lemans' affidavit admits that the Bank was and is doing business in Illinois. Further, the Second Amended Complaint alleges (in paragraphs 5-16 of Count I ) that the Bank at all relevant times did business as ABN AMRO Private Equity, that it had it's principle place of business in Illinois, that Walz was employed by the Bank, that Walz became a director of Argus, and that while in the course of his employment with the Bank, Walz violated numerous fiduciary duties with Plaintiff in Illinois at the Bank's direction. The Lemans affidavit does not dispute any of these facts and admits that Walz is "managing director of ABN AMRO Private Equity," which is "a business unit of ABN AMRO Bank…" Defendants have thereby conceded that the Bank was doing business in Illinois at all relevant times.

Turning to Ventures, Defendants presume "Plaintiff appears to assert that this Court has general personal jurisdiction over (Ventures) under the "doing business" prong of the Illinois Long Arm Statute,…" (Defendants' Memo p. 14). This presumption is only true in part. Like the Bank, Plaintiff is also asserting that this Court has personal jurisdiction over Ventures under other specific acts contained in the statute. Jurisdiction is therefore established where a defendant personally or through an agent commits a "tortious act within this State" (2), or makes any "contract or promise substantially connected with this State" (7), or breaches "any fiduciary duty within this State" (11), and/ or performs the duties as a "director…of a corporation organized under the laws of this State" (12). 735 ILCS 5/2-209(2), (7), (11) and (12). Any of these other prongs satisfies long arm jurisdiction over the Defendants, and all are present in the Second Amended Complaint.

The Second Amended Complaint alleges in Count II (par. 6-12, 23-24) that Ventures is a subsidiary of the Bank, that Walz was employed by the Bank, that Ventures entered into a contract in Illinois with Argus, an Illinois corporation, that Ventures appointed Walz to Argus' Board of Directors as its agent pursuant to its contract, that Walz was acting as agent for Ventures when he violated numerous fiduciary duties with Plaintiff in Illinois at Ventures' direction, and that Ventures forced Argus into bankruptcy in Illinois. Again, the Lemans affidavit does not dispute any of these facts.

Thus, Defendants' Motion under Rule 12(b) (2) should be denied.

**2.     This lawsuit is not derivative in nature, as asserted by Defendants, in its Rule 12(b)(6) Motion.**

This court is guided by common principles in deciding a motion to dismiss under Rule 12(b)(6). Rule 12(b)(6)  requires a Court to sustain a complaint "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957). In assessing the adequacy of the complaint, the Court must "take all facts alleged in the complaint, and any inferences that might reasonably be drawn from those factual allegations, in the light most favorable to the plaintiff[s]." *Szumny v. American Gen. Fin., Inc*., 246 F.3d 1065, 1067 (7th Cir. 2001).

Defendants argue that this lawsuit is not an action by Plaintiff and others similarly situated sounding in tort, notwithstanding the express terms of the Second Amended Complaint; rather, Defendants argue, this is a "derivative" suit that can brought, if at all, by Argus' bankruptcy trustee on behalf of the corporation. According to Defendants (at

p. 6 of their Memorandum), Argus – not plaintiff and putative class members – is "the real party in interest."

The error in Defendants' argument is that Plaintiff is not, via this lawsuit, suing the corporation and its principal shareholder seeking to engage in management activities (like the plaintiff in *Small v. Sussman* ), nor is Plaintiff proposing to act on behalf of Argus in any corporate sense ( like the plaintiff in *Frank v. Hadesman and Frank, Inc.*). Plaintiff is not  pursuing any of  Argus' corporate interests.  Plaintiff has filed this suit because he and others similarly situated have lost a lot of their own money, from their own pockets, as a consequence of Defendants' tortious conduct.  Thus, Defendants' invocation of Federal Rules 17(a) and  23.1, and 805 ILCS 5/7.80(b), is misplaced – all those provisions assume that this lawsuit is actually in the name of Argus, or to enforce an Argus right.  This is not the case.

Plaintiff seeks to recover his financial losses caused by Defendants' conduct.  The real parties in interest are precisely as the Second Amended Complaint defines them – the plaintiff and other shareholders who lost money as a result of Defendants' tortious conduct.  Specifically, the damage caused to Plaintiff and putative class members by Defendants' tortious conduct was the destruction of their property. There can be no doubt that the Defendants, through Keith Walz, engaged in conduct with precisely that goal in mind – harm to Plaintiff and others similarly situated, for the purpose of enhancing the Defendants' perceived interests.

Plaintiff's Second Amended Complaint is expressly stated in tort, alleging duty, breach of duty, causal relationship, and damages.  It matters whether the tort was committed by an ABN AMRO driver in a wayward delivery truck or by a duty-breaching

board member expressly disrupting Argus management.  See attached Exhibit 2 and
discussion of Walz, below.  Defendant's chosen means of causing harm to Plaintiff and
class members does not change Plaintiff's tort action into a derivative suit.

Defendants are correct that the question whether a suit is derivative by nature, or
may be brought by a shareholder in his own right, is governed by the state of
incorporation.  *Kennedy v. Venrock Assocs.*, 348 F.3d 584, 589 (7th Cir. 2003).  Argus is
an Illinois corporation, so Illinois law applies.  In determining whether former
shareholders must file a claim in the form of a derivative suit rather than via a class
action, the fundamental distinction is whether the wrong was committed against the
corporation or against the shareholders.  *King v. Kansas City Southern Indus., Inc.*, 56
F.R.D. 96, 98 (N.D. Ill. 1972).  Thus, the determination of which is the appropriate action
depends on "the nature of the alleged injury."  *Solis-Holmes v. Thorn*, 2004 Bankr.
LEXIS 1371 at *7 (C.D. Ill. 2004).  Wrongs committed against the corporation itself are
brought derivatively, but wrongs perpetrated upon shareholders directly, as here, may be
brought in the form of a class action.  *King*, 56 F.R.D. at 98.

A derivative suit consists of two causes of action: one against the directors of a
corporation for failing to sue, and a second based upon a right belonging to the
corporation.  *Mann v. Kemper Financial Cos.*, 247 Ill. App. 3d 966, 974, 618 N.E.2d 317,
323 (1st Dist. 1993).  Neither is applicable here.  In a derivative suit, the shareholder
derives the power to sue from the unexercised authority of the corporation, and the direct
beneficiary of the derivative suit is the corporation that initially possessed the right to
bring the suit.  Again, neither of these considerations is present here.  The theory
underlying the use of derivative suits is that an action for harm to a corporation must be

brought in the corporate name.  *Frank v. Hadesman and Frank, Inc.*, 83 F.3d 158, 159-60

(7th Cir. 1996).

Illinois law holds that a director (such as the Defendant's employee and agent

Keith Walz) occupies a position of trust, and as such, he or she owes a fiduciary duty to

the <u>shareholders</u>.  *Vermeil v. Jefferson Trust & Savings Bank of Peoria*, 532 N.E.2d 288,

291 (Ill. App. Ct. 1988).  Consequently,

> Directors of a corporation are trustees of its business and property
> for the collective body of stockholders in respect to such business.
> They are subject to the general rule, in regard to trusts and trustees,
> that they cannot, in their dealings with the business or property of
> the trust, use their relation to it for their own personal gain.  It is
> their duty to administer the corporate affairs for the common
> benefit of all the stockholders, and exercise their best care, skill,
> and judgment in the management of the corporate business solely
> in the interest of the corporation.  The stockholders are entitled to
> the utmost fidelity of the directors to the interest of the
> stockholders.  It is a breach of duty for the directors to place
> themselves in a position where their personal interests would
> prevent them from acting for the best interests of those they
> represent.

*Id.* (quoting *Dixmoor Golf Club, Inc. v. Evans*, 156 N.E. 785, 787-88 (Ill. 1927).

Moreover, attached to the Second Amended Complaint as Exhibit 2 is a copy of

the Voting Agreement made on December 3, 2001, between ABN AMRO, Argus and

others, which was thereafter approved by Argus' shareholders.  That Voting Agreement

imposed a number of contractual obligations on ABN AMRO, including but not limited

to (in paragraph 2.2) ABN AMRO's promise to Argus' shareholders that Plaintiff would

remain as CEO for the purpose of achieving revenue targets in the fiscal year 2002 (and

thereafter, if the established targets were met).  Walz's conduct as an Argus board

member breached those contractual rights, the details of which interference are stated in

paragraph 24 of both counts of the Second Amended Complaint.  *See*, *e.g.*, sub-

paragraphs A ("intentionally and unjustifiably interfered with and undermined management of Argus for the benefit of creditors including ABN AMRO"); D ("conspired with ABN AMRO and Mercurius to remove plaintiff as president and chief executive officer" an thus breach his contract); E ("for the benefit of ABN AMRO, failed to comply with the by-laws of Argus"); and F ("for the benefit of ABN AMRO, failed to comply with the contractual obligations of Argus").[2]

Where a claim, as in the instant case, also revolves around the contractual rights of shareholders, the claim can be brought directly by the shareholders as their rights exist independently from the corporation. *Goodman v. Phoenix Container, Inc.*, 271 B.R. 821, 840 (N.D. Ill. 2001); *Spillyards v. Abboud*, 278 Ill. App. 3d 663, 671, 662 N.E.2d 1358, 1363 (1st Dist. 1996).

Finally, on April 13, 2005, the United States Bankruptcy Court for this Central District of Illinois (His Honor Judge Fines presiding), heard argument in Case No. 03-91852, *In re: Argus Systems Group, Inc.*, with respect to whether the Argus trustee should assign any theoretical authority he might have, in relation to the Amended Complaint *sub judice* against ABN AMRO, to Sandone and other shareholders. The matter was before the Bankruptcy Court on Sandone's Motion for an Order of Assignment, which was expressly filed on the basis that this matter *sub judice* is **not** derivative in nature, but that in an "abundance of caution" the Bankruptcy Court was asked to order the assignment. At the hearing, the trustee, Mr. Steve Miller, declared to the Bankruptcy Court that he believed he had disposed of all the Argus assets, and there was nothing of substance to assign in any event. This admission by the trustee

---

[2] As the Second Amended Complaint makes clear Plaintiff Sandone has direct and personal claims against the Defendants in that he was CEO of the company and had an employment contract that was breached. In the event this Court should grant Defendants' Motion to Dismiss, he should have an opportunity to replead.

underscores the distinction between Argus, on the one hand, and the instant Plaintiff and putative class members on the other hand.  The Argus bankruptcy proceedings are on the verge of a final order.

The instant case, by contrast, is brought by individuals who have lost money personally because of the Defendants' tortious conduct.  The Bankruptcy Court accepted Mr. Miller's oral submission and declined to order any assignment, given that there was nothing substantive in terms of Argus assets to assign.  The Bankruptcy Court's ruling on April 13, 2005, makes it plain that the instant suit is not derivative in nature.  Argus may be history – but the Plaintiff's and putative class members' civil grievances against ABN AMRO have yet to be resolved.  Those matters could not possibly have been addressed in the course of the Argus bankruptcy proceedings, because they do not involve Argus assets.

3. **The Amended Complaint properly alleges *respondeat superior*.**

In the portion of their memorandum that addresses *respondeat superior* (pp. 10-12), Defendants have missed the big picture.  The scope of *respondeat superior* does not begin and end with the mere existence of an employment relationship, as Defendants would have it; and the Second Amended Complaint does not rest on a simple allegation that Keith Walz was an employee of the Bank.  Rather, the Second Amended Complaint asserts, in Count I, par. 24, that Walz committed no less than ten specific tortious acts "in the course and scope of his employment with (the) Bank…", and in Count II, par. 24, that Walz did so in the course and scope of his agency with Ventures.

The proper focus for *respondeat superior* is the scope and course of Walz's employment and agency, regardless of the nature of the activities he was performing

within that employment and agency.  The fact that Walz was a corporate board member, rather than (say) a delivery boy, does not alter the *respondeat superior* analysis.  The germane question is whether he was acting within his employment and agency.

In their Memorandum, Defendants relegate *In re Papercraft Corp.*, 165 B.R. 980 (Bankr. W.D. Pa), *vacated on other grounds*, 187 B.R. 486 (Bankr. W.D. Pa. 1995), *rev'd on other grounds*, 211 B.R. 813 (W.D. Pa. 1997), *aff'd sub nom. Citicorp Venture Capital, Ltd. V. Comm. of Creditors Holding Unsecured Claims*, 160 F.3d 982 (3rd Cir. 1998), to a footnote at page 11.  Defendants argue that *Papercraft* is "easily distinguishable" because the defendant corporation in that case had directed and "expressly authorized its [board] nominee" to perform the objectionable actions in his role as a Papercraft board member.  In fact, the Defendants here did precisely what the defendants did in *Papercraft*, and *Papercraft* is on all fours with the instant case in this regard.

Walz has testified at deposition that his conduct as an Argus board member was at all times at the behest of the Defendants.  See Exhibit 2.  Walz also made clear at his deposition that he was "wearing the hat" of the Defendants when he took actions that disrupted management at Argus.[3]

These sworn statements by Walz, who sat on the Argus board at all relevant times, demonstrate the breadth of the Defendants' misconduct that was executed by and through Walz – admittedly acting within the scope of his employment with the Bank and as agent for Ventures.  Applying the very *Papercraft* test that Defendants cite with

---

[3] See Appendix A.  Throughout his deposition, Walz made no distinction between ABN AMRO Bank N.V. and ABN AMRO Ventures B.V. – rather, Walz lumped both Defendants together in describing himself repeatedly as an employee of "ABN" or "ABN AMRO."

approval but mistakenly attempt to distinguish, the Defendants are responsible under the doctrine of *respondeat superior* for the tortious conduct of Walz.

Having relegated *Papercraft* to a footnote, Defendants urge this Court to rely on non-binding decisions from other jurisdictions, hoping to evade responsibility for their conduct.  Thus, they cite the Massachusetts District Court case of *CCBC.com, Inc. v. Thomson Financial, Inc.*, 270 F. Supp. 2d 146 (D. Mass. 2003); the New York District Court case of *U.S. Airways Group, Inc. v. British Airways PLC*, 989 F. Supp. 482 (S.D.N.Y. 1997); the Delaware lower-court case of *Emerson Radio Corp. v. Int'l Jensen Inc.*, 1996 WL 483086 (Del. Ch. August 20, 1996), *appeal denied*, 683 A.2d 58 (Del. 1996); another New York District Court case applying California law in *Medical Self Care, Inc. v. Nat'l Broad. Co., Inc.*, 2003 WL 1622181 (S.D.N.Y. Mar. 28, 2003).  Not one of these non-binding cases is even applicable, because the common denominator is the irrelevant principle that a corporation is not generally liable for the actions of a rogue designee on another corporate board.  Even if that general principle were accepted as the law of every State in the Union, it would not apply here, where a tortfeasor corporation directs and authorizes its employee to commit the torts in question while sitting on another corporation's board.

The test is the scope of the employee's employment, and whether he is acting on the directions of his employer or as a "rogue".  These are ordinarily questions of fact and are so here. Plaintiff alleges Walz was acting within the scope of his employment and agency and at the Defendants' specific requests, and Defendants have offered no proof otherwise.

Having created its straw argument drawn from non-binding courts in other jurisdictions, Defendants propose to stretch their novel proposition into Illinois, even while acknowledging (at p. 12) that "[n]o Illinois court has yet addressed this issue." Defendants take creative lawyering to a new level by their footnote citation of three Illinois cases that have absolutely nothing to do with the instant facts.  In *Jaffe Commercial Fin. Co. v. Harris*, 456 N.E.2d 224 (Ill. App. Ct. 1st Dist. 1983), *Graham v. Mimms*, 444 N.E.2d 549 (Ill. App. Ct. 1st Dist. 1982), and *In re Joy Recovery Tech. Corp.*, 257 B.R. 253 (Bankr. N.D. Ill. 2001), the issue for which the Defendants cites these cases was <u>shareholder</u> liability.  Here, the Second Amended Complaint asserts no claim whatsoever against the Defendants based on their role (or Walz's) as a shareholder. The claim against the Defendants is premised on their tortious conduct through Walz in his capacity, "wearing ABN's hat," as an Argus board member.

Finally, the Defendants cannot escape liability on the basis that its employee's and agent's conduct was not actionable, as it is clear under Illinois law that Walz's conduct as alleged in the Second Amended Complaint constituted a breach of fiduciary duty to shareholders such as Plaintiff and class members.  In *Vermeil* (discussed *supra*), the defendant (like ABN AMRO employee Keith Walz in the instant case) served as an officer, director, and shareholder of Heartland Investments, Inc., while also serving as a director of a bank.  *Vermeil*, 532 N.E. at 289.  The defendant was also a member of the bank's loan committee, and was involved in obtaining two loans from the bank for the benefit of Heartland.  *Id.*  When Heartland subsequently defaulted, the bank brought suit against the defendant, claiming that he "breached his fiduciary duty to exercise ordinary care with respect to the bank."  *Id.* at 290.

In judging the conduct of the defendant in *Vermeil*, the court considered "whether there was a detriment to the corporation as a result of the transaction; and whether there was full disclosure – although neither disclosure nor shareholder assent can convert a dishonest transaction into a fair one." *Id.* at 291 (citation omitted).  Additionally, where the corporation challenges the validity of the transaction or loan, "the burden is on the directors involved . . . to overcome the presumption against validity of the transaction by showing its fairness and propriety." *Id.* (citation and internal quotation marks omitted).

Consequently, the court found that the defendant in *Vermeil* had breached his fiduciary duty.  *Id.* at 292.  While serving as a director at the bank, the defendant acted on behalf of Heartland and caused the bank to make multiple loans to Heartland by misrepresenting Heartland's ability to pay.  *Id.* at 291.  The defendant's breach of his fiduciary duties directly caused the bank to lose $250,000.  *Id.* at 292.

Therefore, where a director (in this case, the Defendants acting through the person of its employee and agent Walz) acts on behalf of both his corporation and a lender, the director has a heavy burden of showing the fairness of his conduct and the fact that he did not violate any of his fiduciary duties.  *See also Christison v. Martin*, 531 F. Supp. 737, 740 (C.D. Ill. 1982) (holding a director liable for losses on loans where he did not disclose his interest in ISSI to IVAC while he served as a director to IVAC, which made several loans to ISSI before the director retired).  In the instant case, this is a heavy burden that these Defendants must meet at trial, and thus, their Rule 12(b)(6) motion should be denied.

**CONCLUSION**

For the foregoing reasons, Plaintiff respectfully requests that Defendants' motion to dismiss the Second Amended Complaint be denied, and that Defendants be directed to timely file their Answer(s) to the Second Amended Complaint.

Dated: July 20, 2005                    Respectfully submitted,


RANDALL J. SANDONE, Plaintiff, by his attorneys, JOSEPH W. PHEBUS, GARY D. FORRESTER and DANIEL J. POPE of the law firm of PHEBUS & KOESTER

BY:  s/ Joseph W. Phebus
Joseph W. Phebus
Attorney for Plaintiff
PHEBUS & KOESTER
136 West Main Street
Urbana, Illinois 61801
(217) 337-1400
(217) 337-1607 (fax)
jwphebus@phebuslaw.com

BY:  s/Gary D. Forrester
Gary D. Forrester
Attorney for Plaintiff
PHEBUS & KOESTER
136 West Main Street
Urbana, Illinois 61801
(217) 337-1400
(217) 337-1607 (fax)
gdforrester@phebuslaw.com

BY:  s/ Daniel J. Pope
Attorney for Plaintiff
PHEBUS & KOESTER
136 West Main Street
Urbana, Illinois 61801
(217) 337-1400
(217) 337-1607 (fax)
dpope@phebuslaw.com

16

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 20, 2005, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Richard L. Klaus
HEYL ROYSTER VOELKER & ALLEN
PO Box 129
Urbana, IL 61801-0129
217-344-0060
217-344-9295 (fax)
rklaus@hrva.com

Edward M. Wagner
HEYL ROYSTER VOELKER & ALLEN
PO Box 129
Urbana, IL 61801-0129
(217) 344-0060
344-9295 (fax)
ewagner@hrva.com

BY:  <u>s/ Joseph W. Phebus</u>
Joseph W. Phebus
Attorney for Plaintiff
PHEBUS & KOESTER
136 West Main Street
Urbana, Illinois 61801
(217) 337-1400
(217) 337-1607 (fax)
jwphebus@phebuslaw.com

**APPENDIX A**

1. His paycheck came "from ABN" (p. 6);

2. He reported to "Gerben Kuyper," a "person in Amsterdam" who was ABN's "head of global private equity" (pp. 6-7);

3. He served on at least eight other boards "as part of [his] work for ABN AMRO" (p. 8);

4. He recognized that his duty as an Argus board member was to represent "the stakeholders in the company, creditors, shareholders [and] employees" (p. 9);

5. He was asked to serve on the Argus board by Jan Dijkstra, an investment manager of ABN AMRO in Amsterdam, in December 2001 (p. 15);

6. His contact at ABN AMRO as he served on the Argus board was Wouter van Veen, who was responsible for technology investments in the private equity group in Amsterdam (p. 21);

7. He submitted quarterly reports about Argus to Mr. van Veen and to ABN AMRO's "investment committee (p. 24);

8. In his capacity as an Argus board member, he was in communication with Frits Vromen, who was responsible for making investments for Mercurius, the other Dutch company that had invested in Argus (pp. 25-26);

9. In arriving at his conclusion that Plaintiff needed to go as CEO of Argus, he talked with Fritz Vromen (at Mercurius) and others (pp. 28 et seq.);

10. He discussed with Kuyper, Van Veen, and the ABN AMRO investment committee whether to convert ABN AMRO's debt to equity, but the conversion

was not made because "we [ABN AMRO] wanted to keep our credit position" with Argus (pp. 41-42);

11. In June, 2002, he "had our [i.e., ABN AMRO's] attorneys issue a letter to all the board members" of Argus expressing concern about Plaintiff's management (p. 46);

12. ABN AMRO indicated that they might invest in Argus if Plaintiff was removed (p. 56);

13. After Plaintiff left as Argus CEO, ABN AMRO and Mercurius did not invest in Argus because "we felt the company [Argus] was in such dire straits, it wasn't worth any further investment" (p. 58);

14. The Argus board never asked the Argus shareholders to ratify or confirm the board's removal of Plaintiff as Argus CEO (p. 60);

15. On October 4, 2002, he [Walz] indicated to another board member, Paul McNabb, that ABN AMRO would remove Plaintiff as CEO at the end of the year, and that ABN AMRO had written off its investment in Argus (p. 117);

16. In making his decisions, while sitting on the Argus board, as to whether or not to help Argus survive, he wore his "hat . . . for ABN AMRO" (p. 118);

17. ABN AMRO and Mercurius coordinated and conferred with one another "quite often" in regard to Argus (p. 128 et seq.);

18. He (Walz) recommended to Vromen that Argus should "take Chapter 11" (p. 134);

19. He did not report to the Argus board all of his communications with Vromen concerning Argus, because those were "confidential" and he [Walz] wore "two

hats. I represent ABN AMRO as a significant creditor/investor. And I also am a board member [of Argus]" (p. 142);

20. Walz's and Vromen's communications with Argus's staff, who were below Sandone in the chain of command, were "intended to disrupt management" at Argus (p. 151);

21. He suggested to Vromen that ABN AMRO's lawyers should start pursuing legal remedies against Argus, on behalf of ABN AMRO and Mercurius, in August of 2002 (p. 158-59);

22. As a member of the board of directors of Argus, he [Walz] recommended to Argus's creditors that they sue Argus (p. 159);

23. In exercising his perceived duty to Argus's creditors (ABN AMRO & Mercurius), Walz perceived that he had "no duty to [Argus] shareholders" (p. 161);

24. As an investment manager for ABN AMRO, Walz recommended to them that they do things to protect their position, including forcing Argus into bankruptcy (p. 162);

25. As an employee of one Dutch company, Walz recommended to the employee of another Dutch company (Vromen), "let's call the notes of the company that I am on the board of, which we know won't be in the position to pay it, so that the Dutch companies can then put Argus into bankruptcy" (pp. 163-64);

26. Walz's recommendations to ABN AMRO and Mercurius to call in the notes, start legal proceedings against Argus, and push Argus into bankruptcy were made in the course and scope of his employment with ABN AMRO, rather than as an Argus board member (p. 165);

27. Walz stated to the other Argus board members on November 6, 2002, that the only way ABN AMRO would possibly approve borrowing would be to gain or control Argus (pp. 175-76);

28. On December 10, 2002, Walz suggested that ABN AMRO and Mercurius should file a lawsuit against Argus and Plaintiff with the intent of freezing everything at Argus and prohibiting transactions so as to give more leverage to ABN AMRO and Mercurius (pp. 183-84);

F:\DOCS\JOE\SANDONE\ABN AMRO\Response to Mo to  Dismiss second amd complt- Federal.doc

1