**Lawyer's Notes**

Terry [8] Snyder in any regard to get his — ask questions of [9] him?

[10] **A:** If I had detailed questions on a line item [11] I didn't understand or something looked abnormal, I [12] would ask detailed questions of Terry.

[13] **Q:** You ever ask him to — ever point out any [14] errors in the financial statements to him?

[15] **A:** I don't remember errors. I would, again, [16] point out anomalies or what didn't look right and [17] try and investigate it. I don't remember there [18] being errors or not.

[19] **Q:** So anytime you saw something that you [20] questioned in your mind if it was correct, you [21] would make it a practice to talk to Terry as to [22] what this is about?

[23] **A:** Right. The substance of it, correct.

[24] **Q:** And the times that you — withdraw that.

Page 107

[1] Did you, in fact, catch anomalies that [2] turned out to be possibly errors?

[3] **A:** I don't recall. I don't believe I did.

[4] **Q:** Were any changes or — well, changes or [5] alterations made on financial statements based on [6] observations that you had communicated?

[7] **A:** I might have requested additional [8] information.

[9] **Q:** But never had any changes — caused any [10] changes to be made on a financial statements?

[11] **A:** I don't believe I did.

[12] **Q:** Okay. So as a board member, you — [13] withdraw that.

[14] Did you feel you had sufficient access to [15] financial information as a board member?

[16] **A:** Not at all times.

[17] **Q:** Ultimately were you satisfied with the [18] accuracy and correctness of the financial [19] statements?

[20] **A:** Yes.

[21] **Q:** I'd like to review some documents with [22] you. They're not going to be in any particular [23] subject matter order because some of them concern [24] multiple subject matters. First let me hand you

Page 108

[1] Exhibit 59.

[2] Do you recognize that as a distribution of [3] a financial statement for November of 2002 to —

[4] **A:** I do.

[5] **Q:** — I guess from McNabb to McNabb. I don't [6] know. But you — did you see that about that point [7] in time?

[8] **A:** I probably did see these, yes.

[9] **Q:** And that's one of them that you reviewed?

[10] **A:** Yes.

[11] **Q:** And to your observations, it was correct?

[12] **A:** Generally.

[13] **Q:** Well, did you see any errors on that one?

[14] **A:** Not that I recall.

[15] **Q:** Let me ask you, explain to me the second [16] page, toward the bottom of the first page, toward the bottom of this page in your mind.

[17] **MR. PHEBUS:** Fine. Next document.

[18] **MR. FORRESTER:** All right.

[19] **BY MR. PHEBUS:**

[20] **Q:** Let me hand you Exhibit 98. In this [21] exhibit, the first page there's some e-mails, page [22] 1 of 4?

[23] **A:** Okay.

[24] **Q:** And you're, as I read this, saying Randy

Page 109

[1] is playing games because of a wrong e-mail address. [2] What are you talking about there?

[3] **A:** Well, I requested to have certain board [4] meetings. And I thought it was odd that when I [5] tried to contact Mr. O'Neill through this e-mail [6] address, that it was not an accurate e-mail address [7] for him. And hence he didn't show up at these [8] meetings and hence couldn't vote on important [9] matters to the board.

[10] **Q:** Did you undertake an investigation to see [11] why he wasn't getting your e-mails?

[12] **A:** You know, I tried to see it. I knew they [13] weren't accurate. And then I asked Mr. Snyder for [14] the e-mail. And he gave me a different e-mail [15] address, so I concluded maybe I was getting the [16] wrong information.

[17] **Q:** Well, the e-mail address that you had, [18] what was the source of that?

[19] **A:** Randy off the e-mails that he sent us for [20] the board meeting.

[21] **Q:** You always had Mr. — well, you took it — [22] I mean, this e-mail address Randy was using for [23] O'Neill?

[24] **A:** Correct.

Page 110

[1] **Q:** And then the e-mails didn't go through [2] when you used the address?

[3] **A:** Correct.

[4] **Q:** Okay. So you concluded that was some [5] intentional conduct on Randy's part to send out [6] wrong e-mail addresses?

[7] **A:** I questioned that, yes.

[8] **Q:** The pages 2 and 3 of 4, I gather this is a [9] letter from you to Mr. O Neil?

[10] **A:** It is.

[11] **Q:** Now, the part that starts duty of loyalty [12] and then there's numbers 1, 2, so forth, are you [13] the author of that?

[14] **A:** I copied this information off of, you [15] know, documents I have that explain the duty of [16] loyalty and duty of care.

[17] **Q:** Is this duty of loyalty and duty of — [18] well, these seven paragraphs under duty of loyalty [19] here, what was the circumstances why you — [20] how you came about to have the underlying document?

[21] **A:** Through other board participations and [22] having reviewed with my legal counsel of [23] what being a board member means.


EXHIBIT 2 part 2

[24] **Q:** And it was your understanding back when

[1] you sent this to O'Neill that this was a fair and [2] reasonable statement of the board members' duty of [3] loyalty?

[4] **A:** Yes.

[5] **Q:** And you still think that?

[6] **A:** Yes.

[7] **Q:** I'm going to hand you Exhibit 25. That's [8] our November 1st board meeting minutes. What I [9] wanted to ask you is, you've reviewed this [10] document —

[11] **A:** Yes.

[12] **Q:** — for accuracy?

[13] **A:** Yes.

[14] **Q:** And at the following board meeting, [15] November 6th, by that point in time did you have [16] these minutes?

[17] **A:** I believe I did.

[18] **Q:** And had you reviewed them for accuracy as [19] of November 6th —

[20] **A:** Yes.

[21] **Q:** — when obviously events were fresher in [22] your mind?

[23] Any errors in Exhibit 25, the board [24] meeting of November 1st?

[1] **A:** No.

[2] **Q:** And actually it was then approved without [3] correction?

[4] **A:** Yes.

[5] **Q:** It indicates here that the board [6] authorized McNabb to negotiate a source code [7] license in terms of Mr. Sandone?

[8] **A:** Yes.

[9] **Q:** So the board was, at least in principle, [10] not adverse to providing a source code license to [11] Mr. Sandone?

[12] **A:** No.

[13] **Q:** Correct?

[14] **A:** Correct.

[15] **Q:** Then McNabb makes — says that Bill Lacey [16] made statements to him on October 8th that Sandone [17] was in gross violation, etcetera.

[18] Did McNabb — when in point of time did [19] McNabb make this observation?

[20] **MR. KASSOF:** Objection, vague.

[21] **THE WITNESS:** I don't know.

[22] **BY MR. PHEBUS:**

[23] **Q:** Was it before Mr. Sandone had been [24] terminated?

[1] **MR. KASSOF:** Object to the form of the [2] question.

[3] **THE WITNESS:** Can you rephrase it or what do [4] you mean?

[5] **BY MR. PHEBUS:**

*Lawyer's Notes*

[6] **Q:** Well, these observations of Mr. McNabb [7] concerning Mr. Lacey, were they made to the board [8] after the motion that was approved that McNabb be [9] authorized to negotiate a source code license with [10] Sandone?

[11] **A:** I don't believe so.

[12] **Q:** It was made before then?

[13] **A:** I'm — yeah, Mr. Lacey made these types of [14] statements for a while.

[15] **Q:** No. What I mean was, when Mr. McNabb [16] said, I want it noted in the minutes that Lacey's [17] made these statements to me and he said that, was [18] that subsequent to the vote authorizing McNabb to [19] negotiate license terms with Sandone?

[20] **A:** I don't recall.

[21] **Q:** Okay. You never requested any changes be [22] made in the meeting — in the minutes of November [23] 1st, Exhibit 25, did you?

[24] **A:** I don't believe I did.

[1] **Q:** I'm going to hand you Plaintiff's Exhibit [2] No. 24 and refer you to paragraph 12.

[3] Now, do you recognize Exhibit 24 as being [4] Sandone's employment agreement with Argus?

[5] **A:** Okay.

[6] **Q:** And this was in force and effect on [7] November 1st, '02, to the best of your knowledge, [8] was it not?

[9] **A:** Yes.

[10] **Q:** And paragraph 12 indicates inter alia that [11] no modification or amendment of any terms, [12] conditions or provisions may be made other than by [13] written agreement signed by the parties; would that [14] be correct?

[15] **A:** Yes.

[16] **Q:** And is it also correct there — that there [17] was no written agreement signed by the parties as [18] to Mr. Sandone being terminated?

[19] **A:** Correct.

[20] **Q:** And you had 24 available to you as of [21] November 1st?

[22] **A:** I don't recall that, the new pieces of [23] this.

[24] **Q:** Did you ask to see it before you made the

[1] decision to terminate him?

[2] **MR. KASSOF:** Object to the form of the [3] question.

[4] **THE WITNESS:** I don't remember.

[5] **BY MR. PHEBUS:**

[6] **Q:** Before November — the vote on November [7] 1st to do whatever the board did, did you ask to [8] see the employment agreement?

[9] **A:** I don't remember.

[10] **Q:** Would you agree with the proposition that [11] the board members are responsible for preserving [12] the value of the company to the shareholders?

[13] **MR. KASSOF:** Object to the form, calls for a [14] legal conclusion.

[15] **THE WITNESS:** Can you read —
[16] **BY MR. PHEBUS:**
[17] **Q:** Yes. Would you agree with the proposition [18] that board members have a responsibility to [19] preserve the value of a corporation for the [20] shareholders?
[21] **MR. KASSOF:** Same objection.
[22] **THE WITNESS:** What's proposition mean?
[23] **BY MR. PHEBUS:**
[24] **Q:** Principally that that is one of the duties

Page 116

[1] of board members.
[2] **MR. KASSOF:** Same objection.
[3] **THE WITNESS:** At certain times I believe Argus [4] was in the zone of insolvency and needed to protect [5] the assets for the creditors at that time more than [6] the shareholders.
[7] **BY MR. PHEBUS:**
[8] **Q:** As of October 4th, '02, had you indicated [9] to Mr. McNabb that ABN will remove Randy as CEO at [10] the end of the year?
[11] **MR. KASSOF:** Can I have that back?
[12] **THE WITNESS:** I probably did do that. I don't [13] remember the exact time.
[14] **MR. KASSOF:** Can I have the question and answer [15] back?
[16] (Record read as requested.)
[17] **BY MR. PHEBUS:**
[18] **Q:** As of October 4th, 2002, had you indicated [19] to Mr. McNabb that ABN had written off its [20] investment in Argus?
[21] **A:** Yes.
[22] **Q:** If it had written off, would that be true [23] that it had written off its investment in Argus?
[24] **A:** Yes.

Page 117

[1] **Q:** And by the phrase written off in that [2] context, what did you mean?
[3] **A:** It means we took any value we had for [4] Argus on our books and wrote it off to a loss.
[5] **Q:** And that being so, what would have been — [6] why wouldn't ABN go along with the proposition [7] that, hey, we'll change our debt to equity and if [8] we want, you'll give us a source code license and [9] we'll go our separate way?
[10] **A:** There was no reason to do that.
[11] **Q:** Well, it would help the company, would it [12] not — Argus to survive if it all of a sudden [13] had Mercurius and ABN's cooperation to $12 million [14] off the books?
[15] **A:** In Argus's position, that may be true. [16] But I had my shareholder hat on for ABN AMARO. And [17] there's no reason for ABN AMARO as a shareholder [18] and creditor to do that.
[19] **Q:** If it had written it off, why is the [20] reason not to do it, that's my point?
[21] **A:** Because there's no reason to do it.
[22] **Q:** What's the reason not to do it?
[23] **A:** I don't know, you tell me. There's no [24]

*Lawyer's Notes*

reason to do something. There was no exchange of

Page 118

[1] anything. You know, it's a bank.
[2] **Q:** If you had — if ABN had a source code and [3] license, it was something that could use in its [4] dealings with I.T.@work, for example?
[5] **A:** ABN AMARO wasn't interested in that.
[6] **Q:** Why wasn't it interested in trying to [7] realize something by licensing the source code to [8] I.T.@work —
[9] **A:** Our position —
[10] **Q:** — sublicensing, I should say?
[11] **A:** In our position, we'd rather go through [12] the bankruptcy process and realize the value of the [13] assets through a bankruptcy.
[14] **Q:** On October 21st, '02, did you indicate to [15] Paul McNabb that Bill Lacey is the biggest problem, [16] if they could get him to stand down, the company [17] would have time to do something?
[18] **MR. KASSOF:** Object to the form of the [19] question. Is that a quote?
[20] **MR. PHEBUS:** No. It was a question.
[21] **THE WITNESS:** Say it again, please.
[22] **BY MR. PHEBUS:**
[23] **Q:** On October 1st, 2002, did you tell [24] Mr. McNabb, in essence, that Bill Lacey's the

Page 119

[1] biggest problem, get him to step down and the board [2] would have more time to do something?
[3] **A:** In terms of financing the company, I [4] probably made those comments. I don't know if it [5] was October 1st or not.
[6] **Q:** Can you tell us the names of any employees [7] that you believe quit the firm because they — [8] because of Randy other than those that you say quit [9] because they didn't get paid?
[10] **A:** I don't know the exact names off the top [11] of my head. Terry Snyder is one of them.
[12] **Q:** When did Terry quit?
[13] **A:** Some time in — I don't recall the exact [14] date.
[15] **Q:** Did he quit after November 1, '02?
[16] **A:** I don't remember.
[17] **Q:** Well, if he quit after November 1, '02, it [18] could hardly have been because of Randy, could it?
[19] **A:** Terry was talking about quitting for some [20] time.
[21] **Q:** Okay. But if Randy — if the source of [22] his irritation is Randy and Randy is now gone, how [23] do you rationalize Randy being the reason he left?
[24] **MR. KASSOF:** Object to the form of the

Page 120

[1] question.
[2] **THE WITNESS:** Don't know.

Page 116 - Page 120  (28)                      Min-U-Script®

[3] **BY MR. PHEBUS:**

[4] **Q:** Let me hand you Exhibit 67. May I direct [5] your attention to page 4 of 7. First of all, will [6] you identify that document for us? It's of two [7] pages in length.

[8] **A:** It's a quarterly write-up.

[9] **Q:** Is this one of those quarterly write-ups [10] that you were telling us that you did three of?

[11] **MR. KASSOF:** Well, is this one of those three, [12] is that the question?

[13] **MR. PHEBUS:** Well, no, not yet.

[14] **BY MR. PHEBUS:**

[15] **Q:** Is this that type of quarterly write-up?

[16] **A:** It's that type of write-up.

[17] **Q:** Okay. Now, can you tell me the date of [18] this quarterly write-up?

[19] **MR. KASSOF:** Why don't you read it.

[20] **THE WITNESS:** Most likely this was done in [21] January of 2002.

[22] **BY MR. PHEBUS:**

[23] **Q:** And who were the authors of this write-up?

[24] **A:** I don't know specifically.

Page 121

[1] **Q:** Were you involved in this?

[2] **A:** No.

[3] **Q:** Was this submitted to you for approval?

[4] **A:** No.

[5] **Q:** When did you become aware — first aware [6] of this quarterly report?

[7] **MR. KASSOF:** Is the question — okay. Do you [8] understand the question?

[9] **THE WITNESS:** When did I first see this report?

[10] **BY MR. PHEBUS:**

[11] **Q:** Yes.

[12] **A:** It looks like in March of 2002.

[13] **Q:** And under what circumstances did you first [14] see it?

[15] **A:** I believe in the transfer of the [16] responsibility of the Argus investment, these were [17] documents that were sent from our SN group over to [18] my group to review.

[19] **Q:** And did you make any inquiry as to who [20] arrived at the market value?

[21] **A:** No.

[22] **Q:** Did you submit any reports addressing this [23] particular report and saying, this is erroneous as [24] to market value or erroneous in any other respect?

Page 122

[1] **A:** No.

[2] **Q:** Up at the upper right of page 1, there's a [3] rating, 4A?

[4] **A:** Okay.

[5] **Q:** What does that mean?

[6] **MR. KASSOF:** Objection, foundation.

[7] **THE WITNESS:** That's a rating system we use, it [8] was inside the bank to measure the investments and [9] the performance of the investments.

[10] **BY MR. PHEBUS:**

[11] **Q:** Four would be on what scale?

[12] **A:** One to five, five being the worst.

[13] **Q:** Pardon?

[14] **A:** One to five, five being the worst.

[15] **Q:** Worst. Okay. And worst as far as what [16] aspect?

[17] **A:** Five meant the company was bankrupt.

[18] **Q:** As far as financial solvency of the [19] company?

[20] **A:** Yes.

[21] **Q:** And then A, what does that mean?

[22] **A:** A is — there is different methodologies [23] between Europe and US. So there's a scale of A, B, [24] C, D, E, that means exactly as 1, 2, 3, 4, 5, so.

Page 123

[1] **Q:** So A would mean what?

[2] **A:** A was — basically meant the company was [3] in jeopardy. It's on the brink of going into [4] bankruptcy.

[5] **Q:** Is one of these ratings the US rating and [6] one the Dutch rating?

[7] **A:** There's an alignment of certain systems [8] for the Federal Reserve requirements to put this [9] together. So I don't recall the exact measurement [10] at this point.

[11] **Q:** Does this mean two separate people did the [12] rating, one from Holland and one here?

[13] **A:** No.

[14] **Q:** There's reference on the first page to an [15] ICC arbitration. Do you see that?

[16] **A:** Uh-huh.

[17] **Q:** What is your understanding, if anything, [18] as to what that was about?

[19] **A:** I don't know all the details of the [20] arbitration.

[21] **Q:** Well, do you know any details?

[22] **A:** I know very high-level, few details. [23] That's it.

[24] **Q:** What are the details you're aware of?

Page 124

[1] **A:** I'm aware that the European — Argus [2] Europe was — went bankrupt or something. And that [3] the ABN AMRO/Mercurius took I think Argus US or [4] Randy and Paul McNabb to an arbitration proceeding.

[5] **Q:** In regards to what? What was the [6] complaint?

[7] **A:** I believe there's some disputes on the [8] investment dollars and how the investment dollars [9] moved back and forth between Europe and the US.

[10] **Q:** And what was the resolution, if you [11] understand?

[12] **A:** I believe the resolution was the agreement [13] to the December 3rd documents.

[14] **Q:** The second page of 5 of 7 has a section, [15]

*Lawyer's Notes*

exit prospects and it refers to, we've been [16] approached already by two US companies. Do you see [17] that?

[18] **A:** Uh-huh.

[19] **Q:** Do you know who those two US companies [20] would be?

[21] **A:** No.

[22] **Q:** We'll go back to it in a second. On page [23] 5 of 7, the second page there, it says actions, the [24] second paragraph, sub 3 there, cautiously starting

Page 125

[1] the process of replacing the certain members of the [2] management. Do you see that?

[3] **A:** Yes.

[4] **Q:** Do you know who's referred to there?

[5] **MR. KASSOF:** Objection, lacks foundation.

[6] **THE WITNESS:** I'm sure it's referring to —

[7] **MR. KASSOF:** If you know who the person is who [8] wrote this down, say so.

[9] **THE WITNESS:** Yeah. I don't know exactly.

[10] **BY MR. PHEBUS:**

[11] **Q:** Has anyone ever told you what's being [12] referred to?

[13] **A:** No.

[14] **Q:** Anybody at ABN ever indicated to you that [15] anybody other than Randy should be replaced?

[16] **A:** No.

[17] **Q:** You went on the board, refresh my memory?

[18] **A:** I believe in late January 2002.

[19] **Q:** Let me hand you Exhibit 71. Do you [20] recognize this as an e-mail from Dijkstra to you?

[21] **A:** I do.

[22] **Q:** And it's dated February 14th of '02 so [23] that would be within a few weeks after you went on [24] the board, correct?

Page 126

[1] **A:** Correct.

[2] **Q:** And you ever discuss this e-mail with [3] Dijkstra either orally or in writing?

[4] **A:** I might have. I believe I did, yes.

[5] **Q:** What did you — what was your response to [6] Dijkstra?

[7] **A:** My response was that I had not been there [8] long enough to really come to these conclusions [9] yet.

[10] **Q:** Did Dijkstra tell you why he thought Randy [11] was probably the best in sales?

[12] **A:** He probably thought — he thought Randy [13] probably knew the product and was good in front of [14] customers.

[15] **Q:** And Steve was in sales at the time, right, [16] Oetegenn?

[17] **A:** Correct.

[18] **Q:** And did he — did he and Jan Dijkstra ever [19] tell you why he thought Steve was not

*Lawyer's Notes*

performing [20] that well?

[21] **A:** I believe he just took that from the [22] results of the amount of deals closing.

[23] **Q:** Let me hand you Exhibit 72. Let me ask [24] this, to your knowledge, to what extent did ABN and

Page 127

[1] Mercurius coordinate and confer with each other in [2] regards to Argus?

[3] **MR. KASSOF:** Object to the form of the [4] question, vague.

[5] **THE WITNESS:** We, you know, coordinated and got [6] each other's opinion quite often.

[7] **BY MR. PHEBUS:**

[8] **Q:** Would you as a board member communicate [9] directly with anyone from Mercurius?

[10] **A:** Mr. Vromen.

[11] **Q:** Why would you be working with Mr. Vromen [12] if he's on behalf of the investor Mercurius when [13] you're on behalf of the investor ABN?

[14] **A:** That's very typical in this line of [15] business for investors to work together on [16] investments and share information.

[17] **Q:** Was there any written agreement between [18] ABN and Mercurius concerning Argus?

[19] **A:** Not to my knowledge.

[20] **Q:** Have you ever made an inquiry if there [21] was?

[22] **A:** No.

[23] **Q:** Who would be most likely to be aware of [24] any such agreements?

Page 128

[1] **A:** Probably Mr. Shoemacher or Mr. Vromen.

[2] **Q:** Now, on the first paragraph, it refers to [3] discussions with the European team. Who do you [4] understand the European team to have been?

[5] **A:** I think that's Hank and Gunther.

[6] **Q:** Well, they're I.T.@work, correct?

[7] **A:** Don't know if they were at this particular [8] moment in time, if they had established that yet or [9] not.

[10] **Q:** Well, what — why would they have any [11] involvement if they hadn't established I.T.@work? [12] Were they at Mercurius or ABN?

[13] **A:** No. They were former employees of Argus [14] Europe, I believe.

[15] **Q:** You think that's who they're referring to, [16] Hank and —

[17] **MR. KASSOF:** Objection, foundation.

[18] **BY MR. PHEBUS:**

[19] **Q:** You ever make any inquiry as to who the [20] European team is you're referring to here?

[21] **MR. KASSOF:** Frits is referring to here.

[22] **THE WITNESS:** No, I didn't.

[23] **BY MR. PHEBUS:**

[24] **Q:** When did this — withdraw that.

2:04-cv-02232-HAB-DGB Randall J. Sandone v. #26-9 Page 6 of 19
Keith Walz, et al.

Keith Walz
July 27, 2004

*Lawyer's Notes*

Page 129

[1] I gather this e-mail, Exhibit 72, came to [2] your attention approximately March 17th, '02?

[3] **A:** Yes.

[4] **Q:** And at that point in time Frits is talking [5] about having Randy step aside immediately?

[6] **A:** Yes.

[7] **Q:** And you — what did you respond to this, [8] if anything?

[9] **A:** You know, we probably had discussions [10] about this. And I had my independent thoughts of [11] why that probably made sense. And Frits was [12] telling me his thoughts about that.

[13] **Q:** And what did Frits tell you at that time?

[14] **A:** With regards to what?

[15] **Q:** To why he wanted Randy to step down?

[16] **A:** I believe that he also thought that the [17] sales were not performing well, the company was [18] having difficulty getting financing, that they [19] wanted financing from Mercurius. That was one of [20] his requirements, which is standard in these types [21] of arrangements.

[22] **Q:** Well, now here he's talking about — he, [23] Frits, we should consider to get Steve the [24] authority to really trim the company and do what

Page 130

[1] has to be done. That would be Steve Oetegenn?

[2] **A:** That's correct.

[3] **Q:** Who a few weeks earlier Dijkstra said [4] wasn't doing the job in your earlier e-mail?

[5] **A:** He suggested that, yeah.

[6] **Q:** And were there some discussions — direct [7] discussions between Steve Oetegenn and folks from [8] Mercurius or ABN concerning the company during this [9] time frame?

[10] **MR. KASSOF:** Objection, foundation.

[11] **THE WITNESS:** I don't know.

[12] **BY MR. PHEBUS:**

[13] **Q:** You ever ask Frits, how did you come up [14] with Steve taking it over since Jan says he's not [15] doing his job?

[16] **A:** I believe I did talk about that with them. [17] And Steve, I believe, worked in the Argus European [18] company as well at some point, so he knew Frits [19] very well.

[20] **Q:** Now, there's a P.S. on this. I don't know [21] if you read that. Take a second to read it. And [22] my question is, this information concerning Sun [23] that's reported in the P.S., did you communicate [24] that to anyone at Argus?

Page 131

[1] **A:** I don't recall.

[2] **Q:** Well, isn't this something that would be [3] of valuable information to the officers and [4] directors of Argus, to know that this may be the [5] act of Sun as expressed in P.S.?

[6] **MR. KASSOF:** Object to the form of the [7] question.

[8] **THE WITNESS:** I don't know. I believe — I [9] thought the company at the time knew this position.

[10] **BY MR. PHEBUS:**

[11] **Q:** Did you ever — when did you learn this [12] position of Sun?

[13] **A:** I don't recall exactly.

[14] **Q:** Did you make any investigation to [15] determine if this — what is expressed here in the [16] P.S. was, in fact, Sun's position?

[17] **A:** No.

[18] **Q:** And as of this day, do you have any [19] opinion on what is meant in this regard?

[20] **A:** No.

[21] **Q:** Ever bring it to Randy's attention what [22] this P.S. meant?

[23] **A:** Not about this particular one I don't [24] believe.

Page 132

[1] **Q:** Well, what leads you to believe that Randy [2] was already aware of this information?

[3] **MR. KASSOF:** Object to the form of the [4] question.

[5] **THE WITNESS:** We had several conversations [6] about Sun. And I vaguely recall that some of those [7] discussions were around the strategy of their [8] business.

[9] **BY MR. PHEBUS:**

[10] **Q:** Did you keep Frits's memo including the [11] P.S. confidential?

[12] **A:** I don't recall.

[13] **Q:** Let me hand you Plaintiff's Exhibit 80. [14] Do you recognize this as an e-mail from Frits to [15] Vromen, to you and others, correct?

[16] **A:** Okay.

[17] **Q:** Did you become aware of this e-mail on [18] approximately March 22nd, '02?

[19] **A:** Yes.

[20] **Q:** And now we have Frits saying, we have no [21] choice but to ask Randy to step down. If he [22] doesn't, I will advise the board to file for [23] Chapter 11. Do you see that?

[24] **A:** I see that.

Page 133

[1] **Q:** Now, you ever had any conversation with [2] Frits concerning his advice that the company take [3] Chapter 11?

[4] **A:** I believe that was my recommendation was [5] to seek protection.

[6] **Q:** But did you previously recommend that to [7] Frits and the folks at ABN?

[8] **A:** Frits and the board as well.

[9] **Q:** Okay. It refers to a business plan that [10] Steve and the Europeans are preparing. Europeans, [11] that would be Hank and Klix?

[12] **A:** I believe so.

[13] **Q:** And you ever see that business plan?

[14] **A:** I don't recall if I did or not.

[15] **Q:** What was your understanding of what that

[16] business plan was all about?
[17] **A:** I don't remember. I'm sure it was a [18] strategy of, you know, how to take the company in [19] the direction they thought was best.
[20] **Q:** Was there any discussion between Mercurius [21] and ABN on how we would make Frits's proposal work [22] as set forth in the next to bottom paragraph?
[23] **MR. KASSOF:** To your knowledge.
[24] **THE WITNESS:** No.

Page 134

[1] **BY MR. PHEBUS:**
[2] **Q:** In looking at page 2, apparently Randy and [3] Paul asked Steve Oetegenn to resign, correct?
[4] **A:** I don't believe they asked him to resign.
[5] **Q:** They terminated him?
[6] **A:** Correct.
[7] **Q:** Okay. And then — and Steve contacts [8] Frits and tells him that. Did you ask — did you [9] ever ask Frits, how come Oetegenn's calling you?
[10] **A:** I never asked him that.
[11] **Q:** Did that — does that strike you as [12] unusual that Oetegenn would be e-mailing Frits [13] about the — this event at Argus?
[14] **MR. KASSOF:** Object to the form of the [15] question.
[16] **THE WITNESS:** No.
[17] **BY MR. PHEBUS:**
[18] **Q:** Did you view Frits as having the authority [19] to micromanage Argus?
[20] **MR. KASSOF:** Same objection.
[21] **THE WITNESS:** I believe he had the right as a [22] significant shareholder and creditor of the company [23] to put forth ideas and try and understand the [24] position of the company.

Page 135

[1] **BY MR. PHEBUS:**
[2] **Q:** Another e-mail from Frits was what he was [3] proposing, as you understood it, that Randy and [4] Paul be removed from the board and Steve be placed [5] on the board?
[6] **MR. KASSOF:** You're asking for his [7] understanding of it?
[8] **MR. PHEBUS:** Yes. What was his understanding [9] of what was being proposed at that time.
[10] **THE WITNESS:** I don't recall that Steve being [11] on the board. I do recall him saying about [12] removing Randy and Paul, which I think I clearly [13] understood we couldn't do.
[14] **BY MR. PHEBUS:**
[15] **Q:** Well, you could have always asked for a [16] meeting of the shareholders, couldn't you, and ask [17] at that time the shareholders remove him?
[18] **A:** Well, we could have done that.
[19] **Q:** Did you ever undertake to do that?
[20] **A:** No.
[21] **Q:** Why not?
[22] **A:** We didn't believe it was worth our time [23] and effort.
[24] **Q:** Was the reason that Carpenter was

Page 136

[1] concerned about directors and officers' errors and [2] omissions a concern of problems that might result [3] from the endeavoring to remove Randy as CEO?
[4] **MR. KASSOF:** Can I have that back, please?
[5] (Record read as requested.)
[6] **MR. KASSOF:** Objection, lacks foundation, calls [7] for speculation.
[8] **MR. PHEBUS:** If you know.
[9] **THE WITNESS:** No.
[10] **BY MR. PHEBUS:**
[11] **Q:** That was not a concern of Carpenter's?
[12] **A:** No.
[13] **Q:** And was there any specific concern of [14] Carpenter's?
[15] **A:** Yes.
[16] **Q:** What was that?
[17] **A:** He was worried about the effect of not [18] meeting payroll and the payroll obligations that [19] would flow to the board of directors.
[20] **Q:** Let me hand you Exhibit 85. Do you [21] recognize that as an e-mail from Dijkstra to [22] yourself?
[23] **A:** Yes.
[24] **Q:** And in that e-mail he asks or suggests you

Page 137

[1] check various formal documents including [2] shareholders' agreement and voting agreement?
[3] **A:** Correct.
[4] **Q:** And did you do what he suggested?
[5] **A:** I did not have our counsel check through [6] them.
[7] **Q:** Did you review it?
[8] **A:** I reviewed them.
[9] **Q:** And the things that you reviewed at that [10] time would have included as exhibits bylaws of the [11] corporation, right?
[12] **A:** Correct.
[13] **Q:** And it would have included Randy's [14] employment agreement, correct?
[15] **A:** Again, I don't know if the employment [16] agreement was contained in that set of documents I [17] have.
[18] **Q:** And you would have reviewed the documents [19] in April of '02?
[20] **A:** Correct.
[21] **Q:** When, to your knowledge, did you first [22] actually have a copy of Randy's employment [23] agreement?
[24] **A:** I don't know.

Page 138

[1] **Q:** Did you have one before November 1st, '02?
[2] **A:** I don't know. I asked many questions [3]

*Lawyer's Notes*

Randall v. Sandone
Keith Walz, et al.
2:04-cv-02232-HAB-DGB     # 26-9     Page 8 of 19

Keith Walz
July 27, 2004

about what was contained in the contract.

[4] **Q:** Okay. Well, you were, at least before [5] November 1st '02, aware of the existence of the [6] employment agreement?

[7] **A:** Yes.

[8] **MR. KASSOF:** Asked and answered.

[9] **BY MR. PHEBUS:**

[10] **Q:** Let me hand you Exhibit 86. That's a — [11] well, there's two e-mails there, Frits to Jan [12] Dijkstra, bottom. And it indicates that, well, [13] that leaves us with pretty much no other contact [14] than Terry Snyder in the company.

[15] Do you see that?

[16] **A:** Let me read this.

[17] **Q:** Sure.

[18] **A:** Okay.

[19] **Q:** Do you see that?

[20] **A:** I see that.

[21] **Q:** Now, at that point in time Paul and Randy [22] were still with the company, correct?

[23] **A:** Correct.

[24] **Q:** Well, weren't they contacts at the

Page 139

[1] company?

[2] **A:** I don't know what he's trying to refer to [3] in that sentence.

[4] **Q:** What was Snyder's position at that time?

[5] **A:** I believe he was CFO at that time.

[6] **Q:** And Randy was CEO?

[7] **A:** Correct.

[8] **Q:** And what was Paul at that time?

[9] **A:** I believe Paul was chief technical [10] officer, I think.

[11] **Q:** And, of course, Paul and Randy were both [12] on the board of directors in April of '02?

[13] **A:** Correct.

[14] **Q:** And you were on the board of directors in [15] April of '02?

[16] **A:** Correct.

[17] **Q:** Well, weren't you and Randy and Paul all [18] contacts from Mercurius at Argus as of April '02?

[19] **MR. KASSOF:** Object to the form of the [20] question.

[21] **THE WITNESS:** We were contacts.

[22] **BY MR. PHEBUS:**

[23] **Q:** Can you explain to me why Frits would be [24] going directly to Terry Snyder when you were on the

Page 140

[1] company's board?

[2] **MR. KASSOF:** Objection, lacks foundation.

[3] **THE WITNESS:** Most likely he was trying to [4] understand —

[5] **MR. KASSOF:** I don't want you to guess. If you [6] know.

[7] **THE WITNESS:** Okay. I don't know.

*Lawyer's Notes*

[8] **BY MR. PHEBUS:**

[9] **Q:** You ever ask, why are you going to Snyder, [10] he's not the chain of command?

[11] **A:** No. I never asked that. It's not unusual [12] to me.

[13] **Q:** Pardon me?

[14] **A:** It's not unusual to me.

[15] **Q:** It's not unusual for creditors just to go [16] directly to — second to your people's company?

[17] **A:** Not in my 8 years of investing. It's very [18] typical for investors to talk with CFOs of [19] companies.

[20] **Q:** To what extent would you get e-mails or [21] other communications from Frits Vromen concerning [22] Argus?

[23] **MR. KASSOF:** Objection, form.

[24] **THE WITNESS:** I would get e-mails regularly

Page 141

[1] from Frits.

[2] **BY MR. PHEBUS:**

[3] **Q:** You ever had conversations with him that, [4] you know, hey, Frits, why don't you come to the [5] board of directors first and just ask me?

[6] **A:** No. I never had that direct question. It [7] was understood that Frits would never be a board [8] member of Argus.

[9] **Q:** Did you ever — let me ask you this, did [10] you make it a habit of reporting all of the [11] communications from Frits Vromen that you received [12] concerning Argus to the Argus board?

[13] **A:** No.

[14] **Q:** Why not?

[15] **A:** Because those were confidential [16] conversations between two investors.

[17] **Q:** Well, I thought you were involved with [18] Argus as a board member?

[19] **MR. KASSOF:** Object, form of question.

[20] **THE WITNESS:** I wear two hats. I represent ABN [21] AMARO as a significant creditor/investor. And I [22] also am a board member.

[23] **BY MR. PHEBUS:**

[24] **Q:** Were you representing Mercurius also?

Page 142

[1] **A:** No.

[2] **Q:** Well, why wouldn't you tell the rest of [3] the board about Vromen's activities, so to say?

[4] **A:** Those were, again, confidential [5] conversations between two investors. It's not [6] typical to share those with board members.

[7] **Q:** But when it's shared with you, it's shared [8] with a member of the board, is it not?

[9] **A:** I have — as me being a board member, [10] there's no obligation for me as a board member to [11] disclose those confidential conversations to other [12] board members.

[13] **Q:** Well, as a board member employed by a [14] creditor, as you view things, is it okay for you to [15] disclose what would be called confidential [16]

information of Argus to Argus's competitors or [17] third parties?

[18] **MR. KASSOF:** Can I have that back?

[19] (Record read as requested.)

[20] **THE WITNESS:** What do you mean by third [21] parties?

[22] **BY MR. PHEBUS:**

[23] **Q:** Oh, I.T.@work I'd call a third party.

[24] **A:** That's not appropriate.

Page 143

[1] **Q:** It would not be appropriate to disclose [2] Argus's internal financial information and [3] potential dealings to I.T.@work, correct?

[4] **MR. KASSOF:** Object to the form.

[5] **THE WITNESS:** Confidential information. I [6] don't think it's inappropriate to discuss the [7] situation of Argus with them as long as it's not [8] confidential information.

[9] **BY MR. PHEBUS:**

[10] **Q:** Would — confidential information, that [11] would include financial information, would it not?

[12] **A:** Most likely.

[13] **Q:** It would include offers from third parties [14] to buy or sell, would it not?

[15] **A:** Most likely.

[16] **Q:** Let me hand you Exhibit 89.

[17] **MR. KASSOF:** 80 what?

[18] **MR. PHEBUS:** 89.

[19] **BY MR. PHEBUS:**

[20] **Q:** Now, going first to page 1, that is an [21] e-mail from Terry Snyder to you June 18th, '02, at [22] 10:19 a.m., correct?

[23] **A:** Uh-huh.

[24] **Q:** And it says message delivered. Do you see

Page 144

[1] that?

[2] **A:** I do.

[3] **Q:** What's he referring to?

[4] **A:** I have no idea.

[5] **Q:** Let's turn to page 2. Do you recognize [6] that as an e-mail from Terry to you about two hours [7] later on the same day?

[8] **A:** Yes.

[9] **Q:** And Terry says to you, I think things are [10] moving forward, I won't let you down, we need to [11] solve this. Right?

[12] **A:** That's what he says.

[13] **Q:** Did you get that e-mail at about that [14] point in time?

[15] **A:** I did receive it.

[16] **Q:** And what's — what's he talking about with [17] you?

[18] **MR. KASSOF:** Object to the form.

[19] **THE WITNESS:** I have no idea. I don't know the [20] context of this conversation.

[21] **BY MR. PHEBUS:**

*Lawyer's Notes*

[22] **Q:** You don't know what the things were that [23] were moving forward on June 18th?

[24] **A:** Not at that particular time.

Page 145

[1] **Q:** And the phrase, I won't let you down, [2] what's that referring to?

[3] **MR. KASSOF:** Objection, foundation, asked and [4] answered.

[5] **THE WITNESS:** I don't know.

[6] **BY MR. PHEBUS:**

[7] **Q:** And then apparently at 12:17 on the same [8] date, you — just a few minutes before I won't let [9] you down, you had sent an e-mail to Snyder, [10] correct?

[11] **A:** Correct.

[12] **Q:** And your e-mail says, re, message [13] delivered, quote, probably like a boomerang, just [14] tell me when to duck, Keith, correct?

[15] **A:** Correct.

[16] **Q:** What are you talking about?

[17] **A:** Again, I don't recall the context of this [18] conversation.

[19] **Q:** So he's telling you, message delivered, I [20] won't let you down and you're telling him that [21] something's probably like a boomerang, tell me when [22] to duck. But that doesn't refresh your [23] recollection in that regard?

[24] **A:** It really doesn't.

Page 146

[1] **Q:** Well, a boomerang is something that —

[2] **A:** I know what that means.

[3] **Q:** — a person throws and it comes back?

[4] **A:** Right.

[5] **Q:** Does this mean you had put something in [6] operation and you were worried it was going to come [7] back and hit you?

[8] **MR. KASSOF:** Object to the form of the [9] question.

[10] **THE WITNESS:** Again, I don't know the context [11] of it.

[12] **BY MR. PHEBUS:**

[13] **Q:** Well, what would be the context of [14] something probably like a boomerang other than it's [15] liable to come back and give you trouble?

[16] **MR. KASSOF:** Objection, asked and answered, [17] object to the form.

[18] **THE WITNESS:** There's several things that it [19] could —

[20] **MR. KASSOF:** I don't want you to speculate. If [21] you recall.

[22] **THE WITNESS:** I don't know. I don't know.

[23] **BY MR. PHEBUS:**

[24] **Q:** Can you suggest to me any context other

Page 147

[1] than the one I just suggested to you for that [2] statement?

[3] **MR. KASSOF:** Same objection.

[4] THE WITNESS: What was the one you suggested?
[5] BY MR. PHEBUS:
[6] Q: That probably like a boomerang means [7] you've thrown something out there and worried it [8] was going to come back and hit you or give you [9] trouble.
[10] A: Right.
[11] Q: Any other meaning you can suggest for that [12] phrase in this context?
[13] A: No.
[14] Q: But you don't know what you had thrown [15] out, so to speak?
[16] A: No. I don't recall.
[17] MR. KASSOF: Take a couple of minute break?
[18] MR. PHEBUS: We can. That's fine.
[19] (A short break was taken.)
[20] BY MR. PHEBUS:
[21] Q: Let me hand you Exhibit 90. That's an [22] e-mail from — the heart of it is from Snyder to [23] Vromen; would that be correct?
[24] A: It appears that way.

Page 148

[1] Q: And this is in June. And Snyder is [2] saying, in essence, as I understand it, how about [3] replacing Paul and Randy with me as CEO, and I'll [4] work every day to get changes made.
[5] Would you agree with that?
[6] A: Let me read it.
[7] MR. KASSOF: Object to the form.
[8] BY MR. PHEBUS:
[9] Q: Sure.
[10] MR. KASSOF: You're asking him to sign on to [11] your interpretation of the document?
[12] BY MR. PHEBUS:
[13] Q: Yes. My question is, is it correct [14] that — is it your understanding of this e-mail [15] that Snyder is suggesting that he ought to become [16] the CEO and replace Randy and Paul?
[17] MR. KASSOF: Objection, lacks foundation.
[18] THE WITNESS: I don't know.
[19] BY MR. PHEBUS:
[20] Q: When did you see this e-mail, if you [21] recall?
[22] A: I probably saw it around the end of June.
[23] Q: Did you bring this to Randy's attention?
[24] A: I don't know.

Page 149

[1] Q: Did you bring it to Paul's attention?
[2] A: I don't know.
[3] Q: Or to Bill O'Neill?
[4] A: I don't know.
[5] Q: Did you ever say to Terry, hey, look, [6] there's a chain of command in this organization, [7] why — you know, if you're just running around to [8] all the investors and trying to get them terminated [9] and you put on as president, that makes it very [10] hard for the company to

*Lawyer's Notes*

smoothly operate or words [11] to that effect?
[12] A: What was the question again?
[13] Q: Well, did you think this was a good idea [14] and a good practice for Snyder to send these out to [15] folks such as Vromen and yourself and him not to be [16] told not to do that anymore?
[17] MR. KASSOF: Object to the form of the [18] question.
[19] THE WITNESS: I believe Terry's just responding [20] to initiations and discussions that Frits had with [21] him.
[22] BY MR. PHEBUS:
[23] Q: Okay. Well, when you heard of these [24] discussions, did you say words to the effect of,

Page 150

[1] what are you guys doing, how can we run a company [2] if we've got investors — or creditors, I should [3] say, coming in and talking to senior staff and [4] fermenting discontent?
[5] MR. KASSOF: Object to the form of the [6] question, assumes facts.
[7] THE WITNESS: Again, I don't know. Again, this [8] is not an untypical process in my experience.
[9] BY MR. PHEBUS:
[10] Q: Well, whether it's typical or not, would [11] you agree that it is a process that disrupts [12] management of the company and unified efforts?
[13] MR. KASSOF: Object to the form of the [14] question.
[15] THE WITNESS: It's intended to disrupt [16] management.
[17] BY MR. PHEBUS:
[18] Q: And it's — it's very disruptive of [19] teamwork, this Frits and Snyder going through this [20] back channel of communication. Would you agree [21] with that?
[22] MR. KASSOF: We're talking in the abstract or [23] specifically with respect to Argus?

Page 151

[1] BY MR. PHEBUS:
[2] Q: With respect to Argus.
[3] A: I don't know.
[4] Q: Okay. Did you ever make any inquiries — [5] withdraw that.
[6] Did you ever advise Snyder or Vromen that [7] they shouldn't be having these back channel [8] communications?
[9] A: No.
[10] Q: Did Snyder ever suggest a merger of Argus [11] with a North Carolina company so — with the [12] thought being that Snyder would then relocate to [13] North Carolina?
[14] A: Not to my knowledge.
[15] Q: Did he ever suggest a merger of Argus with [16] anyone?
[17] A: Not specifically, not to my knowledge.
[18] Q: Did he ever mention Argus having — [19] getting some arrangement with a company in North [20] Carolina?

[21] **A:** Not to my knowledge.

[22] **Q:** Okay. Let me hand you Exhibit 113A. And [23] if you look at page 2 of 2, it's a — I gather [24] that's an e-mail to Hank and Gunther from you,

Page 152

[1] would that be correct — oh, no, from Frits with a [2] copy to you or is it from you to Hank and Gunther?

[3] **A:** Well, there's one here, it looks like from [4] me to Hank and Gunther.

[5] **Q:** And it says, please keep this information [6] confidential and do not indicate to Argus that you [7] know about this?

[8] **A:** That's what it says.

[9] **Q:** What is the information referred to?

[10] **A:** I don't know.

[11] **Q:** Well, let's look over at the first page, 1 [12] of 1, which has the preceding Bates number. And [13] if — it's my understanding that the information [14] from looking at this is Peter Fox's proposal?

[15] **MR. KASSOF:** Object to the form of the [16] question.

[17] **BY MR. PHEBUS:**

[18] **Q:** Isn't that what the information was?

[19] **MR. KASSOF:** Object to the form of the [20] question, assumes facts and foundation.

[21] **THE WITNESS:** I don't know.

[22] **BY MR. PHEBUS:**

[23] **Q:** Doesn't this refresh your recollection [24] that what we're talking about is Peter Fox's

Page 153

[1] proposal?

[2] **A:** I don't know. I don't recall what that [3] was referring to.

[4] **Q:** Would you agree that Klix and Michaels [5] would have no legitimate reason to be furnished [6] with Peter Fox's proposal?

[7] **MR. KASSOF:** Object to the form of the [8] question, assumes facts.

[9] **THE WITNESS:** Don't know.

[10] **BY MR. PHEBUS:**

[11] **Q:** Well, can you suggest to me any proper [12] basis for furnishing Peter Fox's proposal to [13] acquire or refinance Argus to I.T.@work?

[14] **A:** It probably should not have been.

[15] **Q:** On the bottom of the first page, page 1 of [16] 2 of that exhibit, it looks like that's an e-mail [17] from Keith — I'm sorry, from Hank to you and [18] Keith — I'm sorry to you and Frits saying, this is [19] interesting information, thanks for sharing it with [20] us. And it's reading the Fox proposal.

[21] Would you have any reason to believe what [22] was shared with I.T. Technology was anything other [23] than the Fox proposal?

[24] **MR. KASSOF:** Object to the form of the

Page 154

[1] question.

[2] **THE WITNESS:** Again, I don't know exactly

**Lawyer's Notes**

what [3] I shared with them.

[4] **BY MR. PHEBUS:**

[5] **Q:** Well, if you'll look at it, also it says [6] the e-mail you forwarded to us indicates that we [7] have to move fast with the contract. We have to [8] make sure it is signed before this proposal is [9] accepted or one of the show stoppers has to be the [10] contract.

[11] What do you understand he's talking about [12] there?

[13] **MR. KASSOF:** Objection, foundation.

[14] **THE WITNESS:** They were negotiating, you know, [15] a contract with Argus and trying to get it done.

[16] **BY MR. PHEBUS:**

[17] **Q:** And get it done before the Fox proposal [18] was brought to the board?

[19] **MR. KASSOF:** Objection, lacks foundation.

[20] **BY MR. PHEBUS:**

[21] **Q:** Is that what they're talking about?

[22] **A:** I'd infer that's what it's talking about. [23] I don't recollect if that's what they're talking [24] about or not, yeah.

Page 155

[1] **Q:** Well, under the facts and circumstances on [2] January 23rd of '03, it certainly wasn't to Argus's [3] advantage, an advantage of the shareholders, that [4] I.T.@work have inside information concerning a Fox [5] proposal?

[6] **MR. KASSOF:** Object to the form of the [7] question, assumes facts not in evidence.

[8] **THE WITNESS:** Again, I don't know what I sent [9] to them and whether it was inside information or [10] not.

[11] **BY MR. PHEBUS:**

[12] **Q:** At the top there it indicates, we have a [13] conference call tomorrow; it's to you from Hank. [14] Was there a conference call about January 30th, [15] '03?

[16] **A:** I don't recall.

[17] **Q:** Do you recall at this point in time having [18] a conference call with Hank?

[19] **A:** I had several conference calls during this [20] period of time.

[21] **Q:** Exhibit 92, do you recognize that as an [22] e-mail from Terry Snyder to you and others?

[23] **A:** I do.

[24] **Q:** And he's reporting as of July 31st, '03,

Page 156

[1] that the company be having its first operationally [2] profitable month?

[3] **A:** That's the statement he made.

[4] **Q:** Was that correct?

[5] **A:** Might have been.

[6] **Q:** Okay. Any reason to believe it's not [7] correct?

[8] **A:** No.

[9] **Q:** It indicates, it puts us right on plan, it [10] looks as if it will continue through the next [11]

several months, correct?

[12] **A:** A plan, correct.

[13] **Q:** And this is from Terry Snyder, correct, [14] not from Randy?

[15] **A:** That's correct.

[16] **Q:** Okay. So at this point in time, Randy's [17] in charge of the sales, is he not, in July of '02?

[18] **A:** Right.

[19] **Q:** Okay. So — withdraw that. [20] And then I'll hand you Exhibit 93. And [21] you recognize that as being, first of all, on the [22] Bates pages W2A 48 and 49 an e-mail from Randy to [23] you and Frits referring to an e-mail from Terry and [24] that we're reaching our goal and so forth.

Page 157

[1] Do you recognize that as an e-mail from [2] Randy?

[3] **A:** I see that.

[4] **Q:** And then in response to it, going to page [5] 1, Bates 2847, there's an e-mail from you to Frits. [6] Would that be what that is?

[7] **A:** Uh-huh.

[8] **Q:** And you say — now, this is in August of [9] '02, some five months before the end of the year, [10] and you say, my sense is we should demand repayment [11] of the notes, send in a forensic audit teams and [12] get the lawyers to start pursuing legal remedies, [13] right?

[14] **A:** Right.

[15] **Q:** And in light of having a good month, in [16] light of having five more months to meet [17] performance criteria, why were you making this [18] recommendation?

[19] **A:** Because I didn't believe the plan going [20] forward. They had one month, which was not the [21] trend. I didn't believe the projections. I still [22] didn't think —

[23] **MR. KASSOF:** After he answers — finish your [24] answer. Keep going. Hold on one second. Are you

Page 158

[1] done with your answer?

[2] **THE WITNESS:** They were still in default of our [3] debt position. We still, you know, were entitled [4] to pursue remedy to get repaid our credit.

[5] **BY MR. PHEBUS:**

[6] **Q:** And get the lawyers to start pursuing [7] legal remedies. Legal remedies on behalf of whom?

[8] **A:** ABN AMARO and Mercurius.

[9] **Q:** So as a member of the board of directors [10] of Argus, you're recommending to creditors sue [11] Argus, correct?

[12] **A:** That's my recommendation, yeah.

[13] **Q:** And what legal remedies are you — do you [14] have in mind, if you know?

[15] **A:** To call our debt position and demand [16] repayment.

[17] **Q:** So as a member of the board of Argus, your [18] idea is, let's have a creditor call its notes and [19] start litigation?

*Lawyer's Notes*

[20] **MR. KASSOF:** Object to the form.

[21] **THE WITNESS:** Not as a member of the board, as [22] an investor and representative of the investor and [23] creditor.

Page 159

[1] **BY MR. PHEBUS:**

[2] **Q:** Well, you are serving on the board?

[3] **A:** Again, you can wear two different hats and [4] separate those duties.

[5] **Q:** Then Frits goes back to you and says, good [6] to hear from you. I agree, it is a drag dealing [7] with this guy, quote, but as long as he finds [8] funding, it is difficult to pull the trigger, [9] closed quote.

[10] Do you see that?

[11] **A:** Yes.

[12] **Q:** And the — what's he referring to about [13] pulling the trigger, calling the notes and filing [14] suits?

[15] **MR. KASSOF:** Objection, lack foundation.

[16] **THE WITNESS:** Calling the notes and forcing the [17] company into bankruptcy.

[18] **BY MR. PHEBUS:**

[19] **Q:** How would that be in the interest of the [20] shareholders?

[21] **A:** The company was insolvent of being — the [22] interest of the creditors.

[23] **Q:** How would it be in the interest of the [24] shareholders?

Page 160

[1] **A:** At that point they were in the zone of [2] insolvency. And my main duty was to the creditors.

[3] **Q:** How would it be in the interest of the [4] shareholders to pull this trigger, call the notes [5] and force the company into bankruptcy?

[6] **A:** Again, this is from my position as a [7] creditor, which I have no duty to shareholders as a [8] creditor of the company. As a board member, when I [9] got approached by a call, then we would decide [10] what's the right thing to do for shareholders.

[11] **Q:** Had — well, you knew as a creditor that [12] if ABN and Mercurius called their notes, there [13] would be no way for Argus to pay the notes, [14] correct?

[15] **A:** I knew that, correct.

[16] **Q:** Because you had the financial information [17] from Argus by virtue of being on the board?

[18] **A:** No, not by virtue of being on the board. [19] We had information rights as creditors of the [20] company.

[21] **Q:** And as of August 1st, '02, had ABN written [22] off its investment in Argus?

[23] **A:** Yes.

[24] **Q:** Well, if you already had written off your

Page 161

[1] investment, why would you want to demand payment of [2] that which you knew you

couldn't get — the company [3] couldn't pay and then put the company in [4] bankruptcy?

[5] **A:** It's an obligation the company had to the [6] bank. Banks all the time reserve their loans and [7] write them off and pursue the companies to repay [8] their obligations.

[9] **Q:** Well, by the bank, you're talking about [10] Strategic Capital?

[11] **A:** No, ABN AMARO.

[12] **Q:** Okay. I guess I'm a little dense. So [13] you're saying that ABN AMARO, its loan as a banker [14] in putting you on the board as its representative, [15] it made it okay for you as its board member [16] representative, meaning employee of the bank to say [17] that, hey, let's force them into bankruptcy?

[18] **MR. KASSOF:** Object to the form of the [19] question.

[20] **THE WITNESS:** Again, I'm connecting my duties [21] as a board member. I can as an investment manager [22] for ABN AMARO recommend them to do things to [23] protect their position, including forcing the [24] company to protect its assets in the bankruptcy

Page 162

[1] process.

[2] **BY MR. PHEBUS:**

[3] **Q:** So when the company had financial [4] problems, you can abandon your duties to the [5] company and simply perform your obligations to the [6] creditors is what you're telling us —

[7] **MR. KASSOF:** Argumentative.

[8] **BY MR. PHEBUS:**

[9] **Q:** — in your understanding?

[10] **MR. KASSOF:** Argumentative, misstates the [11] testimony.

[12] **THE WITNESS:** Repeat the question.

[13] **BY MR. PHEBUS:**

[14] **Q:** Would you agree that your recommendation [15] to Frits, who is with Mercurius, correct?

[16] **A:** Correct.

[17] **Q:** You're not employed by Mercurius?

[18] **A:** No.

[19] **Q:** So as an employee of one Dutch company, [20] you're recommending to an employee of another Dutch [21] company, let's call the notes of the company that I [22] am on the board of, which we know won't be in the [23] position to pay it, so that the Dutch companies can [24] then put Argus into bankruptcy; isn't that correct?

Page 163

[1] **A:** That's what I recommended.

[2] **Q:** Okay. Let me hand you Plaintiff's Exhibit [3] 66. This is an e-mail from Paul McNabb to you and [4] several others, correct?

[5] **A:** Yes.

[6] **Q:** It's sent to O'Neill at the same address [7] you were — said you couldn't get it to him at. Do [8] you see that?

[9] **A:** I don't know. I don't remember what the [10] other one was.

[11] **Q:** You get this e-mail about the time it's [12] written?

[13] **A:** I assume I got it about that time.

[14] **Q:** Make any response to it?

[15] **A:** I did make a response to it.

[16] **Q:** Pardon?

[17] **A:** I did make a response to it.

[18] **Q:** In writing or —

[19] **A:** E-mail.

[20] **Q:** Okay. And I don't know if I got that [21] e-mail. What did you say?

[22] **A:** I believe I said that I think Paul [23] misunderstood the letter and that, you know, I [24] could wear two hats at the company, one as a board

Page 164

[1] member and one as a representative of ABN AMARO as [2] a creditor and that I wasn't going to resign from [3] the board. There was no purpose in that.

[4] **Q:** And that your recommendations — called [5] the notes, start legal proceedings, push them in [6] bankruptcy, these were recommendations you were [7] making in the course and scope of your employment [8] with ABN AMARO versus as a board member; is that [9] what you're telling us?

[10] **A:** Yes.

[11] **Q:** Exhibit 94, got that in front of you, sir?

[12] **A:** Uh-huh.

[13] **Q:** Good. It refers to — it's an e-mail from [14] you to Frits Vromen, August 1st, correct?

[15] **A:** Uh-huh.

[16] **Q:** Yes?

[17] **A:** Yes.

[18] **Q:** Talking about the July progress report. [19] Now, what's the — what are we talking about by [20] July progress report?

[21] **A:** Where do you see that at?

[22] **Q:** In the heading. Are we looking at 94? [23] Yes.

[24] **A:** I assume it's a report that was sent to us

Page 165

[1] for information on July.

[2] **Q:** Is this the accounting report we're [3] talking about or something different?

[4] **A:** It looks like the e-mail that's attached [5] here.

[6] **Q:** Okay. Would that be — well, let me see [7] what's attached to your copy. It has attached to [8] it an e-mail from Randy, Bates WA — 2A 55 and 56, [9] right?

[10] **A:** Right.

[11] **Q:** And refer to, it helps if we're both [12] sitting on him. What are you talking about?

[13] **A:** Just putting pressure on Randy to perform [14] and to, you know, try and get the company turned [15] around.

*Lawyer's Notes*

[16] Q: And then you — telling Frits at Mercurius [17] that Randy is very slippery?

[18] A: Right.

[19] Q: What do you mean by — what were you [20] referring to, he's very slippery, that he's not [21] being honest with you people?

[22] A: I don't recall exactly what I meant by [23] slippery.

[24] Q: Well, did you mean that as a complimentary

Page 166

[1] term?

[2] A: No.

[3] Q: Did you mean to indicate he was not doing [4] his job?

[5] A: I probably insinuated that with that [6] comment.

[7] MR. PHEBUS: Let's take a brief recess and try [8] to expedite things here.

[9] (A short break was taken.)

[10] BY MR. PHEBUS:

[11] Q: Exhibit 97. Do you recognize that as an [12] e-mail from Frits to yourself and copies to others?

[13] A: Yes.

[14] Q: Everybody's — Frits is at Mercurius but [15] everybody it's addressed to is at AMARO?

[16] A: Correct.

[17] Q: And on September 27th, '02, Frits is [18] saying Terry Snyder will take over as our new guys [19] come in and re-organize the shop.

[20] Do you see that?

[21] A: I see that.

[22] Q: Who's our new guys?

[23] MR. KASSOF: Objection, lacks foundation.

[24] THE WITNESS: I don't know.

Page 167

[1] BY MR. PHEBUS:

[2] Q: Did Frits ever tell you who he proposed [3] our new guys to be?

[4] A: I don't believe so.

[5] Q: And did you ever tell him in your opinion [6] what needed to be done to enforce Randy's [7] resignation if that was even — if that was even [8] feasible to do?

[9] A: At certain points I did tell him my [10] thoughts on those.

[11] Q: And what did you tell him your thoughts [12] were?

[13] A: I believe that we needed to wait until the [14] end of the year to make the measurement date.

[15] Q: And even if he didn't meet the performance [16] criteria, you could not force his resignation, [17] could you?

[18] MR. KASSOF: Object to the form.

[19] THE WITNESS: We could present it to the [20] shareholders.

[21] BY MR. PHEBUS:

**Lawyer's Notes**

[22] Q: Exhibit 61. You will be sending an e-mail [23] to Paul that enclosed the newspaper article on the [24] O'Keena (phonetic) acquisition by Sysco, correct?

Page 168

[1] A: Correct.

[2] Q: And your comments are, this ought to make [3] the guarantors feel a bit better, correct?

[4] A: Correct.

[5] Q: And this is in January of '03?

[6] A: Correct.

[7] Q: And Paul replies it's exciting and that, [8] in essence, Argus isn't too far behind, correct?

[9] A: That's what he says.

[10] Q: Did you agree with Paul's assessment?

[11] A: No.

[12] Q: Did you feel that the O'Keena acquisition [13] was probative as to the value of Argus?

[14] MR. KASSOF: Object to the form.

[15] THE WITNESS: Rephrase the question.

[16] BY MR. PHEBUS:

[17] Q: What significance, if any, did you feel [18] the amount of the O'Keena acquisition by Sysco had [19] in relation to the value of Argus stock?

[20] A: I don't believe there was any correlation.

[21] Q: Well, then why would it make guarantors [22] feel better?

[23] A: Because at least the sector was starting [24] to improve, and transactions were starting to occur

Page 169

[1] in the sector.

[2] Q: But Argus never did improve, correct?

[3] A: Correct.

[4] Q: And Argus was saddled with about $12 [5] million of debt owed to ABN and Mercurius as of [6] that point in time, correct?

[7] MR. KASSOF: Object to the form of the [8] question.

[9] THE WITNESS: That wasn't all our debt.

[10] BY MR. PHEBUS:

[11] Q: Well, between Argus and ABN, it was over [12] 11 and a half million?

[13] A: Well, roughly, correct. There was much [14] more senior debt on top of us making our position [15] worth nothing. So it wasn't us holding the company [16] back.

[17] Q: But yet you refused to convert your debt [18] to equity?

[19] A: No one gave us a proposal to convert our [20] debt to equity.

[21] Q: Well, did you ever propose to convert it [22] to equity to help the company go forward?

[23] A: We had talked about certain proposals in [24] exchange for other things. It never went anywhere.

Page 170

[1] **Q:** Well, you with your financial background [2] and experience were aware of the fact that if the [3] debt owed to Mercurius and ABN was converted to [4] equity, the financial situation and the prospects [5] for additional financing would be — by Argus would [6] be substantially improved?

[7] **A:** No, I disagree with that.

[8] **Q:** Why do you disagree with that?

[9] **A:** The company still had a very high debt [10] load even if you erased our debt. Mercurius and [11] ABN AMARO still couldn't meet its current [12] obligations, still wasn't on a revenue ramp to ever [13] meet those obligations.

[14] **Q:** At some point in time did it come to your [15] attention that the investment firm of Grace, [16] Matthews in Milwaukee felt that there was a value [17] of 25 to $60 million in the market then present as [18] far as Argus?

[19] **A:** I might have had a conversation from [20] someone there. I don't remember those specific [21] numbers.

[22] **Q:** Remember who you had the conversation [23] with?

[24] **A:** I don't, no.

Page 171

[1] **Q:** Was this part of a conference call?

[2] **A:** No. I think it might have been an [3] in-person meeting.

[4] **Q:** In?

[5] **A:** Chicago.

[6] **Q:** Who else was there?

[7] **A:** I think just the banker was there. I [8] think Randy referred them to us.

[9] **Q:** And what was generally discussed at that [10] meeting?

[11] **A:** Whether they could either help sell the [12] company or raise money for the company.

[13] **Q:** And did they make any — did you ask them [14] to make a proposal?

[15] **A:** I don't recall if I did or not.

[16] **Q:** Did you ever suggest to the Argus board [17] that — that Grace, Mathews be approached to see if [18] they could do a — what was it, an IPO or a private [19] placement?

[20] **A:** Well, at the time it would only be a [21] private placement.

[22] **Q:** If they would do a private placement?

[23] **A:** I don't recall. I thought Randy was [24] talking with them about possibly doing that. I

Page 172

[1] don't really remember what came about.

[2] **Q:** Did you ever recommend that a private [3] placement be undertaken?

[4] **A:** I don't believe I recommended it because I [5] thought it would be a waste of time.

[6] **Q:** Well, and your thought that it would be a [7] waste of time, so not to even bother try it was [8] based on what?

[9] **A:** Market conditions.

[10] **Q:** Let me hand you Exhibit 18. Do you [11]

**Lawyer's Notes**

recognize that as an October 31st, '02, e-mail from [12] McNabb to various folks?

[13] **A:** I do. I see that.

[14] **Q:** At what point did this e-mail come to your [15] attention?

[16] **A:** I don't know if I ever saw this e-mail.

[17] **Q:** Were you aware of the e-mail as of the [18] board meeting on November 1st, '02?

[19] **A:** Which e-mail?

[20] **Q:** The e-mail that's Exhibit 18.

[21] **A:** This one?

[22] **Q:** Yes, sir.

[23] **A:** I don't think I was aware of this e-mail, [24] no.

Page 173

[1] **Q:** Okay. For that matter, after the — at [2] any time until recently were you aware of this [3] e-mail?

[4] **A:** I don't believe I've ever seen this until [5] this moment.

[6] **Q:** Okay. You recognize that the folks this [7] is sent to are basically investors in this [8] Wisconsin group, Milwaukee group?

[9] **A:** That's what it appears like to me.

[10] **Q:** And this is — and apparently it wasn't [11] sent to anybody on the Argus board other than [12] McNabb sent it to himself?

[13] **A:** It appears that way.

[14] **Q:** I guess I'm somewhat confused by it [15] because it's dated October 31st and it refers to [16] Sandone resigned as chairman of the board. This is [17] an earlier meeting versus resigning as — was there [18] a meeting on Tuesday where — which would be, I [19] guess, two days earlier where Randy resigned as [20] chairman of the board of directors?

[21] **MR. KASSOF:** To your recollection.

[22] **THE WITNESS:** On what date, Tuesday the 3rd or [23] whatever?

Page 174

[1] **BY MR. PHEBUS:**

[2] **Q:** This purports to be — this e-mail as [3] Thursday, October 31st.

[4] **A:** Well, again, I bet this is a draft. And [5] the date on here is the draft date rather than not [6] the sent date. That's my speculation.

[7] **Q:** Well, did Randy as of — when, if ever, [8] did Randy resign as chairman of the board of [9] directors?

[10] **A:** You know, I don't remember the exact date. [11] I know he did.

[12] **Q:** Would it have been after November 1st, [13] '02?

[14] **A:** Yes.

[15] **Q:** Okay. So a statement — in any event, [16] you're not aware of this e-mail?

[17] **A:** No, I'm not.

[18] **Q:** And you haven't taken — had the [19] opportunity to review it in detail to see if you [20]

agree or disagree —

[21] **A:** I haven't read it at all.

[22] **Q:** November 6th, '02, there was a board [23] meeting. It's Exhibit 39. And the second page, [24] page 2 of 2, there's a statement made at the bottom

Page 175

[1] of the next to last paragraph, Mr. Walz stated that [2] ABN AMARO is not interested in participating in the [3] first position. And they would probably veto any [4] attempts to extend the guarantees. Quote, the only [5] way they will possibly approve borrowing would be [6] to gain or control, closed quote.

[7] Do you see that?

[8] **A:** Uh-huh. Yes.

[9] **Q:** And did you make that statement?

[10] **A:** Yes.

[11] **Q:** And now you were at the board of Argus?

[12] **A:** Correct.

[13] **Q:** So were you conveying that statement to [14] the board as an agent and employee of ABN?

[15] **A:** I was just relaying the intentions of what [16] ABN AMARO's position was to the rest of the board [17] members.

[18] **Q:** And you were aware of that position [19] because that had been communicated to you by the [20] others like the loan committee at ABN?

[21] **A:** Well, it's a — the position that we've [22] developed, myself included, over time.

[23] **Q:** Okay. So you knew that was the official [24] position of ABN?

Page 176

[1] **A:** Correct. Right.

[2] **Q:** Let me hand you Exhibit 113, board minutes [3] of December 27th thereto. Do you recognize Exhibit [4] 113 as the December 27th board minutes?

[5] **A:** I do.

[6] **Q:** Turn to the second page, 2 of 2, Sandone [7] lawsuit and it indicates that Bill — I presume [8] that's Bill O'Neill, correct?

[9] **A:** Correct.

[10] **Q:** Pointed out that negotiations between Paul [11] and Randy were never completed after the board [12] meeting when Randy's employment was terminated?

[13] **A:** Correct.

[14] **Q:** So there exists — so there exists today [15] no agreement upon terms of separation for the board [16] to approve, correct? Is that what it says?

[17] **A:** Yes.

[18] **Q:** And is that a correct statement?

[19] **A:** No. Terms for the separation that we were [20] talking about in early November.

[21] **Q:** All right. Were ever brought to the board [22] by Paul?

[23] **A:** Correct.

[24] **Q:** And thus the board never did approve any

*Lawyer's Notes*

Page 177

[1] terms of separation?

[2] **A:** Correct.

[3] **Q:** And, of course, never approved any license [4] agreement of any nature?

[5] **A:** Correct.

[6] **MR. PHEBUS:** I may just have a few more. Let [7] us confer out here and see what we have.

[8] (A short break was taken.)

[9] **BY MR. PHEBUS:**

[10] **Q:** If you would go to Exhibit 102, please. [11] Do you recognize this as an e-mail from Nicole [12] Smith's customers to you?

[13] **A:** I do.

[14] **Q:** And did you receive it at about this day?

[15] **A:** I did.

[16] **Q:** So I gather you have somehow — oh, wait, [17] this is dated November 1 at 9:40 in the morning. [18] What time would this be?

[19] **A:** That would be, you know, seven hours up [20] front here, if we're here — reversed, right? It's [21] 2:00 in the morning here.

[22] **Q:** So this would be 2:00 o'clock a.m. on [23] November 1st?

[24] **A:** I believe so. I guess.

Page 178

[1] **Q:** So this is before the board meeting on [2] November 1st?

[3] **A:** Right. I don't — again, I don't know how [4] that date in time works exactly.

[5] **Q:** And Nicole Smith's customers, what is she, [6] an assistant to Mr. Vromen?

[7] **A:** I believe that's the case.

[8] **Q:** And this refers to — so this is really [9] from Frits? It's his assistant e-mailed this for [10] Frits, as I understand it?

[11] **A:** Correct.

[12] **Q:** All right. Now, it says on the first [13] line, after some consultation with our guys at [14] I.T.@work, it is deemed advisable that Terry Snyder [15] be appointed as interim CEO. Did you ever ask [16] Frits why should I.T. have any input whatsoever in [17] who's going to be the next CEO of Argus?

[18] **A:** No.

[19] **Q:** Did this seem odd to you, that Vromen was [20] going to I.T. to find out what they wanted done [21] — what I.T. wanted done with Argus?

[22] **MR. KASSOF:** Object to the form of the [23] question, it assumes facts.

[24] **THE WITNESS:** Again, Frits was, I think,

Page 179

[1] gathering information when he was analyzing this. [2] And that's part of what he does is talk to these [3] guys who were closer to Argus than he was. And [4] it's a recommendation.

[5] **BY MR. PHEBUS:**

[6] **Q:** Let me hand you Exhibit 103. Do you [7] recognize this document, sir?

[8] **A:** I recognize it.

[9] **Q:** And what is this?

[10] **A:** It's a document that I think is trying to [11] put forth some ideas and proposals on how to, you [12] know, restructure the company and move it forward.

[13] **Q:** And this is November 3rd, '02, just — two [14] days after the November 1 board meeting, of course?

[15] **A:** Correct.

[16] **Q:** And it is from three people at — I guess [17] that were all at I.T. Technology — I.T.@work at [18] that time; would that be correct?

[19] **A:** No. Steve Oetegenn was not.

[20] **Q:** He was not? Where was he at the time?

[21] **A:** I forget the name of the company he worked [22] for in Boston.

[23] **Q:** Okay. And can you just tell us generally [24] what happened in response to this memorandum?

Page 180

[1] **A:** I don't believe I responded to this at [2] all.

[3] **Q:** Okay. What is your understanding, if any, [4] why this would have gone to Hadley?

[5] **MR. KASSOF:** Objection, foundation.

[6] **THE WITNESS:** I believe these three individuals [7] thought Hadley was a potential financier of the [8] company.

[9] **BY MR. PHEBUS:**

[10] **Q:** All right. At any rate, as far as you [11] know, you did not respond to this?

[12] **A:** I don't think I responded to this.

[13] **Q:** Why not?

[14] **A:** Well, there was a lot of people throwing [15] out ideas and situations for the company. And, you [16] know, we had enough at the board to try and figure [17] out on our own, make our own plans up.

[18] **Q:** Let me hand you Exhibit 112A. Now let's [19] start at the back. Pages 4 and 5 is I guess an [20] e-mail to you and Frits from Hank at I.T.@work; [21] would that be correct?

[22] **A:** It appears to be that.

[23] **Q:** Okay. Do you — did you participate in [24] any of these phone calls and discussions referred

Page 181

[1] to in this two-page memo from Hank?

[2] **MR. KASSOF:** Object to the form. Take your [3] time to read it.

[4] **THE WITNESS:** Okay. What was the question [5] again?

[6] **BY MR. PHEBUS:**

[7] **Q:** Did you participate in any of the phone [8] calls or discussions that are referred to in this [9] memo?

[10] **A:** This refers to me having a discussion with [11] Paul.

[12] **Q:** Do you recall any details other than [13]

**Lawyer's Notes**

what's in this memo — I should say e-mail, excuse [14] me.

[15] **A:** Yes. I believe we were, you know, working [16] through and trying to see if we could potentially [17] come to an agreement to exchange debt for maybe a [18] technology license or a source code deal.

[19] **Q:** Now, in other words, ABN AMARO would [20] forgive debt in order to get a license?

[21] **A:** Not ABN AMARO, it was mainly Mercurius [22] would.

[23] **Q:** And Mercurius had expressed an interest in [24] possibly doing that?

Page 182

[1] **A:** Yes.

[2] **Q:** Okay. And now this, I gather by looking [3] at the whole exhibit, would have been in early [4] December '02? Would that be consistent with your [5] recollection?

[6] **A:** I guess that's right.

[7] **Q:** Okay. So by that point in time, Mercurius [8] is talking about giving up debt in return for a [9] license of some sort?

[10] **A:** That was the proposal. Hank at I.T.@work [11] was trying to influence Mercurius and possibly ABN [12] AMARO to possibly pursue.

[13] **Q:** Okay. Then it looks like the pages — the [14] bottom of page 1 and pages 2 and 3 is an e-mail [15] from — well, from Frits to you and then there's a [16] small e-mail from you to Frits; would that be [17] correct?

[18] **A:** Correct.

[19] **Q:** Okay. And then at the top what I want to [20] look here on page 1, that's an e-mail of December [21] 10th, '02, Keith to Frits, correct?

[22] **A:** Okay.

[23] **Q:** So you as — let me ask which hat do you [24] have on in this e-mail?

Page 183

[1] **MR. KASSOF:** Object to the form.

[2] **THE WITNESS:** As an investor.

[3] **BY MR. PHEBUS:**

[4] **Q:** And so as an investor, you — and this is [5] over a month after the November 1st meeting, you're [6] suggesting the company file a lawsuit — ABN file a [7] lawsuit against the company — withdraw.

[8] You're suggesting ABN and Mercurius file a [9] lawsuit against Argus and a lawsuit against Randy [10] with the intent being to freeze everything [11] prohibiting any transaction so as to give more [12] leverage to ABN Mercurius, right?

[13] **A:** Correct.

[14] **Q:** And this would be in the best — for that [15] event to happen would not be in the best interest [16] of the shareholders of Argus, would it?

[17] **MR. KASSOF:** Object to the form of the [18] question, calls for a legal conclusion.

[19] **THE WITNESS:** I don't know.

[20] **BY MR. PHEBUS:**

[21] **Q:** Can you suggest to me any reason or way in [22] which it would be in the best interest of the [23] shareholders of Argus to have a lawsuit against the [24] company that would freeze everything and prohibit

Page 184

[1] any transaction?

[2] **A:** No.

[3] **Q:** And in the first paragraph, they're [4] talking about it will not be a pleasant process. [5] And guns will be drawn. We'll sit at the table.

[6] My question is, who are we talking about [7] when you say we'll be sitting at the table?

[8] **A:** I don't remember who I was referring to [9] there. I believe the — you know, all the secured [10] creditors who had different interests in the [11] company.

[12] **Q:** Well, would it have been in the secured [13] creditors' interest to have a suit against Argus by [14] Mercurius and ABN that would tie up everything?

[15] **A:** It would be for ABN AMARO and Mercurius.

[16] **Q:** How about the other creditors?

[17] **A:** Unlikely.

[18] **MR. PHEBUS:** Thank you, sir. I have nothing [19] further at this time.

[20] **THE WITNESS:** Okay.

[21] **MR. KASSOF:** Exhibits 115 and 116, which you [22] marked, yesterday, there was a discussion about [23] 116, that it was inadvertently produced. Last [24] night when we received your documents, we looked

Page 185

[1] back through the exhibits. And I believe it's 115, [2] it's our position as well that that was a [3] privileged document that was inadvertently [4] produced. So 115 and 116, we'd ask that they be [5] returned to us.

[6] **BY MR. PHEBUS:**

[7] **Q:** Well, with that in mind, I'm going to ask [8] a few questions about it, some foundational [9] questions. I'm going to hand you Exhibit 115, [10] which actually has Bates numbers W 4997 through 999 [11] and then W 5016 and 5017.

[12] **MR. KASSOF:** Before you ask questions, Joe, now [13] I'm looking at 115, the clarification that I'll [14] make is it's not our position that the document [15] that was sent by I.T.@work to Keith Walz, that's [16] not privileged obviously. But it's our position [17] that Keith Walz's e-mail to counsel of January [18] 23rd, '03, that one is.

[19] Do you see where I am?

[20] **MR. PHEBUS:** What year?

[21] **MR. KASSOF:** At the top of W 4998, it's our [22] view that that should be redacted as privilege.

[23] **MR. PHEBUS:** So you're just talking about page [24] 4998?

Page 186

[1] **MR. KASSOF:** I'm claiming privilege on — an

*Lawyer's Notes*

[2] inadvertent production on the top portion of [3] W 4998. That's correct.

[4] **BY MR. PHEBUS:**

[5] **Q:** Referring to page 2 of 7 of Exhibit 115, [6] the top of it there apparently is an e-mail — let [7] me ask you this, who is it to and who is it from as [8] you understand this?

[9] **A:** It's from — it's to me from my attorney [10] at Kirkland & Ellis.

[11] **Q:** It says FYI, forwarded by Keith Walz. Who [12] was it forwarded to? Is that referring to —

[13] **A:** To my attorney, Andrew Herman, at [14] Kirkland & Ellis.

[15] **Q:** Well, what was forwarded to him? I'm just [16] trying to understand this.

[17] **A:** The attached e-mails here, the source code [18] agreement and the letter that was, I guess, [19] submitted, too.

[20] **Q:** And Andrew Herman, he was and presumably [21] is still an attorney at Kirkland & Ellis?

[22] **A:** He is.

[23] **Q:** And he's retained by ABN AMARO as outside [24] counsel; is that correct?

Page 187

[1] **MR. KASSOF:** Your question is at the time that [2] this —

[3] **BY MR. PHEBUS:**

[4] **Q:** At that time, sure.

[5] **A:** Yes.

[6] **Q:** And you at the time were in what position [7] at ABN AMARO?

[8] **A:** I was managing director.

[9] **Q:** Of?

[10] **A:** Private equity.

[11] **Q:** Private equity for what? Is that your [12] entire title?

[13] **A:** Correct.

[14] **Q:** You described that in the first of the day [15] about what that involved?

[16] **A:** Right. I did.

[17] **MR. KASSOF:** So are you done with 115?

[18] **MR. PHEBUS:** That's the only question I have on [19] that.

[20] **MR. KASSOF:** So with respect to Exhibit 115, [21] it's our position that the documents should be [22] redacted. We'll be sending you a copy of a [23] redacted version of it. We would ask that you [24] promptly return all copies that you have, the

Page 188

[1] unredacted version.

[2] **MR. PHEBUS:** We'll certainly hold it in [3] confidence until we have agreed with you or let a [4] court decide. I'm just saying we're not going to [5] disclose it until we can work it out. We may or [6] may not agree with you.

[7] **MR. KASSOF:** I understand.

[8] **BY MR. PHEBUS:**

[9] **Q:** Let me hand you 116.

[10] **MR. KASSOF:** Can I have an extra copy?

[11] **MR. FORRESTER:** That's theirs.

[12] **MR. PHEBUS:** Excuse me?

[13] **MR. KASSOF:** Let me look at it. And I'll tell [14] you my position on it.

[15] **MR. PHEBUS:** Yes. If you want to say the whole [16] part of it or certain parts of it.

[17] **MR. KASSOF:** On exhibit — Plaintiff's Exhibit [18] 116, everything on W 5021 and everything starting [19] with the e-mail from Keith Walz to Andrew Herman [20] asking for Andrew Herman's thoughts on the [21] attached. Everything above that, I claim privilege [22] on, everything below that I would not.

[23] **BY MR. PHEBUS:**

[24] **Q:** I gather this is the same Andrew Herman

Page 189

[1] but it's just a different law firm?

[2] **A:** That's correct.

[3] **Q:** Was he at the new law firm? Is it Roamer [4] and Cutler?

[5] **A:** That was his old law firm.

[6] **Q:** Okay. This is the earlier one, I guess?

[7] **A:** Correct.

[8] **Q:** He was representing ABN?

[9] **A:** Yes.

[10] **Q:** And you were, of course, in the same [11] position?

[12] **A:** Correct.

[13] **MR. PHEBUS:** Okay. Let us think about it. And [14] I'm sure we'll have no disagreement. We'll [15] convince you or you'll convince us.

[16] **MR. KASSOF:** I have no questions at this time.

[17] **MR. HAILE:** I don't have any questions either.

[18] **MR. KASSOF:** Reserve.

[19] FURTHER DEPONENT SAITH NAUGHT.

Page 190

```
STATE OF ILLINOIS      )
                       ) SS:
COUNTY OF C O O K      )
IN THE CIRCUIT COURT OF THE SIXTH JUDICIAL CIRCUIT
       CHAMPAIGN COUNTY, ILLINOIS
RANDALL J. SANDONE,    )
       Plaintiff,      )
    vs.                ) No. 02 L 272
KEITH WALZ, PAUL McNABB and )
WILLIAM O'NEILL,       )
       Defendants.     )
```
This is to certify that I have read the transcript of my deposition taken by Kyla Elliott, Certified Shorthand Reporter, on July 27, 2004, and that the foregoing transcript accurately states the questions asked and the answers given by me as they now appear.
                        KEITH WALZ
SUBSCRIBED AND SWORN TO
before me this _____ day
of _____ 2004.
    Notary Public

Page 191

[1] **STATE OF ILLINOIS** )

[2] **) SS:**

[3] **COUNTY OF C O O K )**

[4] I, Kyla Elliott, a notary public within and for [5] the County of Cook County and State of Illinois, do [6] hereby certify that heretofore, to-wit, on the 27th [7] day of July, 2004, personally appeared before me, [8] at 515 North State Street, Suite 2800, Chicago, [9] Illinois, KEITH WALZ, in a cause now pending and [10] undetermined in the Circuit Court of the Sixth [11] Judicial Circuit, Champaign County, Illinois, [12] wherein RANDALL J. SANDONE is the Plaintiff, and [13] KEITH WALZ, PAUL McNABB and WILLIAM O'NEILL are the [14] Defendants.

[15] I further certify that the said witness was [16] first duly sworn to testify the truth, the whole [17] truth and nothing but the truth in the cause [18] aforesaid; that the testimony then given by said [19] witness was reported stenographically by me in the [20] presence of the said witness, and afterwards [21] reduced to typewriting by Computer-Aided [22] Transcription, and the foregoing is a true and [23] correct transcript of the testimony so given by [24] said witness as aforesaid.

Page 192

I further certify that the signature to the foregoing deposition was reserved by counsel for the respective parties.
    I further certify that the taking of this deposition was pursuant to Notice, and that there were present at the deposition the attorneys hereinbefore mentioned.
    I further certify that I am not counsel for nor in any way related to the parties to this suit, nor am I in any way interested in the outcome thereof.
    IN TESTIMONY WHEREOF: I have hereunto set my hand and affixed my notarial seal this _____ day of _____ , 2004.
        NOTARY PUBLIC, COOK COUNTY, ILLINOIS

Page 193

[1] McCorkle Court Reporters, Inc. 200 N. LaSalle Street Suite 300 [2] Chicago, Illinois 60601-1014

[4] **Date:** August 24, 2004 Mr. Andrew A. Kassof [5] 200 East Randolph Drive Chicago, Illinois 60601

[7] **IN RE:** SANDONE vs. WALZ, et al.

**COURT NUMBER:** 02 L 272 [8] DATE TAKEN: July 27, 2004 DEPONENT: Mr. Keith Walz

**Dear Mr. Kassof:**

Enclosed is the deposition transcript for the [11] aforementioned deponent in the above-entitled cause. Also enclosed are additional signature [12] pages, if applicable, and errata sheets. [13] Per your agreement to secure signature, please submit the transcript to the deponent for review [14] and signature. All changes or corrections must be made on the errata sheets, not on the transcript [15] itself. All errata sheets should be signed and all signature pages need to be signed and notarized. After the deponent has completed the above, please [17] return all signature pages and errata sheets to me at the above address, and I will handle [18] distribution to the respective parties. [19] If you have any questions, please call me at the phone number below.

[21] Sincerely, [22] Margaret Setina Kyla Elliott Signature Department Court Reporter

[24] cc: All attorneys of record.

Page 194

**Lawyer's Notes**