UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
URBANA DIVISION

| | | |
|---|---|---|
| DAN GONZALES, *et al*. | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | No.  04-2232 |
| | ) | |
| ABN AMRO BANK N.V., Amsterdam, a | ) | The Honorable Judge Harold A. |
| Dutch corporation; and ABN AMRO | ) | Baker |
| VENTURES B.V., Amsterdam, a Dutch | ) | |
| corporation, | ) | |
| | | |
| Defendants. | | |

### PLAINTIFFS' RESPONSE TO DEFENDANTS' MEMORANDUM IN SUPPORT OF THEIR MOTION TO DISMISS THE THIRD AMENDED COMPLAINT

Defendants ABN AMRO BANK, N.V. ("Bank") and ABN AMRO VENTURES, B.V. ("Ventures") assert that "[t]he substitution of named plaintiffs in this case does not alter the fact that Third Amended Complaint [sic] fails to state a viable claim" against defendants.  This contention is entirely off the mark.  The substitution of the named plaintiffs had nothing to do with the substance of the allegations against defendants, as Bank and Ventures are well aware.  In its order made on December 6, 2005, this Court observed that the change in named plaintiffs was prompted by a ruling in a companion case in the Champaign County Circuit Court.  Subsequent to this Court's order, the Champaign County Circuit Court reconsidered its earlier ruling, withdrew its previous order of dismissal, and ordered the ABN AMRO defendants to answer the state complaint.

Thus, putting ABN AMRO's red-herring argument to one side, this memorandum addresses the substance of defendants' motion to dismiss.  Although the numbering in Bank and Ventures' memorandum is hard to follow, it appears they have moved to dismiss on four grounds (*see* pp. 1-2 of defendants' memorandum in support of their motion):

1.     That plaintiffs lack standing[1] to bring this claim, because the claim is allegedly "derivative" in nature and can only be asserted for or on behalf of Argus Systems Group, Inc. ("Argus");

2.     That the Third Amended Complaint does not state a claim upon which relief can be granted, allegedly because plaintiffs' *respondeat superior* theory would "dangerously" expand the fiduciary duties of "shareholders";

3.     That although the defendants have entered an appearance and were properly served in Amsterdam with the complaint and summons, they allegedly did not receive a "summary"; and

4.     That this Court lacks personal jurisdiction over one of the defendants (Ventures), because an affidavit from a vice-president of Bank (Ms. Carly Lemans) asserts, *inter alia*, that Ventures does not "currently" do any business in Illinois within the meaning of 735 ILCS § 5/2-209(b)(4).  (Defendants do not make any such argument on behalf of co-defendant Bank.)

---

[1] The Northern District of Illinois has recently observed that the Seventh Circuit regards as a "misnomer" the labeling of the question presented as one of "standing," as defendants have done herein.  Rather, the inquiry to be made is whether the action is prosecuted in the name of the real party in interest.  *Goodman v. Phoenix Container, Inc.*, 271 B.R. 821, 839 (fn. 5) (N.D. Ill. 2001).  Accordingly, this memorandum will approach the "derivative" issue in compliance with the Seventh Circuit's approach.

## ARGUMENT

**1.    Plaintiffs' claim is not derivative.**

Defendants contend that this lawsuit is not what it says it is, to-wit: an action by plaintiffs and others similarly situated sounding in tort; rather, defendants argue, this is a "derivative" suit that can brought, if at all, by Argus's bankruptcy trustee on behalf of the corporation and its shareholders.  According to defendants (at p. 6 of their memorandum), Argus – not plaintiffs and putative class members - was "the real party in interest."

An old adage has it that "the law begins when someone does something that someone else doesn't like."  In the matter *sub judice*, the plaintiffs do not like what Bank and Ventures have done – but plaintiffs' lawsuit against Bank and Ventures is not based on some noble regard for the now-bankrupt Argus corporation; rather, plaintiffs have sued because Bank and Ventures caused plaintiffs (and putative class members) to lose a lot of money from their own pockets.

The fundamental error in defendants' argument is that plaintiffs are <u>not</u>, via this lawsuit, proposing to act on behalf of Argus or its shareholders in any corporate sense; nor are plaintiffs seeking to engage in management activities vis-à-vis Argus.  Plaintiffs do not herein pursue the Argus corporation's interests.  Rather, plaintiffs have filed this suit because of their individual injuries suffered as a consequence of defendants' tortious conduct.  Thus, for example, defendants' invocation of Federal Rule 23.1, and 805 ILCS 5/7.80(b), is misplaced – both those provisions assume that this lawsuit is actually in the name of Argus, or to enforce an Argus right.  This is not the case.

Plaintiffs seek to recover their (and class members') financial losses caused by defendants' conduct.  The real parties in interest are precisely as the Third Amended

Complaint defines them – the individuals who lost money as a result of defendants'
tortious conduct.  As the discussion that follows in Section 2 hereof makes clear, there
can be no doubt that Bank and Ventures, through Keith Walz, engaged in conduct that
caused harm to plaintiffs and others similarly situated, with the goal of enhancing ABN
AMRO's perceived interests.  *See* in particular the deposition of Keith Walz, attached
hereto as Exhibit 2, and the summary of the Walz deposition provided in the attached
Appendix, *infra*.

Plaintiffs' Third Amended Complaint is expressly stated in tort, alleging duty,
breach of duty, causal relationship, and damages.  It matters not, structurally for pleading
purposes, whether the tort was committed by an ABN AMRO driver in a wayward
delivery truck or by a duty-breaching board member expressly and admittedly disrupting
Argus management.  Bank and Venture's chosen means of causing harm to plaintiffs and
class members does not change plaintiffs' tort action into a derivative suit.

Defendants are correct that the question whether a suit is derivative by nature, or
may be brought by a shareholder in his or her own right, is governed by the state of
incorporation.  *Kennedy v. Venrock Assocs.*, 348 F.3d 584, 589 (7th Cir. 2003).  As
defendants admit in their memorandum, Argus is an Illinois corporation, so Illinois
applies.

In determining whether former shareholders must file a claim in the form of a
derivative suit rather than via a class action, the fundamental distinction is whether the
wrong was committed against the corporation or against the shareholders.  *King v.
Kansas City Southern Indus., Inc.*, 56 F.R.D. 96, 98 (N.D. Ill. 1972).  Thus, the
determination of which is the appropriate action depends on "the nature of the alleged

injury." *Solis-Holmes v. Thorn*, 2004 Bankr. LEXIS 1371 at *7 (C.D. Ill. 2004).  Wrongs committed against the corporation itself are brought derivatively, but wrongs perpetrated upon shareholders directly, as here, may be brought in the form of a class action.  *King*, 56 F.R.D. at 98.

A derivative suit consists of two causes of action: one against the directors of a corporation for failing to sue, and a second based upon a right belonging to the corporation.  *Mann v. Kemper Financial Cos.*, 247 Ill. App. 3d 966, 974, 618 N.E.2d 317, 323 (1st Dist. 1993).  Neither is applicable here.  In a derivative suit, the shareholder derives the power to sue from the unexercised authority of the corporation, and the direct beneficiary of the derivative suit is the corporation that initially possessed the right to bring the suit.  Again, neither of these considerations is present here.  The theory underlying the use of derivative suits is that an action for harm to a corporation must be brought in the corporate name.  *Frank v. Hadesman and Frank, Inc.*, 83 F.3d 158, 159-60 (7th Cir. 1996).  Plaintiffs do not bring this action to redress harm to Argus, nor have plaintiffs ever been concerned with bringing an action in the Argus corporate name to recover their individual losses (and the losses of others similarly situated).

Illinois law holds that a director (such as defendants' employee/agent Keith Walz) occupies a position of trust, and as such, he or she owes a fiduciary duty <u>to the shareholders</u>.  *Vermeil v. Jefferson Trust & Savings Bank of Peoria*, 532 N.E.2d 288, 291 (Ill. App. Ct. 1988).  Consequently:

> Directors of a corporation are trustees of its business and property
> for the collective body of stockholders in respect to such business.
> They are subject to the general rule, in regard to trusts and trustees,
> that they cannot, in their dealings with the business or property of
> the trust, use their relation to it for their own personal gain.  It is
> their duty to administer the corporate affairs for the common

5

> benefit of all the stockholders, and exercise their best care, skill,
> and judgment in the management of the corporate business solely
> in the interest of the corporation.  The stockholders are entitled to
> the utmost fidelity of the directors to the interest of the
> stockholders.  It is a breach of duty for the directors to place
> themselves in a position where their personal interests would
> prevent them from acting for the best interests of those they
> represent.  While a director is not disqualified from dealing with
> the corporation, he must act fairly and be free from all fraud or
> unfair conduct, his transactions will be subjected to the closest
> scrutiny, and, if not conducted with the utmost fairness, to the end
> that the corporation shall have received full value, they will be set
> aside.

*Id.* (quoting *Dixmoor Golf Club, Inc. v. Evans*, 156 N.E. 785, 787-88 (Ill. 1927)

(emphasis added).

Moreover, attached to the Third Amended Complaint as Exhibit 1 thereto is a

copy of the Voting Agreement made on December 3, 2001, between ABN AMRO, Argus

and others, which was "thereafter approved by Argus's shareholders."  *See* Third

Amended Complaint, Counts 1 and 2, paragraph 10.  That Voting Agreement imposed a

number of contractual obligations on ABN AMRO, including but not limited to (in

paragraph 2.2) ABN AMRO's promise to Argus's shareholders that putative class

member Randall J. Sandone would remain as CEO for the purpose of achieving revenue

targets in the fiscal year 2002 (and thereafter, if the established targets were met).

Among other things, Walz's conduct as an Argus board member (*see* the Walz deposition

attached as Exhibit 2, the attached Appendix, and the discussion in Section 2, below)

interfered with those contractual rights, the details of which interference are stated in

paragraph 24 of Counts 1 and 2 of the Third Amended Complaint.  *See*, *e.g.*, sub-

paragraphs 24A ("intentionally and unjustifiably interfered with and undermined

management of Argus for the benefit of creditors including ABN AMRO [Ventures and

Bank, respectively]"); 24D ("conspired with ABN AMRO [Ventures and Bank,

respectively] and Mercurius to remove plaintiff as president and chief executive officer");

24E ("for the benefit of ABN AMRO [Ventures and Bank, respectively], failed to comply

with the by-laws of Argus"); and 24F ("for the benefit of ABN AMRO [Ventures and

Bank, respectively], failed to comply with the contractual obligations of Argus").

Ironically, had the December 3, 2001, Voting Agreement not been approved by Argus

shareholders, ABN AMRO would not have been able to secure the very seat on the Argus

board that enabled Walz to "disrupt management."  *See* discussion in Section 2, *infra*,

and in particular the Walz deposition, attached Exhibit 2.

      Where a claim, as in the instant case, revolves around contractual rights of

shareholders (such as voting rights, majority control, etc.), those rights exist

independently from the corporation.  *Goodman v. Phoenix Container, Inc.*, 271 B.R. 821,

840 (N.D. Ill. 2001); *Spillyards v. Abboud*, 278 Ill. App. 3d 663, 671, 662 N.E.2d 1358,

1363 (1st Dist. 1996).  Such claims can be asserted directly by shareholders because the

underlying rights are independent of the corporation's.  *Id.*  In the matter *sub judice*, the

allegations against Bank and Ventures include, among other things, their interference

with contractual rights and their interference with management, with the objective of

achieving gains for ABN AMRO at the expense of plaintiffs and putative class members.

      Defendants argue, on page 1 of their memorandum, that ""[f]ormer named

plaintiff Randall J. Sandone tried to divest the [Argus bankruptcy] trustee of [his]

exclusive authority, and was rebuffed by the bankruptcy court and by Chief Judge

McCuskey on appeal."   On page 5, defendants state that "as confirmed by Chief Judge

McCuskey's July 8 order, plaintiffs will never have standing to assert derivative claims

against the ABN AMRO defendants."  On page 8, defendants state that "Argus's bankruptcy divested plaintiffs of standing to sue derivatively."  These are serious misstatements or misrepresentations, such that defendants may wish to consider their obligations to this Court under Rule 11.  No "divestiture" was sought by Sandone, and neither Sandone nor any of the named plaintiffs has <u>ever</u> asserted "standing to sue derivatively."   The facts, as follows, are just the opposite:

(a) When the ABN AMRO defendants originally made their "derivative" argument to this Court, back on March 18, 2005, Sandone (through plaintiffs' counsel, and joined by other individual shareholders) filed an "emergency motion" with the bankruptcy court seeking an order of assignment from the trustee of "any and all authority he may have to pursue a suit against ABN AMRO for diminution of shareholder value on behalf of the corporation or its shareholders."

(b) Sandone's emergency motion <u>expressly</u> stated that "Sandone does not agree or accept that his [complaint] against ABN AMRO is a 'shareholder derivative suit' as urged by defendants."  Nevertheless, Sandone's emergency motion <u>expressly</u> stated that "in an abundance of caution," Sandone sought the requested order of assignment so as to remove defendants' argument from further consideration.

(c) On April 13, 2005, in Case No. 03-91852 (*In re: Argus Systems Group, Inc.*), the bankruptcy trustee (Mr. Steve Miller) advised His Honor Judge Fines that he believed he had disposed of all the Argus assets, and there was nothing of substance to assign in any event.  The

trustee further stated:  "I am not in favor of the Argus [bankruptcy] case being prolonged.  I would rather move to closing, and I think, you know, this is a fight between shareholders I frankly want no part of."  The trustee further advised Judge Fines that he did not even know (!) whether Argus's potential cause of action against the ABN AMRO defendants may have already been "sold":  "It may be even be that [Argus's] cause of action has already been transferred to the people who bought at that time.  I don't know that for certain.  I don't want to misrepresent to the Court that that was the case, but that would just be further [sic] that I wouldn't have anything else to sell . . . and so I just wanted to throw that in."

(d)  His Honor Judge Fines accepted the trustee's oral submission that there was nothing substantive in terms of Argus assets to assign, and on April 13, 2005, declined to order any assignment.   Judge Fines expressly declined, on April 13, 2005, to determine whether or not Sandone's suit against the ABN AMRO defendants was "derivative" in nature.

(e)  On appeal, His Honor Judge McCuskey found that Judge Fine's decision was "not in error," because the trustee's decision "not to pursue or assign the action [against ABN AMRO] in the interest of closing the bankruptcy matter was not an unjustifiable position."  However, Judge McCuskey expressly observed that:

> A finding that Case Number 04-2232 is not a
> derivative action or other asset of the bankruptcy

estate may make this appeal moot because there would be nothing for the bankruptcy trustee to assign. However, this matter has not been adequately presented on the appeal from the bankruptcy court's order and <u>is best left for resolution in the matter pending before Judge Baker</u>.

**2.     Plaintiffs' *Respondeat Superior* theory is proper in light of the conduct defendants' employee, Keith Walz; in any event, defendants are not sued as "shareholders," as they mistakenly assert.**

In the portion of their memorandum that addresses *respondeat superior*, defendants have missed the big picture. The scope of *respondeat superior* does not begin and end with the mere existence of an employment or agency relationship, as defendants would have it; and the Third Amended Complaint does not rest on a simple allegation that Keith Walz was an employee/agent of Bank and Ventures. Rather, the Third Amended Complaint asserts, in paragraph 24 of each count, that Walz committed specific tortious acts "in the course and scope" of his employment/agency.

Defendants have previously described Walz, in submissions to this Court, as "a rogue director" on the Argus board. A more complete description of Walz's conduct on the Argus board was given at his July 27, 2004, deposition, which demonstrated that Walz may have been a "rogue" with respect to Argus, but his rogue activities were precisely what his employer and principal expected and required of him. *See* attached Exhibit 2, transcript of Walz deposition of July 27, 2004.

The proper focus for *respondeat superior* is the scope and course of this so-called "rogue director's" employment/agency, regardless of the nature of the activities he was performing within that employment/agency. The fact that Walz was a corporate board

member, rather than (say) a delivery boy, does not alter the *respondeat superior* analysis. The germane question is whether he was acting within his employment/agency.

In their memorandum at page 11, defendants relegate *In re Papercraft Corp.*, 165 B.R. 980 (Bankr. W.D. Pa), *vacated on other grounds*, 187 B.R. 486 (Bankr. W.D. Pa. 1995), *rev'd on other grounds*, 211 B.R. 813 (W.D. Pa. 1997), *aff'd sub nom. Citicorp Venture Capital, Ltd. V. Comm. of Creditors Holding Unsecured Claims*, 160 F.3d 982 (3rd Cir. 1998), to a footnote. Defendants argue that *Papercraft* is "readily distinguishable" because the defendant corporation in that case had directed and "expressly authorized its [board] nominee" to perform the objectionable actions in his role as a Papercraft board member. In fact, the instant defendants did precisely what the defendants did in *Papercraft*, and *Papercraft* is on all fours with the instant case in this regard.

The sworn statements by Walz (sitting on the Argus board at all relevant times), as set forth in the Appendix below, demonstrate the breadth of defendants' conduct that was executed by and through Walz – admittedly acting within the scope of his employment/agency. Applying the very *Papercraft* test that defendants cite with approval but mistakenly attempt to distinguish, defendants are responsible under the doctrine of *respondeat superior* for the tortious conduct of Walz.

Having relegated *Papercraft* to a footnote, defendants urge this Court to rely on non-binding decisions from other jurisdictions, hoping to evade responsibility for their conduct. Thus, they cite the Massachusetts District Court case of *CCBC.com, Inc. v. Thomson Financial, Inc.*, 270 F. Supp. 2d 146 (D. Mass. 2003); the New York District Court case of *U.S. Airways Group, Inc. v. British Airways PLC*, 989 F. Supp. 482

(S.D.N.Y. 1997); the Delaware lower-court case of *Emerson Radio Corp. v. Int'l Jensen Inc.*, 1996 WL 483086 (Del. Ch. August 20, 1996), *appeal denied*, 683 A.2d 58 (Del. 1996); another New York District Court case applying California law in *Medical Self Care, Inc. v. Nat'l Broad. Co., Inc.*, 2003 WL 1622181 (S.D.N.Y. Mar. 28, 2003).  Not one of these non-binding cases is even applicable, because their common denominator is the irrelevant principle that a corporation is not generally liable for the actions of a rogue designee on another corporate board.  Even if that general principle were accepted as the law of every state in the union, it would not apply here, where a tortfeasor corporation underlineddirects and authorizes its employee/agent to commit the torts in question while sitting on another corporation's board.  The test is the scope of the employment/agency.

Having created its straw argument drawn from non-binding courts in other jurisdictions, defendants propose to stretch their novel proposition into Illinois, even while acknowledging (at page 12) that "[n]o Illinois court has yet addressed this issue."  Defendants engage in creative lawyering with their footnote citation of three Illinois cases that have absolutely nothing to do with the instant facts.  In *Jaffe Commercial Fin. Co. v. Harris*, 456 N.E.2d 224 (Ill. App. Ct. 1st Dist. 1983), *Graham v. Mimms*, 444 N.E.2d 549 (Ill. App. Ct. 1st Dist. 1982), and *In re Joy Recovery Tech. Corp.*, 257 B.R. 253 (Bankr. N.D. Ill. 2001), the issue for which defendants cite these cases was shareholder liability.  In the matter *sub judice*, the Third Amended Complaint asserts no claim whatsoever against either defendant based on its role (or Walz's) as a shareholder.

The claim against each defendant is premised on tortious conduct through Walz in his capacity, "wearing ABN's hat," as an Argus board member.[2]

Finally, defendants cannot escape liability on the basis that their employee/agent's conduct was not actionable, as it is clear under Illinois law that Walz's conduct as alleged in the Third Amended Complaint constituted a breach of fiduciary duty to shareholders such as plaintiffs and class members. In *Vermeil* (discussed *supra*), the defendant (like Walz in the instant case) served as an officer, director, and shareholder of Heartland Investments, Inc., while also serving as a director of a bank. *Vermeil*, 532 N.E. at 289. The defendant was also a member of the bank's loan committee, and was involved in obtaining two loans from the bank for the benefit of Heartland. *Id.* When Heartland subsequently defaulted, the bank brought suit against the defendant, claiming that he "breached his fiduciary duty to exercise ordinary care with respect to the bank." *Id.* at 290.

In judging the conduct of the defendant in *Vermeil*, the court considered "whether there was a detriment to the corporation as a result of the transaction; and whether there was full disclosure – although neither disclosure nor shareholder assent can convert a dishonest transaction into a fair one." *Id.* at 291 (citation omitted). Additionally, where the corporation challenges the validity of the transaction or loan, "the burden is on the directors involved . . . to overcome the presumption against validity of the transaction by showing its fairness and propriety." *Id.* (citation and internal quotation marks omitted).

Consequently, the court found that the defendant in *Vermeil* had breached his

---

[2] This "shareholder" argument is yet another of defendants' red herrings, which Webster's dictionary defines as "something that draws attention from the matter or issue at hand" [from the use of red herring to distract hunting dogs from the scent].

fiduciary duty.  *Id.* at 292.  While serving as a director at the bank, the defendant acted on behalf of Heartland and caused the bank to make multiple loans to Heartland by misrepresenting Heartland's ability to pay.  *Id.* at 291.  The defendant's breach of his fiduciary duties directly caused the bank to lose $250,000.  *Id.* at 292.

Therefore, where a director (in this case, Bank and Ventures acting through the person of their employee/agent Walz) acts on behalf of both his corporation and a lender, the director has a heavy burden of showing the fairness of his conduct and the fact that he did not violate any of his fiduciary duties.  *See also Christison v. Martin*, 531 F. Supp. 737, 740 (C.D. Ill. 1982) (holding a director liable for losses on loans where he did not disclose his interest in ISSI to IVAC while he served as a director to IVAC, which made several loans to ISSI before the director retired).  In the instant case, this is a heavy burden that these defendants must meet at trial.

### 3.    Defendants were properly served.

Because defendants refused to accept service, plaintiffs followed the demands of the Hague Convention in serving them in Amsterdam.  *See* Fed R. Civ. P. 4(f)(1), 4(h)(2).

Attached hereto and marked as Exhibit 1 is an affidavit that sets forth the steps that were taken on behalf of plaintiffs, through their counsel, to effect service on Bank and Ventures in Amsterdam.  Defendants do not dispute that they were served with the Amended Complaint and summonses.  Thereafter, defendants (through their counsel) entered their appearance in this matter.  Further, the return of service documents from the Public Prosecutor's office in Holland, which office effected service on Bank and Ventures in Amsterdam, were received by Plaintiff's counsel on March 11, 2005, and promptly filed in this Court.

Despite their acknowledged receipt of the Amended Complaint and summonses, Bank and Ventures argue (in two brief paragraphs at p. 13 of their memorandum) that overseas service has failed because "[t]he summonses delivered to the ABN AMRO Defendants in Amsterdam did not include [a] summary."  Defendants offer no judicial authority for this novel jurisdictional challenge; and in any event, a "summary" was sent to Holland with the package of materials for service on defendants (*see* plaintiffs' Exhibit 1, Affidavit of Kristen Conley, paragraph 3, and the summary attached as page 3 to Exhibit D thereof).

Further, there is no competent affidavit from defendants that a "summary" was not served on them[3]; rather, there is only defense counsel's bald "argument" in two paragraphs on page 13 of their memorandum.

What is clear and uncontested is that Bank and Ventures make the judicial admission that they were properly served by the Public Prosecutor with the Amended Complaint and summonses.  (*See* the Lemans affidavit, attached to defendants' memorandum as Exhibit A, paragraphs 7 and 8.)  Moreover, plaintiffs went beyond the Hague requirements, as a courtesy to defendants and at plaintiffs' expense, by attending to a translation of the complaint from English to Dutch, and forwarding the translated version to Holland.  *See* attached Exhibit 1.

---

[3] Bank and Ventures rely entirely on alleged "facts" contained in the Lemans affidavit (defendants' Exhibit A).  Lemans provides an unsupported conclusion, in paragraph 9 thereof, that there was no "summary" among the documents that she received.  But Lemans admits (paragraph 8) her "understanding" that "the Sandone envelopes were delivered [by the Public Prosecutor in Amsterdam] to Mr. A. Van Vliet," who works in ABN AMRO's head office mailroom at the "Gustav Mahlerlaan."  It is not clear from the Lemans affidavit if "Gustav Mahlerlaan" is the location of Lemans' office; whether the documents she received were identical to the documents served on Van Vliet; or how the documents were channeled from Van Vliet to Lemans.  The proper affiant, if any, should have been Van Vliet, not Lemans - Van Vliet was the ABN AMRO employee in Holland who received the served documents from the Public Prosecutor.  Further, Lemans does not indicate whether these "facts" stated in her affidavit are based on her own personal knowledge - it appears they are not.  Nor does the Lemans affidavit identify the address or age of the purported affiant, or where the affidavit was allegedly executed, or before whom it was allegedly sworn.

Even if a "summary" was not received by defendants, it is clear that a "summary" does not shed any additional light on the contents of the complaint for these sophisticated corporate defendants. They and their counsel have, admittedly, the full complaint and its exhibits. Even if there had been any error or omission in this instance, it was harmless, as defendants' feckless challenge implicitly admits. Defendants' motion to dismiss on the basis of an alleged technical deficiency in service should be denied.

### 4. Defendants have not properly asserted a lack of personal jurisdiction over Ventures.

In support of their "long arm" arguments (which pertain to Ventures but not to Bank), defendants once again rely on the Lemans affidavit (defendants' Exhibit A). But even if the Lemans affidavit met the minimal legal requirements, which it does not, it is conclusory in nature and should be disregarded for that reason as well. For example, in paragraph 4 of her affidavit Lemans offers her legal conclusion that "ABN AMRO Ventures does not <u>currently</u> do any business in the State of Illinois" (emphasis added). Defendants are silent as to the Illinois activities of defendant Bank. [4]

Clearly the proper jurisdictional focus is not on Venture's activities in March of 2005 (when the Lemans affidavit was executed), but rather on Ventures' activities at the relevant times as per the Third Amended Complaint. In determining whether a foreign corporation's activities subject it to Illinois jurisdiction, a court reviews the corporation's

---

[4] Count 1 of the Third Amended Complaint alleges *inter alia* that Bank at all relevant times did business in Illinois, including business in the name of "ABN AMRO Private Equity"; that it had its principle place of business in Illinois; that its employee Keith Walz became a director of Argus in Illinois, and that while in the course of his employment in Illinois with Bank, Walz (at Bank's direction) violated numerous fiduciary duties owed to plaintiffs. Defendants' Exhibit A (the Lemans affidavit) does not dispute any of these facts, but rather admits that Walz is "managing director of ABN AMRO Private Equity," which is "a business unit of ABN AMRO Bank." Defendants have thereby conceded that Bank was doing business in Illinois at all relevant times.

Illinois contacts over a continuous period of time rather than a specific, fixed point in time.  *Reeves v. Baltimore & Ohio R.R. Co.*, 171 Ill. App. 3d 1021, 1027, 526 N.E.2d 404, 407 (1st Dist. 1988).  The relevant time period begins approximately when the claim arose, and extends to when suit was filed and service of process was attempted.  *Reeves*, 171 Ill. App. 3d at 1027, 526 N.E.2d at 408.  *See also Riemer v. KSL Rec. Corp.*, 348 Ill. App. 3d 26 at 35-36, 807 N.E.2d 1004, 1012-1013 (1st Dist. 2004).  Ultimately, the full scope of Ventures' Illinois activities will become clear by way of deposition and other discovery in due course; but the sworn testimony of ABN AMRO's witness Keith Walz has already established a sufficient basis for this Court's jurisdiction.  *See* attached Exhibit 2, transcript of Walz's deposition of July 27, 2004; *see also* the "Appendix" attached to this memorandum, *infra*, wherein plaintiffs have excerpted twenty-eight specific portions of the Walz deposition.  Walz designates his employer/principal as "ABN AMRO," commingling Bank, Ventures, and the ABN AMRO family of companies without distinction.  The conduct of Walz, as set forth in Exhibit 2 and summarized in the attached Appendix, is the basis for this litigation, in that Walz admittedly performed his tortious actions within the course and scope of his employment/agency with Bank and Ventures, and at their specific direction.  *See* attached Exhibit 2, deposition of Keith Walz.

The Third Amended Complaint properly alleges that both Bank and Ventures were "doing business in the State of Illinois, including but not limited to engaging in financial transactions including acquisitions and lending in the State of Illinois."  The Third Amended Complaint further alleges that Bank and Ventures forced Argus into bankruptcy in Illinois.  Paragraph 3 of each count alleges that "a substantial part of the

events or omissions giving rise to the claim" occurred in Illinois. Paragraph 24 of each count alleges that Keith Walz was acting within the course and scope of his employment/agency when he committed the enumerated violations of fiduciary duty – each of which took place in Illinois.

The jurisdictional impact of each defendant's Illinois activities is to be determined by this Court in the light of the statutory language of 735 ILCS 5/2-209 and applicable Illinois case law such as that discussed above. This determination cannot be made as defendants urge – i.e., on the basis of the improperly-executed, conclusory, and self-serving affidavit of Carly Lemans, read in isolation from the allegations of the complaint and the admissions of Walz.

Finally, defendants have now apparently recognized the spuriousness of their earlier contention that the complaint "lumps together" or "aggregates" the activities of the ABN AMRO defendants. Plaintiffs have properly relied on Keith Walz's sworn testimony in framing the terms of the Third Amended Complaint, wherein he lumps together the ABN AMRO defendants as his employers and principals, in defining the course and scope of his employment/agency. *See* attached Exhibit 2, transcript of Walz's deposition.

## **CONCLUSION**

For the foregoing reasons, plaintiffs respectfully request that defendants' motion to dismiss the Third Amended Complaint be denied, and that defendants be directed to timely file their Answer(s) to the Third Amended Complaint.


Dated: January 4, 2006

Respectfully submitted,

DAN GONZALES *et al.*, Plaintiffs, by their
attorneys, JOSEPH W. PHEBUS, GARY D.
FORRESTER and DANIEL J. POPE of the law
firm of PHEBUS & KOESTER

s/ Joseph W. Phebus

s/ Gary D. Forrester

s/ Daniel J. Pope

## CERTIFICATE OF SERVICE

I hereby certify that on January 4, 2006, I electronically filed the foregoing with
the Clerk of the Court using the CM/ECF system which will send notification of such
filing to the following:  Richard L. Klaus, Edward M. Wagner.

s/Gary D. Forrester
PHEBUS & KOESTER
136 West Main Street
Urbana, Illinois 61801
(217)337-1400
(217)337-1607 (fax)
gforrester@phebuslaw.com

*f:\docs\joe\sandone\abn amro\reply mo dis 3rd am comp--federal.doc*

**APPENDIX TO PLAINTIFFS' RESPONSE TO DEFENDANTS' MEMORANDUM IN SUPPORT OF THEIR MOTION TO DISMISS THE THIRD AMENDED COMPLAINT**

Keith Walz testified at deposition that his conduct as an Argus board member was at the behest of the ABN AMRO defendants.  *See* Exhibit 2.  Walz made clear at deposition that he was "wearing the hat" of ABN AMRO when he took actions that "disrupted management" at Argus.[5]

1.   His paycheck came "from ABN" (p. 6);

2.  He reported to "Gerben Kuyper," a "person in Amsterdam" who was ABN's "head of global private equity" (pp. 6-7);

3.  He served on at least eight other boards "as part of [his] work for ABN AMRO" (p. 8);

4.  He recognized that his duty as an Argus board member was to represent "the stakeholders in the company, creditors, shareholders [and] employees" (p. 9);

5.  He was asked to serve on the Argus board by Jan Dijkstra, an investment manager of ABN AMRO in Amsterdam, in December 2001 (p. 15);

6.  His contact at ABN AMRO as he served on the Argus board was Wouter van Veen, who was responsible for technology investments in the private equity group in Amsterdam (p. 21);

7.  He submitted quarterly reports about Argus to Mr. van Veen and to ABN AMRO's "investment committee (p. 24);

---

[5] Throughout his deposition, Walz made no distinction between defendants ABN AMRO Bank N.V. and ABN AMRO Ventures B.V. – rather, Walz lumped all together in describing himself repeatedly as an employee of "ABN" or "ABN AMRO."

8.  In his capacity as an Argus board member, he was in communication with Frits Vromen, who was responsible for making investments for Mercurius, the other Dutch company that had invested in Argus (pp. 25-26);

9.  In arriving at his conclusion that Plaintiff needed to go as CEO of Argus, he talked with Fritz Vromen (at Mercurius) and others (pp. 28 et seq.);

10. He discussed with Kuyper, Van Veen, and the ABN AMRO investment committee whether to convert ABN AMRO's debt to equity, but the conversion was not made because "we [ABN AMRO] wanted to keep our credit position" with Argus (pp. 41-42);

11. In June, 2002, he "had our [i.e., ABN AMRO's] attorneys issue a letter to all the board members" of Argus expressing concern about Plaintiff's management (p. 46);

12. ABN AMRO indicated that they might invest in Argus if Plaintiff was removed (p. 56);

13. After Plaintiff left as Argus CEO, ABN AMRO and Mercurius did not invest in Argus because "we felt the company [Argus] was in such dire straits, it wasn't worth any further investment" (p. 58);

14. The Argus board never asked the Argus shareholders to ratify or confirm the board's removal of Plaintiff as Argus CEO (p. 60);

15. On October 4, 2002, he [Walz] indicated to another board member, Paul McNabb, that ABN AMRO would remove Plaintiff as CEO at the end of the year, and that ABN AMRO had written off its investment in Argus (p. 117);

16. In making his decisions, while sitting on the Argus board, as to whether or not to help Argus survive, he wore his "hat . . . for ABN AMRO" (p. 118);

17. ABN AMRO and Mercurius coordinated and conferred with one another "quite often" in regard to Argus (p. 128 et seq.);

18. He (Walz) recommended to Vromen that Argus should "take Chapter 11" (p. 134);

19. He did not report to the Argus board all of his communications with Vromen concerning Argus, because those were "confidential" and he [Walz] wore "two hats.  I represent ABN AMRO as a significant creditor/investor. And I also am a board member [of Argus]" (p. 142);

20. Walz's and Vromen's communications with Argus's staff, who were below Sandone in the chain of command, were "intended to disrupt management" at Argus (p. 151);

21. He suggested to Vromen that ABN AMRO's lawyers should start pursuing legal remedies against Argus, on behalf of ABN AMRO and Mercurius, in August of 2002 (p. 158-59);

22. As a member of the board of directors of Argus, he [Walz] recommended to Argus's creditors that they sue Argus (p. 159);

23. In exercising his perceived duty to Argus's creditors (ABN AMRO & Mercurius), Walz perceived that he had "no duty to [Argus] shareholders" (p. 161);

24. As an investment manager for ABN AMRO, Walz recommended to them that they do things to protect their position, including forcing Argus into bankruptcy (p. 162);

25. As an employee of one Dutch company, Walz recommended to the employee of another Dutch company (Vromen), "let's call the notes of the company that I am on the board of, which we know won't be in the position to pay it, so that the Dutch companies can then put Argus into bankruptcy" (pp. 163-64);

26. Walz's recommendations to ABN AMRO and Mercurius to call in the notes, start legal proceedings against Argus, and push Argus into bankruptcy were made in the course and scope of his employment with ABN AMRO, rather than as an Argus board member (p. 165);

27. Walz stated to the other Argus board members on November 6, 2002, that the only way ABN AMRO would possibly approve borrowing would be to gain or control Argus (pp. 175-76);

28. On December 10, 2002, Walz suggested that ABN AMRO and Mercurius should file a lawsuit against Argus and Plaintiff with the intent of freezing everything at Argus and prohibiting transactions so as to give more leverage to ABN AMRO and Mercurius (pp. 183-84).