**E-FILED**
Monday, 16 October, 2006  09:34:54 AM
Clerk, U.S. District Court, ILCD

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
URBANA DIVISION

| | | |
|---|---|---|
| DANIEL V. GONZALES, JAY A. KASMERCHAK, PAUL A. FREDERICK, RICHARD A. RODRIGUES, PHILLIP G. SAWICKI, JOHN J. KELLER, and LON P. FREDERICK | ) ) ) ) ) | |
| | ) | No. 04-2232 |
| Plaintiffs, | ) ) ) | The Honorable Judge Harold A. Baker |
| vs. | ) ) | |
| ABN AMRO BANK N.V., Amsterdam, a Dutch corporation; and ABN AMRO VENTURES B.V., Amsterdam, a Dutch corporation, | ) ) ) ) ) | |
| Defendants. | ) | |

## COUNTS 3 AND 4 OF
## THIRD AMENDED COMPLAINT

(Counts 1 and 2 having previously been filed and neither withdrawn or amended)

### Count 3
### (Class Action – Breach of Fiduciary Duty by ABN AMRO Bank)

COME NOW Plaintiffs DANIEL V. GONZALES, JAY A. KASMERCHAK, PAUL A. FREDERICK, RICHARD A. RODRIGUES, PHILLIP G. SAWICKI, JOHN J. KELLER, and LON P. FREDERICK, by and through their attorneys, Joseph W. Phebus and Daniel J. Pope of Phebus & Koester, and pursuant to Rule 23.1 and Rule 23 of the Federal Rules of Civil Procedure, bring this claim as a class action against Defendant ABN AMRO BANK, N.V., a Dutch corporation ("ABN AMRO Bank") in the alternative to Count 1 of the complaint, and aver:

     1.    The plaintiffs have standing to bring this claim and bring it

**EXHIBIT A**

pursuant to Rule 23.1 of the Federal Rules of Civil Procedure in that:

A.   The plaintiffs and each of them were shareholders of Argus Systems Group, Inc., at the time of the transactions of which the plaintiffs complain and at the time of Argus' adjudication of bankruptcy.

B.   The putative class members that the plaintiffs seek to represent were all shareholders of Argus Systems Group, Inc., at the time of the transactions in question and the time of Argus' adjudication of bankruptcy.

C.   The plaintiffs' claim is not a collusive claim in an attempt to confer jurisdiction in this court which it would not otherwise have.

D.   The plaintiffs were unable to ask the directors to bring this claim as the corporation was in bankruptcy.

E.   A request by a putative class member was made of the trustee (the comparable authority) to bring an action; however, the trustee has refused to do so and is taking the position "This is a fight between shareholders, I frankly want no part of."

F.   The plaintiffs are all individual shareholders and are similarly situated with all putative class members in the proposed class whose rights they seek to enforce against ABN AMRO Bank, N.V., and ABN AMRO Ventures, B.V., as set forth in their initial complaint herein.

2.   This Court has subject matter jurisdiction pursuant to 28 U.S. Code

Section 1332 in that:

A.   Plaintiffs Rodrigues and Sawicki are citizens of the State of Illinois; Plaintiffs Gonzalez, Kasmerchak, Lon Frederick, Paul Frederick, and Keller are citizens of the State of Wisconsin.

B.   Defendant ABN AMRO Bank is a corporation organized under the laws of the Netherlands with its principal office in the Netherlands, and accordingly is a citizen of a foreign state.

C.   Co-Defendant ABN AMRO Ventures, B.V., (ABN AMRO

Ventures) is a corporation organized under the laws of the Netherlands with its principal office in the Netherlands, and accordingly is a citizen of a foreign state.

D.    The amount in controversy exclusive of interest and costs is in excess of $75,000.

3.    This Court has personal jurisdiction over ABN AMRO Bank by virtue of the allegations set forth herein.

4.    Pursuant to 28 U.S. Code Section 1391, this Court has venue in that a substantial part of the events or omissions giving rise to the claim occurred in its territorial jurisdiction including Champaign County, Illinois.

5.    Plaintiffs and putative class members at all relevant times were shareholders of Argus Systems Group, Inc., an Illinois corporation ("Argus"), the principal place of business of which was located, at all relevant times, in Champaign County, Illinois.

6.    At all relevant times, ABN AMRO Bank did business as ABN AMRO Private Equity.

7.    At all relevant times, Co-Defendant ABN AMRO Ventures was a subsidiary of ABN AMRO Bank.

8.    To Plaintiffs' information and belief, at all relevant times ABN AMRO Bank d/b/a ABN Private Equity had its principal North American office for ABN Private Equity in the State of Illinois and was doing business including but not limited to engaging in financial transactions including acquisitions and lending in the State of Illinois.

9.    At all relevant times, Keith Walz ("Walz") was employed by ABN AMRO Bank as a managing director of its ABN AMRO Private Equity unit, with his

principal place of employment being ABN Private Equity's office in the State of Illinois.

10.    To Plaintiffs' information and belief, at all relevant times ABN AMRO Bank's North America operations were headquartered in the State of Illinois.

11.    On December 3, 2001, ABN AMRO Ventures entered into a stock purchase agreement to acquire stock in Argus and in conjunction therewith a voting agreement (a copy of which is attached hereto as Exhibit 1), a registration of rights agreement, a security agreement and various other agreements.

12.    Pursuant to said agreements, ABN AMRO Ventures had the right to designate and appoint one member of the Board of Directors of Argus, and in or about January, 2002, did appoint Walz.

13.    At all relevant times prior to November 1, 2002, putative class member Randall J. Sandone was the President and Chief Executive Officer of Argus and had a Senior Management Employment Agreement (a copy of which is attached hereto as Exhibit 2) with Argus that provided he could only be removed as President with the concurrence of two-thirds of the outstanding shares of stock, which provision among other things provided a protection for shareholders against having Sandone terminated as President without such a concurrence.

14.    The conduct of Walz complained of was in the course and scope of his employment with ABN AMRO Bank; accordingly, ABN AMRO Bank is liable for his acts or omissions complained of herein under the doctrine of *respondeat superior* in that among other things he regularly reported to his superiors at ABN AMRO Bank so as to obtain their direction, prior approval and authorization of his actions in question.

15.    To Plaintiffs' information and belief, at all relevant times ABN

AMRO Bank together with Co-Defendant ABN AMRO Ventures shared substantial business interests with Mercurius Beleggingsmaatschappij B.V., a Dutch corporation ("Mercurius"), and as a consequence thereof ABN AMRO Bank had an interest in promoting the profitability and interests of Mercurius.

16.    On May 23, 2003, Mercurius with the assistance and prior consent of ABN AMRO Bank and ABN AMRO Ventures filed a petition in the Bankruptcy Court for the United States District Court for the Central District of Illinois forcing Argus into bankruptcy primarily, if not exclusively, for the benefit of Argus's two primary creditors, ABN AMRO Ventures and Mercurius, the interests of which as creditors had a priority over the interests of shareholders in the bankruptcy proceeding, and accordingly Plaintiffs as shareholders have standing to bring a direct action for the benefit of the putative class.

17.    At all relevant times, ABN AMRO Ventures and Mercurius had loans to Argus which from their inception were intended to be converted to equity, which conversion would have converted a combined total of approximately $12 million of secured debt to equity in common stock thereby substantially enhancing the financial condition of Argus and avoiding or preventing its bankruptcy.

18.    As a director of Argus, Walz owed a fiduciary duty to the shareholders of Argus to:

> A.    Refrain from utilizing his office as director in a manner contrary to the best interests of Argus;
>
> B.    Put the interests of all of its shareholders ahead of the best interests of creditors such including ABN AMRO Ventures and Mercurius;
>
> C.    Not disclose confidential Argus information to ABN AMRO Bank, ABN AMRO Ventures, Mercurius and third parties;

D.   Not manipulate the management and operation of Argus contrary to the best interests of Argus;

E.   Not manipulate the management and operation of Argus for the interest and benefit of creditors including ABN AMRO Ventures and Mercurius;

F.   Exercise good faith and fair dealing toward Argus and all of its shareholders in his performance of his duties and obligations as a director;

G.   Faithfully follow and comply with the by-laws of Argus; and

H.   Cause Argus to comply with its contractual obligations.

19.   Walz, in the course and scope of his employment with ABN AMRO Bank, violated his aforesaid fiduciary duties in one or more of the following ways or a combination thereof:

A.   Intentionally and unjustifiably interfered with and undermined management of Argus for the benefit of creditors including ABN AMRO Bank, ABN AMRO Ventures and Mercurius.

B.   Intentionally disclosed confidential information concerning Argus to ABN AMRO Bank, ABN AMRO Ventures, and Mercurius for the purpose of interfering with management and operation of Argus.

C.   Disclosed confidential information concerning Argus to ABN AMRO Bank, ABN AMRO Ventures, and Mercurius with the intent of manipulating the management and operation of Argus for the benefit of ABN AMRO Bank, ABN AMRO Ventures, and Mercurius.

D.   Conspired with ABN AMRO Bank, ABN AMRO Ventures and Mercurius to remove Sandone as president and chief executive officer without converting approximately $12 million of debt financing into equity in Argus stock.

E.   For the benefit of ABN AMRO Bank, ABN AMRO Ventures and Mercurius, intentionally violated the by-laws

of Argus, *inter alia*, removing Sandone as president without obtaining shareholders' consent as required under the by-laws.

F.    For the benefit of ABN AMRO Bank, ABN AMRO Ventures and Mercurius, failed to comply with the contractual obligations of Argus.

G.    Failed to exercise good faith and fair dealing toward Argus and all of its shareholders in his performance of his duties and obligations as a director.

H.    Failed to undertake action to compel ABN AMRO Ventures and Mercurius to convert their debt financing into equity.

I.    Blocked attempts to obtain additional financing by Argus from third parties.

J.    Assisted Mercurius, ABN AMRO Bank and ABN AMRO Ventures in placing Argus in such a condition as to allow Mercurius to file an involuntary bankruptcy petition as to Argus.

20.    Plaintiffs bring their claims pursuant to Rule 23(b)(3) of the Federal Rules of Civil Procedure seeking certification of a class defined as follows or as the Court may otherwise define:

All shareholders of Argus as of the time it filed bankruptcy on May 23, 2003.

Excluded from the class are (1) ABN AMRO Bank, ABN AMRO Ventures, and their directors, officers, agents and employees; (2) Mercurius and its directors, officers, agents and employees.

21.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, the prerequisites for the maintenance of a class action are satisfied in that:

A.    The class is so numerous that joinder of all members is impracticable, thus satisfying the requirement of Rule 23(a)(1) in that at all relevant times, to Plaintiffs' knowledge, information and belief, there were more than 50 persons or entities who were shareholders of Argus.

B.   There are questions of fact or law common to the class which predominate over any questions affecting only individual members thus satisfying the requirement of Rule 23(a)(2), which common predominant questions include:

   (1)   The nature and extent of the fiduciary duty owed by Walz to Argus and all of its shareholders;

   (2)   Whether Walz violated the fiduciary duty;

   (3)   ABN AMRO Bank's responsibility under the doctrine of *respondeat superior*;

   (4)   The damages to Plaintiffs and putative class members.

C.   The claims of Plaintiffs are typical of the claims of the class and accordingly the requirement of Rule 23(a)(3) is met.

D.   Plaintiffs will fairly and adequately protect the interest of the class. Accordingly the requirement of Rule 23(a)(4) is met in that: Plaintiffs are members of a class they seek to represent and will adequately and fairly protect the interests of the class. The interests of the Plaintiffs are coincident with, and not antagonistic to, the interests of the other members of the class. Plaintiffs have retained attorneys who are experienced in complex litigation, including class actions involving breach of consumer contracts and consumer fraud.

E.   The requirements of Rule 23(b)(3) are met in that:

   (1)   The aforesaid questions of law or fact common to members of the class predominate over any questions effecting only individual members;

   (2)   A class action is superior to other available methods for the fair and efficient adjudication of the controversy;

   (3)   The labor and expense of an individual action would be disproportionately large as to the amount of potential recovery for a substantial number of the putative class members;

(4)    No other litigation concerning this controversy has been commenced against ABN AMRO Bank by any member of the putative class;

(5)    Litigation of claims by individual class members would produce a multiplicity of cases that would further burden already congested court dockets while proceeding as a class action, by contrast, provides a mechanism for efficient adjudication of substantially all claims arising out of the conduct of ABN AMRO Bank.

(6)    While the members of the class are numerous, manageability difficulties are not anticipated. The identities of all class members are known from the corporate records of Argus as well as the amount of stock each class member owned.

22.    By virtue of the foregoing, Plaintiffs and the putative class members were damaged in that Argus was undermined in its ability to conduct its business affairs, and as a result, Argus's business suffered, and as a result, the class members were damaged in that they received no dividends and the value of the stock ultimately declined to worthless, and the corporation was forced into bankruptcy, and it was unable to have an initial public offering which would have substantially compensated the class members all of whom were start-up investors.

WHEREFORE, Plaintiffs pray:

1.    This claim be certified as a class action with Plaintiffs as class representatives and their attorneys as class counsel;

2.    For a judgment on behalf of the class and against ABN AMRO Bank in the amount of $60 million;

3.    For costs of suit;

4.    Such other and further relief in the premises as may be appropriate;

5.      Demand a trial by jury.


## Count 4
### (Class Action – Breach of Fiduciary Duty by ABN AMRO Ventures)

COME NOW Plaintiffs DANIEL V. GONZALES, JAY A. KASMERCHAK, PAUL A. FREDERICK, RICHARD A. RODRIGUES, PHILLIP G. SAWICKI, JOHN J. KELLER, and LON P. FREDERICK, by and through their attorneys, Joseph W. Phebus and Daniel J. Pope of Phebus & Koester, and pursuant to Rule 23.1 and Rule 23 of the Federal Rules of Civil Procedure, bring this claim as a class action against Defendant ABN AMRO VENTURES, B.V., a Dutch corporation ("ABN AMRO Ventures") in the alternative to Count 2 of the complaint, and aver:

1.      The plaintiffs have standing to bring this claim and bring it pursuant to Rule 23.1 of the Federal Rules of Civil Procedure in that:

A.      The plaintiffs and each of them were shareholders of Argus Systems Group, Inc., at the time of the transactions of which the plaintiffs complain and at the time of Argus' adjudication of bankruptcy.

B.      The putative class members that the plaintiffs seek to represent were all shareholders of Argus Systems Group, Inc., at the time of the transactions in question and the time of Argus' adjudication of bankruptcy.

C.      The plaintiffs' claim is not a collusive claim in an attempt to confer jurisdiction in this court which it would not otherwise have.

D.      The plaintiffs were unable to ask the directors to bring this claim as the corporation was in bankruptcy.

E.      A request by a putative class member was made of the trustee (the comparable authority) to bring an action; however, the trustee has refused to do so and is taking the

position "This is a fight between shareholders, I frankly want no part of."

F.      The plaintiffs are all individual shareholders and are similarly situated with all putative class members in the proposed class whose rights they seek to enforce against ABN AMRO Bank, N.V., and ABN AMRO Ventures, B.V., as set forth in their initial complaint herein.

2.      This Court has subject matter jurisdiction pursuant to 28 U.S. Code Section 1332 in that:

A.      Plaintiffs Rodrigues and Sawicki are citizens of the State of Illinois; Plaintiffs Gonzalez, Kasmerchak, Lon Frederick, Paul Frederick, and Keller are citizens of the State of Wisconsin.

B.      Defendant ABN AMRO Ventures is a corporation organized under the laws of the Netherlands with its principal office in the Netherlands, and accordingly is a citizen of a foreign state.

C.      Co-Defendant ABN AMRO Bank is a corporation organized under the laws of the Netherlands with its principal office in the Netherlands, and accordingly is a citizen of a foreign state.

D.      The amount in controversy exclusive of interest and costs is in excess of $75,000.

3.      This Court has personal jurisdiction over ABN AMRO Ventures by virtue of the allegations set forth herein.

4.      Pursuant to 28 U.S. Code Section 1391, this Court has venue in that a substantial part of the events or omissions giving rise to the claim occurred in its territorial jurisdiction including Champaign County, Illinois.

5.      Plaintiffs and putative class members at all relevant times were shareholders of Argus Systems Group, Inc., an Illinois corporation ("Argus"), the principal place of business of which was located, at all relevant times, in Champaign

County, Illinois.

6.    At all relevant times, ABN AMRO Bank did business as ABN AMRO Private Equity.

7.    At all relevant times, Co-Defendant ABN AMRO Ventures was a subsidiary of ABN AMRO Bank.

8.    To Plaintiffs' information and belief, at all relevant times ABN AMRO Bank d/b/a ABN Private Equity had its principal North American office for ABN Private Equity in the State of Illinois and was doing business including but not limited to engaging in financial transactions including acquisitions and lending in the State of Illinois.

9.    At all relevant times, Keith Walz ("Walz") was employed by ABN AMRO Bank as a managing director of its ABN AMRO Private Equity unit, with his principal place of employment being ABN Private Equity's office in the State of Illinois.

10.    To Plaintiffs' information and belief, at all relevant times ABN AMRO Bank's North America operations were headquartered in the State of Illinois.

11.    On December 3, 2001, ABN AMRO Ventures entered into a stock purchase agreement to acquire stock in Argus and in conjunction therewith a voting agreement (a copy of which is attached hereto as Exhibit 1), a registration of rights agreement, a security agreement and various other agreements.

12.    Pursuant to said agreements, ABN AMRO Ventures had the right to designate and appoint one member of the Board of Directors of Argus, and in or about January, 2002, did appoint Walz.

13.    At all relevant times prior to November 1, 2002, putative class

member Randall J. Sandone was the President and Chief Executive Officer of Argus and had a Senior Management Employment Agreement (a copy of which is attached hereto as Exhibit 2) with Argus that provided he could only be removed as President with the concurrence of two-thirds of the outstanding shares of stock, which provision among other things provided a protection for shareholders against having Sandone terminated as President without such a concurrence.

14.     The conduct of Walz complained of was in the course and scope of his agency with ABN AMRO Ventures; accordingly, ABN AMRO Ventures is liable for his acts or omissions complained of herein under the doctrine of *respondeat superior* in that among other things he regularly reported to employees of ABN AMRO Ventures so as to obtain their direction, prior approval and authorization of his actions in question.

15.     To Plaintiffs' information and belief, at all relevant times ABN AMRO Ventures together with Co-Defendant ABN AMRO Bank shared substantial business interests with Mercurius Beleggingsmaatschappij B.V., a Dutch corporation ("Mercurius"), and as a consequence thereof ABN AMRO Ventures had an interest in promoting the profitability and interests of Mercurius.

16.     On May 23, 2003, Mercurius with the assistance and prior consent of ABN AMRO Bank and ABN AMRO Ventures filed a petition in the Bankruptcy Court for the United States District Court for the Central District of Illinois forcing Argus into bankruptcy primarily, if not exclusively, for the benefit of Argus's two primary creditors, ABN AMRO Ventures and Mercurius, the interests of which as creditors had a priority over the interests of shareholders in the bankruptcy proceeding, and accordingly Plaintiffs as shareholders have standing to bring a direct action for the benefit of the putative class.

17.     At all relevant times, ABN AMRO Ventures and Mercurius had loans to Argus which from their inception were intended to be converted to equity, which conversion would have converted a combined total of approximately $12 million of secured debt to equity in common stock thereby substantially enhancing the financial condition of Argus and avoiding or preventing its bankruptcy.

18.     As a director of Argus, Walz owed a fiduciary duty to the shareholders of Argus to:

A.     Refrain from utilizing his office as director in a manner contrary to the best interests of Argus;

B.     Put the interests of all of its shareholders ahead of the best interests of creditors such including ABN AMRO Ventures and Mercurius;

C.     Not disclose confidential Argus information to ABN AMRO Ventures, ABN AMRO Bank, Mercurius and third parties;

D.     Not manipulate the management and operation of Argus contrary to the best interests of Argus;

E.     Not manipulate the management and operation of Argus for the interest and benefit of creditors including ABN AMRO Ventures and Mercurius;

F.     Exercise good faith and fair dealing toward Argus and all of its shareholders in his performance of his duties and obligations as a director;

G.     Faithfully follow and comply with the by-laws of Argus; and

H.     Cause Argus to comply with its contractual obligations.

19.     Walz, in the course and scope of his agency with ABN AMRO Ventures, violated his aforesaid fiduciary duties in one or more of the following ways or a combination thereof:

A.   Intentionally and unjustifiably interfered with and undermined management of Argus for the benefit of creditors including ABN AMRO Bank, ABN AMRO Ventures and Mercurius.

B.   Intentionally disclosed confidential information concerning Argus to ABN AMRO Bank, ABN AMRO Ventures, and Mercurius for the purpose of interfering with management and operation of Argus.

C.   Disclosed confidential information concerning Argus to ABN AMRO Bank, ABN AMRO Ventures, and Mercurius with the intent of manipulating the management and operation of Argus for the benefit of ABN AMRO Bank, ABN AMRO Ventures, and Mercurius.

D.   Conspired with ABN AMRO Bank, ABN AMRO Ventures and Mercurius to remove Sandone as president and chief executive officer without converting approximately $12 million of debt financing into equity in Argus stock.

E.   For the benefit of ABN AMRO Bank, ABN AMRO Ventures and Mercurius, intentionally violated the by-laws of Argus, *inter alia*, removing Sandone as president without obtaining shareholders' consent as required under the by-laws.

F.   For the benefit of ABN AMRO Bank, ABN AMRO Ventures and Mercurius, failed to comply with the contractual obligations of Argus.

G.   Failed to exercise good faith and fair dealing toward Argus and all of its shareholders in his performance of his duties and obligations as a director.

H.   Failed to undertake action to compel ABN AMRO Ventures and Mercurius to convert their debt financing into equity.

I.   Blocked attempts to obtain additional financing by Argus from third parties.

J.   Assisted Mercurius, ABN AMRO Bank and ABN AMRO Ventures in placing Argus in such a condition as to allow Mercurius to file an involuntary bankruptcy petition as to Argus.

20.    Plaintiffs bring their claims pursuant to Rule 23(b)(3) of the

Federal Rules of Civil Procedure seeking certification of a class defined as follows or as

the Court may otherwise define:

> All shareholders of Argus as of the time it filed bankruptcy on May 23, 2003.
>
> Excluded from the class are (1) ABN AMRO Bank, ABN AMRO Ventures, and their directors, officers, agents and employees; (2) Mercurius and its directors, officers, agents and employees.

21.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, the

prerequisites for the maintenance of a class action are satisfied in that:

A.    The class is so numerous that joinder of all members is impracticable, thus satisfying the requirement of Rule 23(a)(1) in that at all relevant times, to Plaintiffs' knowledge, information and belief, there were more than 50 persons or entities who were shareholders of Argus.

B.    There are questions of fact or law common to the class which predominate over any questions affecting only individual members thus satisfying the requirement of Rule 23(a)(2), which common predominant questions include:

(1)    The nature and extent of the fiduciary duty owed by Walz to Argus and all of its shareholders;

(2)    Whether Walz violated the fiduciary duty;

(3)    ABN AMRO Venture's responsibility under the doctrine of *respondeat superior*;

(4)    The damages to Plaintiffs and putative class members.

C.    The claims of Plaintiffs are typical of the claims of the class and accordingly the requirement of Rule 23(a)(3) is met.

D.    Plaintiffs will fairly and adequately protect the interest of the class. Accordingly the requirement of Rule 23(a)(4) is

met in that: Plaintiffs are members of a class they seek to represent and will adequately and fairly protect the interests of the class. The interests of the Plaintiffs are coincident with, and not antagonistic to, the interests of the other members of the class. Plaintiffs have retained attorneys who are experienced in complex litigation, including class actions involving breach of consumer contracts and consumer fraud.

E.    The requirements of Rule 23(b)(3) are met in that:

(1)    The aforesaid questions of law or fact common to members of the class predominate over any questions effecting only individual members;

(2)    A class action is superior to other available methods for the fair and efficient adjudication of the controversy;

(3)    The labor and expense of an individual action would be disproportionately large as to the amount of potential recovery for a substantial number of the putative class members;

(4)    No other litigation concerning this controversy has been commenced against ABN AMRO Ventures by any member of the putative class;

(5)    Litigation of claims by individual class members would produce a multiplicity of cases that would further burden already congested court dockets while proceeding as a class action, by contrast, provides a mechanism for efficient adjudication of substantially all claims arising out of the conduct of ABN AMRO Ventures.

(6)    While the members of the class are numerous, manageability difficulties are not anticipated. The identities of all class members are known from the corporate records of Argus as well as the amount of stock each class member owned.

22.    By virtue of the foregoing, Plaintiffs and the putative class members were damaged in that Argus was undermined in its ability to conduct its

business affairs, and as a result, Argus's business suffered, and as a result, the class members were damaged in that they received no dividends and the value of the stock ultimately declined to worthless, and the corporation was forced into bankruptcy, and it was unable to have an initial public offering which would have substantially compensated the class members all of whom were start-up investors.

WHEREFORE, Plaintiffs pray:

1.    This claim be certified as a class action with Plaintiffs as class representatives and their attorneys as class counsel;

2.    For a judgment on behalf of the class and against ABN AMRO Ventures in the amount of $60 million;

3.    For costs of suit;

4.    Such other and further relief in the premises as may be appropriate;

5.    Demand a trial by jury.

s/ _J.W. PHEBUS_____
J. W. PHEBUS
Attorney for Plaintiff
PHEBUS & KOESTER
136 West Main Street
Urbana, Illinois 61801
Telephone:  (217) 337-1400
Fax:  (217) 337-1607
*jwphebus@phebuslaw.com*

## JURY DEMAND

COME NOW Plaintiffs, by their attorneys, Joseph W. Phebus and Daniel J. Pope of the law firm of Phebus & Koester, and hereby demand a trial by jury on the issues in this cause.

s/  J.W. PHEBUS
          J. W. PHEBUS
          Attorney for Plaintiff
          PHEBUS & KOESTER
          136 West Main Street
          Urbana, Illinois 61801
          Telephone:  (217) 337-1400
          Fax:  (217) 337-1607
          *jwphebus@phebuslaw.com*

*f:\docs\joe\sandone\abn amro\counts 3 and 4 3rd am comp..doc*

**E-FILED**
Wednesday, 16 November, 2005   03:00:44 PM
Clerk, U.S. District Court, ILCD

EXECUTION COPY

## VOTING AGREEMENT

This Voting Agreement (this "*Agreement*") is made as of the 3rd day of December, 2001, by and among Argus Systems Group, Incorporated, an Illinois corporation (the "*Company*"), ABN Amro Ventures, B.V., a Dutch corporation ("*ABN Amro*"), Mercurius Beleggingsmaatschappij B.V., a Dutch corporation ("*Mercurius*" and together with ABN Amro, the "*Investors*") and the following holders of shares of the Company's common stock without par value ("*Common Stock*"): Randall J. Sandone and Paul A. McNabb (the "*Stockholders*").

The Company and the Investors have entered into a Stock Purchase Agreement (the "*Purchase Agreement*") of even date herewith pursuant to which the Company desires to sell to the Investors and the Investors desire to purchase from the Company shares of the Company's Class B Common Stock. A condition to the Investors' obligations under the Purchase Agreement is that the Company, the Investors and the Stockholders enter into this Agreement for the purpose of setting forth the terms and conditions pursuant to which the Stockholders and the Investors shall vote their shares of the Company's voting stock in favor of certain designees to the Company's Board of Directors. The Company, the Investors and the Stockholders each desire to facilitate the voting arrangements set forth in this Agreement, and the sale and purchase of shares of Common Stock pursuant to the Purchase Agreement, by agreeing to the terms and conditions set forth below.

The parties agree as follows:

## ARTICLE I
## ELECTION OF DIRECTORS.

1.1    Board Representation. At each annual meeting of the stockholders of the Company, or at any meeting of the stockholders of the Company at which members of the Board of Directors of the Company are to be elected, or whenever members of the Board of Directors are to be elected by written consent, the Investors and the Stockholders agree to vote or act with respect to their shares so as to nominate and elect:

(a)    three (3) members of the Company's Board of Directors designated by the Stockholders, which designees shall initially be Randall J. Sandone, William M. O'Neill and Steven Oetegenn; and

(b)    so long as ABN Amro or its affiliates continue to own at least 5% of the Company's stock, one member of the Company's Board of Directors designated by ABN Amro or its designated affiliates; and

(c)    so long as Mercurius or its affiliates continue to own at least 5% of the Company's stock, one member of the Company's Board of Directors designated by Mercurius or its designated affiliates.



**PLAINTIFF'S EXHIBIT**



1.2    Filling Vacancies. In the event of the resignation, death, removal or disqualification of a director nominated pursuant to Section 1.1, then, if the party or parties that had the right to nominate such director pursuant to Section 1.1 still has such right, such party or parties shall promptly nominate a new director and, after written notice of the nomination has been given by such party to each of the parties hereto, the Investors and the Stockholders will vote their shares of the Company's capital stock to elect such nominee to the Board of Directors.

1.3    Certain Resignations or Removals. Except as provided in Section 2, no party hereto shall vote for the removal of a director nominated and elected pursuant to this Agreement, and no such vote shall be effective, unless the parties who nominated such director, voting among themselves shall specify, provided, that nothing contained herein shall limit the right of a party to vote to remove a director for violation of fiduciary obligations or willful misconduct, provided, further, that the party or parties having the right to nominate a director pursuant to Section 1.1 shall have the right to nominate a replacement in the event that a director is so removed. Any party or parties having the right to nominate a director pursuant to Section 1.1 also shall have the right to request the resignation or removal of the director so nominated and elected. In such event, such director shall immediately resign or be subject to removal by a vote of the Company's stockholders, and each Investor and Stockholder shall vote all of their shares of capital stock of the Company in favor of such removal. If such director shall fail to resign, such party or parties shall have the right to call a special meeting of stockholders for the purpose of removing such director and each Investor and Stockholder shall vote all their shares entitled to vote at such meeting in favor of removal.

ARTICLE II
MANAGEMENT PROTECTION

2.1    Annual Budget. As provided more fully in that certain Shareholders' Agreement dated as of the date hereof by and between the Company, Investors and Stockholders, the Company shall prepare an annual budget (each, an "*Annual Budget*") approved by the Investors for each of 2002, 2003 and 2004 fiscal years (a "*Fiscal Year*") that contain minimum revenue targets for each such year (each, a "*Revenue Target*").

2.2    Management Votes. At any time that the Company's actual gross revenue for any Fiscal Year is less than ninety percent (90%) of such year's Revenue Target (for these purposes, actual revenue shall also include the amount by which the prior's year actual revenue exceeded the prior year's Revenue Target, if any, but the carry-over from a prior year may not be used to determine whether there is any excess revenue that can be carried over to a subsequent year), all classes of voting stock of the Company shall vote as one class on the issue of removal of Randall J. Sandone ("*Sandone*") as Chief Executive Officer and as a director of the Company, provided, however, that nothing in this Agreement shall prohibit the Investors from exercising their fiduciary obligations under the laws of the State of Delaware in the event of Sandone's fraud, gross negligence or willful misconduct requires his earlier removal from the Board of Directors.

2

### ARTICLE III
### ADDITIONAL REPRESENTATIONS AND COVENANTS.

3.1    No Revocation.  The voting agreements contained herein are coupled with an interest and may not be revoked during the term of this Agreement.

3.2    Number of Directors.  The Investors and Stockholders will not vote for any amendment or change to the Certificate of Incorporation or Bylaws effecting a change in the number of directors from the number then subject to nomination rights pursuant to Section 1.1.

3.3    Legends.  Each certificate representing shares of the Company's capital stock held by the Investors or the Stockholders or any assignee of either the Investors or the Stockholders shall bear the following legend:

> "THE SHARES EVIDENCED HEREBY ARE SUBJECT TO A
> VOTING AGREEMENT BY AND AMONG THE COMPANY
> AND CERTAIN STOCKHOLDERS OF THE COMPANY (A
> COPY OF WHICH MAY BE OBTAINED FROM THE
> COMPANY), AND BY ACCEPTING ANY INTEREST IN
> SUCH SHARES THE PERSON ACCEPTING SUCH INTEREST
> SHALL BE DEEMED TO AGREE TO AND SHALL BECOME
> BOUND BY ALL THE PROVISIONS OF SAID VOTING
> AGREEMENT."

### ARTICLE IV
### COVENANTS OF THE COMPANY.

The Company agrees to ensure that the rights granted hereunder are effective and that the parties hereto enjoy the benefits thereof.  Such actions include, without limitation, the use of the Company's best efforts to assist in the nomination and election of the directors as provided above.

4.1    The Company will not, by any voluntary action, avoid or seek to avoid the observance or performance of any of the terms to be performed hereunder by the Company, but will at all times in good faith assist in the carrying out of all of the provisions of this Agreement and in the taking of all such actions as may be necessary, appropriate or reasonably requested by the parties hereto in order to protect the rights of the parties hereunder against impairment.

4.2    The Company shall take such action as may be necessary to cause the Board to meet no less often than four (4) times per year, of which three (3) such meetings shall be held in person; provided, however, the Board may consent by majority vote to waive the covenant contained in this Section 4.2.

### ARTICLE V
### TERMINATION

5.1    Termination Events.  This Agreement shall terminate upon the earlier of:



3

(a)    A firm commitment underwri    . public offering by the Company of shares of its Common Stock pursuant to a registration statement on Form S-1 under the Securities Act of 1933, as amended, the public offering price of which is not less than $8.00 per share (appropriately adjusted for any stock split, dividend, combination or other recapitalizations after the date hereof) and which results in aggregate gross cash proceeds of at least $50,000,000; or

(b)    The sale, conveyance or disposal of all or substantially all of the Company's property or business or the Company's merger with or into or consolidation with any other corporation (other than a wholly-owned subsidiary corporation and other than any reincorporation of the Company in another jurisdiction with substantially the same capital structure) or if the Company effects any other transaction or series of related transactions in which more than fifty percent (50%) of the voting power of the Company is disposed of and the Company is not the survivor, provided that this Section 5.1(b) shall not apply to a merger effected exclusively for the purpose of changing the domicile of the Company; or

(c)    This Agreement shall further terminate and cease to apply to any Party who or which at any time ceases to own at least five percent (5%) of the issued and outstanding shares of capital stock of the Company (treating any convertible debt instruments, warrants or options beneficially held by such Party as having been converted).

5.2    Removal of Legend.  At any time after the termination of this Agreement in accordance with Section 5.1, any holder of a stock certificate pursuant to Section 3.3 may surrender such certificate to the Company for removal of the restrictive legend, and the Company will duly reissue a new certificate without the legend.

## ARTICLE VI
## MISCELLANEOUS

6.1    Successors and Assigns.  The terms and conditions of this Agreement shall inure to the benefit of and be binding upon the respective successors and assigns of the parties. Nothing in this Agreement, express or implied, is intended to confer upon any party other than the parties hereto or their respective successors and assigns any rights, remedies, obligations, or liabilities under or by reason of this Agreement, except as expressly provided in this Agreement.

6.2    Application of Agreement to After-Acquired Shares.  All of this provisions of Section 1 shall apply to all voting securities held by the Investors and the Stockholders, whether issued or acquired before or after the date hereof, and all securities issued as a replacement for the Common Stock or with respect to the Common Stock as a result of any stock dividend, stock split or other similar event.

6.3    Specific Performance.  The rights of the parties under this Agreement are unique and, accordingly, the parties shall have the right, in addition to such other remedies as may be available to any of them at law or in equity, to enforce their rights hereunder by actions for specific performance in addition to any other legal or equitable remedies they might have to the extent permitted by law.

4

6.4    Amendments and Waivers.  Any term hereof may be amended or waived only with the written consent of each party hereto.  Any amendment or waiver effected in accordance with this Section 6.4 shall be binding upon the Company, the Investors and the Stockholders, and each of their respective successors and assigns.

6.5    Notices.  Unless otherwise provided, any notice required or permitted under this Agreement shall be given in writing and shall be deemed effectively given when received if given by delivery in person or by courier or a courier service; (ii) on the date of transmission if sent by telex, facsimile or other wire transmission (in the case of facsimile, subject to confirmation of receipt made by printed confirmation sheet verifying successful transmission; or (iii) four (4) business days after deposit with the United States Postal Service, by registered or certified mail, postage prepaid. Such notice shall be addressed to the party to be notified at the address set forth below, or at such other address as such party may designate by ten (10) days' advance written notice to the other parties:

(a)    To Argus US:    Argus Systems Group, Incorporated
c/o Mr. Randall J. Sandone
1809 Woodfield Drive
Savoy, Illinois 61874
TELE: (217) 355-6308
FAX: (217) 355-1433

(b)    To ABN AMRO Ventures B.V.:

ABN AMRO Capital
Gustav Mahlerlaan 10
P.O. Box 283 (HQ 4048)
1000 EA Amsterdam
The Netherlands
TELE: (31) 20-628-6389
FAX: (31) 20-628-9127
Attn:  Adminstration Department

and to:    Wilmer, Cutler & Pickering
4 Carlton Gardens
London  SW1Y5AA, England
TELE: 011 (4420) 7872-1000
FAX: 011 (4420) 7839-3537
Attn:  Gerry B. Cater, Esquire

(c)    To Mercurius:

        Mercurius Beleggingsmaatschappij B.V.
        c/o Mr. Frits F. Vromen
        Akerstraat 126
        NL - 6417 BR Heerlen
        TELE: (31) 45 560-6222
        FAX: (31) 45-579-8070

(d)    To the Stockholders:

        Mr. Randall Sandone
        1809 Woodfield Drive
        Savoy, IL  61874 USA

        Mr. Paul A. McNabb
        1809 Woodfield Drive
        Savoy, IL  61874 USA

6.6    Severability. If one or more provisions of this Agreement are held to be unenforceable under applicable law, the parties agree to renegotiate such provision in good faith. In the event that the parties cannot reach a mutually agreeable and enforceable replacement for such provision, then (a) such provision shall be excluded from this Agreement, (b) the balance of the Agreement shall be interpreted as if such provision were so excluded and (c) the balance of the Agreement shall be enforceable in accordance with its terms.

6.7    Governing Law. This Agreement and all acts and transactions pursuant hereto and the rights and obligations of the parties hereto shall be governed, construed and interpreted in accordance with the laws of the State of Delaware, without giving effect to principles of conflicts of law.

6.8    Counterparts. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original and all of which together shall constitute one instrument. Any signature page delivered by a fax machine or telecopy machine shall be binding to the same extent as an original signature page, with regard to any agreement subject to the terms hereof or any amendment thereto. Any party who delivers such a signature page agrees to later deliver an original counterpart to any party which requests it.

6.9    Titles and Subtitles. The titles and subtitles used in this Agreement are used for convenience only and are not to be considered in construing or interpreting this Agreement.

6.10    Further Assurances. Each party to this Agreement hereby covenants and agrees, without the necessity of any further consideration, to execute and deliver any and all such further documents and take any and all such other actions as may be necessary or appropriate to carry out the intent and purposes of this Agreement.

6.11    Attorneys' Fees.  If any action at law or in equity is necessary to enforce or interpret the terms of this Agreement, the prevailing party shall be entitled to reasonable attorneys' fees, costs and disbursements in addition to any other relief to which such party may be entitled.

*[Signature Page Follows]*

7

IN WITNESS WHEREOF, the undersigned have hereunto set their hand as of the day and year first above written.

COMPANY:

ARGUS SYSTEMS GROUP,
INCORPORATED, an Illinois corporation

By: _____
Name:
Title:

STOCKHOLDERS:

_____
Randall J. Sandoval

_____
Paul A. McNabb

INVESTORS:

ABM AMRO VENTURES, B.V.,
a Dutch corporation

By: _____
Name:
Title:

MERCURIUS
BELEGGINGSMAATSCHAPPIJ B.V.

By: _____
Name: FRITS F. VROMEN
Title: EXEC VP

Signature page to Voting Agreement

SENIOR MANAGEMENT EMPLOYMENT AGREEMENT

This Employment Agreement (the "Agreement") is entered into as of 1 June 2001 (the "Effective Date") by and between Randall J. Sandone ("Employee") and Argus Systems Group, Inc., an Illinois corporation (the "Company").

RECITALS

Company desires to employ Employee as President and Chief Executive Officer ; and Employee desires to be so employed;

Therefore, in consideration of the mutual covenants and agreements contained in this Agreement, and for other good and valuable consideration, the receipt and sufficiency of which is acknowledged, the parties agree as follows:

1.    *Employment.*  Employee agrees to render services customarily required of the President and Chief Executive Officer for the Company, and Company agrees to utilize these services on the terms and conditions stated below.

2.    *Duties.*  Employee will be employed as President and Chief Executive Officer for Company.  Employee will have the authority and will perform the duties specified in the Bylaws of Company for the offices to which Employee has been employed; subject however, to any limitations, instructions, directions and control the Board of Directors of Company may specify from time to time. During the term of this Agreement, Employee will devote his full time attention, skills, benefits and best efforts to the performance of the duties under this Agreement and to the promotion of the business and interests of Company.

3.    *Term.*  The term of employment under this Agreement will be 4 years, commencing on 1 June 2001, subject to earlier termination in accordance with the terms and conditions set forth below.

4.    *Compensation.*  As compensation for the services rendered under this Agreement, Employee will be entitled to receive the following:

4.1    *Salary.*  Company will pay Employee a base annual salary of the equivalent of $110,000 for the term commencing on 1 June 2001 and terminating on December 31, 2001.  Employee's base annual salary may be adjusted annually as determined by the Board of Directors, but will not be less than the initial base annual salary identified above.  The base annual salary will be payable in periodic monthly or semimonthly installments at times as may be in accordance with the practices of Company.

4.2    *Performance Bonus.*  Employee will be eligible to receive performance bonus compensation for each fiscal year that ends during the periods prior to December 31 in an amount as determined by the Board of Directors of Company in its discretion based on Company performance during the Company's prior fiscal year.  The performance bonus will be payable to Employee within 60 days after the end of Company's fiscal year or as soon as practicable after publishing Company's annual financial results.

4.3    *Withholding.*  Company will be entitled to withhold from all payments of base annual salary and from all other payments of compensation under this Agreement, amounts as may be necessary to satisfy any federal or state income tax withholding requirements or payroll tax requirements or similar assessments as required by law or as may be directed by Employee to be withheld for extended insurance coverage or Company deferred savings plans.



PLAINTIFF'S
EXHIBIT
2
tabbies

5.    *Expenses and Benefits.* Employee will be reimbursed for reasonable expenses in connection with the business of Company, including expenses for entertainment, travel, and similar matters in accordance with the standard expense reimbursement policy of Company. Company will reimburse Employee for expenses upon presentation by Employee of accounts and records as Company will from time to time require. Company also agrees to provide Employee with the following benefits:

(a)    A certain number of paid vacation days in each calendar year in accordance with the vacation policies and practices of Company, but not less than 20 business days in any calendar year. Employee will also be entitled to all paid holidays given by Company to its senior executive employees.

(b)    Coverage under major medical health insurance, term life insurance and disability insurance, and other benefit plans as are in effect under the current policies and practices of Company.

(c)    Participation in all pension and profit sharing plans established in accordance with the policies and practices of Company and the terms of the plans.

6.    *Stock Options.* Employee has been a participant in the Employee Stock Option Plan. All options granted and any anti-dilution rights currently enjoyed as of the date of this agreement shall remain in force. Employee shall be entitled to continue to participate in the Employee Stock Option Plan, with specific future option compensation to be determined by the Board of Directors.

7.    *Additional Consideration for Employment.* The Company currently purchases a life insurance policy on behalf of Employee, whereby Employee owns all benefits of the policy (cash value, death benefit, etc.). The Company shall continue this policy in force and shall pay all premiums of the policy until termination of employment.

8.    *Termination.* This Agreement and the employment relationship created will terminate upon the occurrence of any of the following events:

(a)    The expiration of the term of this Agreement as set forth in Section 3;

(b)    Written notice to Employee from Company of termination for Cause; or

(c)    The voluntary termination of his employment by Employee. For purposes of this Agreement, "Cause" is defined as Employee's conviction, by a court of competent jurisdiction, of a felony, theft of Company property, or a crime of moral turpitude, or gross negligence in the performance of Employee's duties.

*Involuntary Termination:* If Company terminates this Agreement for reasons other than those set forth in Sections 8(a) through 8(c), and without the express written consent of Randall J. Sandone, such termination shall be considered Involuntary Termination. In the event of Involuntary Termination, Company will pay to Employee the remainder of all base annual salary, signing bonus, and minimum annual bonus payable under Sections 4.1, 4.2, and 4.3 of this Agreement and due Employee under this Agreement in a one-time, lump sum payment. The parties expressly agree that the Involuntary Termination of Employee, as a company CEO and well-known industry leader, will cause professional disgrace and damage to Employee's professional reputation. Accordingly, as specific compensation for such Involuntary Termination, Company will, in addition to all other compensation as identified above, pay a one-time lump sum termination fee of $250,000 and will grant to Employee an additional 1,000,000 options to purchase common stock (exercisable over five years from the date of grant, at an exercise price that shall be equal to the price per share paid in the then most recent share offering of $500,000 or greater). Withholdings as required by local, state or federal laws or regulations shall be taken out of any final payment made to Employee, except in the event the parties agree otherwise in a written Separation and Termination Agreement. The parties expressly agree that such obligation to pay Employee such amounts due under this paragraph shall vest immediately to Employee upon the moment of his termination without Cause, and further shall be independent of, and not mitigated by, any subsequent employment Employee is able to find or obtain following any involuntary discharge by Employer.

If Employee terminates this Agreement for any reason, he shall be entitled to such final compensation and benefits as the parties shall negotiate and agree to in writing.

9    *Confidential Information.* Employee covenants and agrees that he will not knowingly at any time during the term of this Agreement, directly or indirectly, reveal, divulge, use, disclose or communicate to any person, firm or corporation, in any manner whatsoever, any Confidential Information (defined below) of or concerning Company or its subsidiaries or any other entities affiliated or associated with Company. As used in this Agreement, "Confidential Information" means information of any kind, nature and description and in any form disclosed to, discovered by, or otherwise known by Employee as a direct or indirect consequence of or through his employment by Company or the services he renders to other entities while an employee of Company, or as a result of his association with any of the above, which is not generally known by the public, including without limitation (a) software source codes, trade secrets, including, but not limited to, formulas, patterns, devices, secret specifications, and (b) any and all developments, corporate opportunities, product lines, designs, purchases, finances and financial affairs, marketing, merchandising, clients, customers, any merchandise, equipment or supply sources, systems designs, procedure manuals and the unpublished prices Company obtains or has obtained or at which it sells or has sold its services or products. In addition, Employee will execute Company's standard nondisclosure agreement.

10.    *Notices.* Any notices to be given by either party to the other may be effected either by personal delivery in writing or by mail, registered or certified, postage prepaid, with return receipt requested. Personal delivery to Company will be made to the President with a copy to the General Counsel. Mailed notices will be addressed to the respective addresses shown below. Either party may change its address for notice by giving written notice in accordance with the terms of this Section 10.

(a)    If to Employee:    Randall J. Sandone
                         1779 County Road, 1550 North
                         Urbana, IL 61802

(b)    If to Company:    Paul A. McNabb, Corporate Secretary
                         Argus Systems Group, Inc.
                         1809 Woodfield Drive
                         Savoy, IL 61874

11.    *Reimbursement of Legal Fees.* If Company breaches any term, condition or covenant of this Agreement, it shall, in addition to any other amounts Company is obligated to pay to Employee hereunder, pay all of Employee's reasonable attorney's fees, costs and expenses incurred by Employee in connection with Employee's enforcement of the terms and conditions of this Agreement pursuant to Company's breach, whether or not suit is brought and whether or not such breach is admitted by Company in any final settlement agreement.

12.    *Entire Agreement and Time of the Essence.* This Agreement contains the entire agreement of the parties and supercedes all prior agreements and understandings, oral or written between the parties. No modification or amendment of any of the terms, conditions or provisions may be made other than by written agreement signed by the parties. Time shall be of the essence to this Agreement where applicable herein.

13.    *Governing Law.* Illinois law will govern the validity, construction, enforcement and interpretation of this Agreement.

14.    *Parties Bound.* This Agreement and the rights and obligations under it will be binding upon and inure to the benefit of Company. Employee and his respective heirs, personal representatives, successors and assigns; provided, however, that the Employee may not assign any rights or obligations without the express written consent of Company. This Agreement will also bind and inure to the benefit of any successor of Company by acquisition, merger or consolidation, or any purchaser of all or substantially all of Company's assets or properties, or to any of Company's assigns.

15.    *Savings Clause.* If any one or more of the provisions contained in this Agreement will for any reason be held to be invalid, illegal or unenforceable in any respect, the invalidity, illegality or unenforceability will not affect the validity and enforceability of any other provisions. Further, should any provisions within this Agreement ever be reformed or rewritten by a judicial body, the rewritten provisions will be binding upon Company and Employee.

16    *Waiver of Breach.* The waiver by any party of a breach of any provision of this Agreement will not operate or be construed as a waiver of any subsequent breach by any party.

17.    *Descriptive Headings.* Title to paragraphs in this Agreement are for information purposes only and will not be used for interpretation of this Agreement.

18.    *Multiple Counterparts.* This Agreement may be executed in a number of identical counterparts, each of which for all purposes is to be deemed an original, and all of which constitute, collectively, one agreement; but in making proof of this Agreement, it will not be necessary to produce or account for more than one counterpart.

19.    *Other Obligations.* Employee represents and warrants that he has not as of the execution of this Agreement assumed any obligations inconsistent with those contained here.

20.    *Effective Date:* This Agreement shall be effective as of the date set forth above.

Company: Argus Systems Group, Inc.

By:

Title:    Corporate Secretary

Employee:

By: